**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERCA** | ) ) ) ) | Case No. **1:25-cr-00069-RCL-1** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **ERLEND OLSON,** | ) ) | Honorable Royce C. Lamberth |
| Defendant, | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR REVOCATION OF MAGISTRATE ORDER OF DETENTION REGARDING ERLEND OLSON**

---

Date: 4/2/2025

Respectfully Submitted,

LAW OFFICES OF CHARLES R. HASKELL, PLLC

/s/ Charles Haskell
Law Offices of Charles R. Haskell, PLLC
641 Indiana Ave. NW
Washington, D.C. 20004
P: (202) 888-2728
Charles@CharlesHaskell.com

*Attorney for Defendant Erlend Olson*

1

COMES NOW Defendant Erlend Olson, through attorney's Charles Haskell & Nick Sitterly (PVC forthcoming), and moves this Court to revoke the New Mexico Magistrate's order of detention in cause number 1:25-mj-00468-SCY under 18 U.S.C. § 3145, and alleges the following in support:

## I. INTRODUCTION

The Government's detention briefing below placed the greatest weight and focus on the strength of its case despite the long-standing precedential admonition that underlying case related facts are the weakest of the 18 U.S.C. § 3142 factors. The Government apparently chose this strategy in order to misdirect the Court from the weakness of the Government's other § 3142 arguments. For example, the flight risk arguments are premised upon Mr. Olson's alleged incarceration due to ancient misdemeanor probation violations in California for which Defense Counsel has now refuted through court documents and his St. Kitts passport which expired eight (8) years ago. Dangerousness facts are also lacking – the Government does not allege that Mr. Olson is a physical threat to any person and cannot cite a single physical threat or action against any person connected to this case. The Government makes tampering allegations due to two (2) communications where Mr. Olson advised potential witnesses to get a lawyer to assist in delaying the federal investigation. Though arguably irksome to the government, delaying an investigation through legal means is certainly not the worst act a Defendant can commit, and the Court can easily order Mr. Olson not to communicate with witnesses as a less invasive alternative to the heavy burden of pre-trial detention, which negatively impacts Mr. Olson's defense, family, community, and employment. Mr. Olson asks the Court to revoke the Order of Detention.

a. <u>Procedural History</u>

The Court should first note that of the five (5) alleged co-conspirators charged under the indictment, only Mr. Olson has been detained pending trial despite all defendants being subject to substantially the same charges and being equally positioned.

Mr. Olson was arrested pursuant to the warrant issued by this Court on March 13, 2025 on March 17, 2025, in Albuquerque New Mexico. His initial appearance was held on March 17, 2025 before the Honorable Steven C. Yarbrough, United States Magistrate Judge. (1:25-mj-00468-SCY, Doc. 3.) Mr. Olson's detention hearing was set for Thursday, March 20, 2025 before the Honorable Jennifer M. Rozzoni.

Above-signed counsel appeared on behalf of Mr. Olson after filing Mr. Olson's Response in Opposition (Doc. 9, below) to the Government's Memorandum in Support of Detention (Doc. 6, below). Pretrial Services for the District of New Mexico filed its Pretrial Services Report (Ex. A; Doc. 8, below) recommending Mr. Olson's release on his own recognizance.

The Magistrate Judge entered her Order detaining Mr. Olson the same day on March 20, 2025. (Ex. B; Doc. 12, below.)

II.   STATEMENT OF FACTS

1.   Theia Group International and its associated entities ("TGI" for purposes of this response) were first subjected to the execution of subpoena and search warrants in June of 2021, nearly four (4) years prior to Mr. Olson's post-indictment arrest on March 17, 2025. (Ex. C.)

2.   On June 25, 2021, the Government issued and executed the pleadings in Exhibit C at the Request of AUSA Leslie Goemaat (*id.* at 2) the former AUSA acting as the *de facto* point person along with AUSA Peter Lallas until her replacement by AUSA Rebecca Ross, and Agent Charles Sublett of the Internal Revenue Service who has been the lead agent from the inception

3

of the investigation to the best of Defendant's knowledge. Defendant was in frequent contact with each of these attorneys through counsel.

3. Exhibit D (Grand Jury Subpoena (Theia Holdings)) was issued on or about the same date by the same personnel.

4. The attached search warrant, Exhibit E was executed on or about the same date as part of a nationwide operation to seize information from TGI, TGI affiliates, officers, and contractors. Execution of this and associated warrants took place in three (3) separate states involving over two-dozen agents. These searches accomplished the seizure of nearly all pertinent materials to the Government's case nearly four (4) years ago.

5. Mr. Olson cooperated fully in the search of his home, effects, accounts, filter team review and all other manner of requested compliance over the previous four (4) years.

6. Communications between counsel for Mr. Olson and the Government have been extensive and cordial to date. Mr. Olson proffers that Counsel for the DOJ, including Peter Lallas, the initial key man AUSA, AUSA Goemaat, AUSA Ross, and the supervising attorney AUSA Nannette Davis, have sent over 158 emails to counsel in the four (4) years following the TGI raid, have conducted several phone calls regarding all manner of pre-indictment issues.

7. Defense Counsel attended a meeting, at Mr. Olson's expense, with DOJ Counsel in person in Washington, D.C., on October 3, 2023 to review "reverse proffer" information. (Exhibit F (Goemaat re Meeting).)

8. The Government encouraged counsel to discuss the charges and proffered evidence with Mr. Olson.

9. At the October 3, 2023 meeting, the Government left no doubt, if there had been any, that they eventually intended to proceed to indictment on similar charges to those listed in

the indictment. (Exhibit G (Goemaat re charges).). The present indictment has broken no new ground on the charges discussed in October of 2023 and anticipated as early as 2021. Therefore, the present indictment presents no new motivations or exigencies to Mr. Olson that would increase his flight risk or witness tampering risk.

10. Mr. Olson has also undergone an extensive filter review process, in which time Mr. Olson disclosed at least 250 documents comprising many hundreds of pages voluntarily (The Government seized hundreds of thousands of pages from multiple sources initially and provided copies to counsel during filter review). At no time has the government sought to compel Mr. Olson to comply with warrants or subpoenas or sought contempt or other remedies to force Mr. Olson's compliance. At no point has it been alleged that Mr. Olson obstructed this evidence gathering process.

11. Mr. Olson asks the Court to keep in mind that this case is a financial fraud case where the communications involved are largely written and electronic in nature, and the Government already possesses the vast majority of these records. Mr. Olson is therefore in no position to "tamper" with evidence in the future.

   b. <u>Despite the Government's extensive demands and communications to Mr. Olson, at no point has the Government alleged Mr. Olson's travel or potential witness communications to be improper prior to the self-serving statements in the Memorandum below.</u>

12. At no point in the previous four (4) years have the Government suggested that Mr. Olson has attempted to flee the obviously impending charges at issue in this case. The DOJ has not asked Mr. Olson,

   a. to restrict his travel,

   b. to surrender his passport,

5

    c.  to avoid travelling to certain regions, states, or nations,

    d.  to restrict specific means of travel, such as vehicle, air carrier, or otherwise,

    e.  to maintain contact with the Government or counsel during travel,

    f.  to avoid meeting with specific persons during travel,

    g.  to restrict certain activities during travel.

c. <u>The Memorandum cherry-picks bad facts while omitting the above positive facts to create an incorrect narrative</u>

13.    The worst criminal history identified by either the Government or Pretrial Services is over fifteen (15) years old on misdemeanor charges from another State. Even the proffer on these items is thin, alleging without detail violations of probation. Only the electronic docket entries were available to counsel for the Government and pretrial services, but Defense Counsel has now obtained the underlying court records and can demonstrate that Mr. Olson was never incarcerated in these matters nor failed to appear as ordered (his appearance was waived for some proceedings). (Ex. H.)

14.    While vaguely suggesting witness tampering, the Government has not alleged that Mr. Olson has threatened or intimidated any person, let alone potential witnesses. The Government has not requested, for example, that Mr. Olson:

    a.  refrain from contacting individuals,

    b.  limit the scope or topics of communications,

    c.  to refrain from text, email, or phone communications,

6

d. <u>Facts relevant to conditions of release</u>

15. The instant crime is not one alleged to involve illicit narcotics, alcohol, improper use of the internet, terrorism, etc., and no monitoring is necessary regarding the typical concerns in those areas.

16. Following the initial search, Mr. Olson voluntarily sold or surrendered all firearms in his possession. He currently possesses no firearms. Furthermore, the Government has made no allegation that Mr. Olson possesses contraband or dangerous weapons, *et cetera.*

17. Mr. Olson has been surviving on funds borrowed from friends and family as well as a modest income for providing technology consulting services. He leases his current residence. Mr. Olson's father, Chris Olson, offers to encumber his real estate and promissory notes as property bond for Mr. Olson's release.

18. The Government suggested in its argument below that Mr. Olson was hiding or withholding assets from pretrial services. This was a surprise assertion first made in the detention hearing that and is unsupported by any evidence. Mr. Olson is deeply indebted and has minimal income from the sources described in the previous paragraph.

III.   ARGUMENT

a. <u>Standard of Review</u>

18 U.S.C. 3145(b) provides for district court review, upon motion by the Government or the Defendant, of a Magistrate's release or detention order. In reviewing a Magistrate's determination, a district court should conduct a de novo review, *United States v. Delker*, 757 F.2d 1390, 1394–95 (3d Cir.1985), *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir.1985), *United States v. Maull*, 773 F.2d 1479, 1482 (8th Cir.1985) (en banc), *United States v. Hurtado*, 779 F.2d 1467, 1480 (11th Cir.1985), *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir.1985), and

7

need not defer to the Magistrate's findings or give specific reasons for rejecting them. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985); Delker, 757 F.2d at 1394–95; *Medina*, 775 F.2d at 1402.

Pretrial detention and release are governed by the Bail Reform Act (BRA), 18 U.S.C. § 3142, et seq. The BRA instructs the Court to seek "the least restrictive further condition or conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id*. § 3142(c)(1)(B). However, if the Court finds after the hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court "shall order the detention of the person before trial." *Id*. § 3142(e)(1). Where, as here, a detention ruling is based on a defendant's danger to the community, the Court must make the finding by clear and convincing evidence. *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam).

The Court's determination is governed by four factors:

1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

2) The weight of the evidence against the person;

3) The history and characteristics of the person, including

A. The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

B. Whether, at the time of the current offense or arrest, the person was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

      4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

    b. <u>A strict Constitutional framework, combined with the extensive precedential history interpreting the bail reform act, favors defendants' release prior to trial, setting a high burden which the Government has not met.</u>

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The United States Supreme Court has long recognized the constitutional limits on pretrial detention. *See id.* at 746-48 (holding that restrictions on pretrial release of adult arrestees must be carefully limited to serve a compelling governmental interest). Congress imposed procedural safeguards designed to limit detention to only those instances where it is clearly necessary. *United States v. Holloway*, 781 F.2d 124, 125-126 (8th Cir. 1986); S. Rep. No. 225, 98th Cong. 1st Sess. 8 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3191 (recognizing a detention statute may be constitutionally defective if it "fails to provide adequate procedural safeguards or if it does not limit pretrial detention to cases in which it is necessary to serve the societal interests it is designed to protect").

The statutory scheme of the Bail Reform Act favors pretrial release over detention. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985) (en banc). Any doubts regarding release should be resolved in the defendant's favor. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). As a result, only in "rare" cases should a court deny pretrial release. *Id.*, *see also United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) ("Pretrial detention is an exceptional step."); *Sabhnani*, 493 F.3d at 75 (pretrial detention is appropriate for only a limited group of offenders); *Orta*, 760 F.2d at 891 (Congress

intended that "very few" defendants would be subject to pretrial detention); *United States v. Singleton,* 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose.").

Section 3142 provides that a judicial officer must consider various release options before ordering detention. *See* 18 U.S.C. § 3142(a), (b), & (c). A defendant may be detained only if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required [or] the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). The Act requires a reasonable assurance, not a guarantee. *United States v. Xulam,* 84 F.3d 441, 444 (D.C. Cir. 1996). Any conditions imposed must be the least restrictive to reasonably assure the person's appearance and community safety. 18 U.S.C. § 3142(c)(B).

The Government bears the heavy evidentiary burden to justify pretrial detention. *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). The government must meet its burden with respect to flight risk by a preponderance of the evidence, and with respect to danger by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Charley*, 2010 WL 4338094, * 4 (D.N.M. Sept. 9, 2010) (unpublished). Clear and convincing evidence is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) (internal quotation marks omitted) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

   c. <u>The 3142(g) factors favor Mr. Olson's release.</u>

The individual 3142(g) factors are addressed in turn below.

(1) The nature of the crime – The alleged crime at issue is not one of violence, terrorism, controlled substances, firearms, or one of explosives or destructive devices, but instead is an

alleged financial crime which unfolded over a period of at least four (4) years, concluding in June of 2021 with the receivership and Government raids of the business.

(2) The Weight of Evidence –

The Government alleges from a small selection of documents that Mr. Olson defrauded a number of investors. Yet Motion does not address,

a. the authorship and review of said documents by other members of the alleged conspiracy, especially the role of TGI's Chief Financial Officer – not Mr. Olson – in a financial crimes case;

b. the nexus of any alleged falsehood or forged documents to the alleged harm; the amount in controversy of $250 million;

c. Whether the institutional lenders were shown or relied on the "forged" bank statement;

d. Whether all friends and family members were shown or relied on the "forged" bank statement;

e. the proportion of the alleged $250 million loss that was suffered by small, inexperienced investors as opposed to large institutional investors with more sophisticated means and methods of financial investigation;

f. the cause of the investor loss; or

g. the specific actions of the members of the conspiracy vis-à-vis Mr. Olson.

The detention motion below asserts that Mr. Olson will be ultimately found guilty of crimes resulting in a financial loss of approximately "$250 Million."(Gov. Mem. at 1.) However, this number lumps together institutional and non-institutional "friends and family" investors. The institutional investors' loans to TGI constitute the lion's share of any number calculated

11

regarding the total TGI loans. However, the Government has much more complex proof problems regarding institutional lenders, who have access to professional accounting services and financial evaluation mechanisms far more robust than those available to "friends and family" investors.

In continuing reliance on prejudicial argument, the motion below alleges a series of salacious facts regarding Mr. Olson's personal spending (Doc. 6 at 10, below) but fails to indicate to what extent those funds were obtained as a part of valid consulting fees, loans, or other income from TGI. These facts are unduly prejudicial given that, were the income sources legal or legitimate, Mr. Olson's personal spending decisions are irrelevant and should never be admissible. This spending does not become any more relevant by virtue of the alleged illegality of the funding source. It is likely that any law-abiding citizen would have embarrassing and private items in their spending history. Mr. Olson asks the Court to discount these unduly prejudicial arguments as a sign of weakness on the Government's part.

While Mr. Olson is at worst guilty of making misstatements resulting in the financial harms alleged in the complaint, no party disputes that Mr. Olson is an aerospace engineer formerly employed by NASA who successfully applied for numerous patents and valuable spectrum licenses issued by the Federal Communications Commission and the National Oceanic and Atmospheric Administration in connection with the start-up of the TGI corporation. Mr. Olson is not an individual who should be placed in the same category of risk as armed, violent, drug trafficking, sex trafficking, or terrorist defendants for which detention is typically sought. Furthermore, this case features no rebuttable presumption.

While the Court may weigh the length of Mr. Olson's potential sentence and the weight of evidence as somewhat unfavorable, of the various 3142(g) factors, Courts have deemed the

weight of the evidence to be the least important factor. *See, e.g, Townsend,* 767 F.2d at 1408; *United States v. Carrasco-Carrasco,* 20-cv-20061-JAR-1 (D. Kansas Dec. 22, 2020) (unpublished) (noting that the weight of the evidence factor "has been deemed the least important of the various [3142(g)] factors because, if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment") (internal quotation marks and citation omitted). Although Mr. Olson acknowledges that the charges against him are serious, and that he is facing a substantial sentence if convicted, he is presumed innocent. *See Stack v. Boyle,* 342 U.S. 1, 4 (1951) ("Unless the right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."); 18 U.S.C. § 3142(j).

> d. <u>Regarding Subsection 3, History and Characteristics, the United States cannot meet its burden to prove by a preponderance of the evidence that Mr. Olson will not reasonably assure his appearance at court proceedings, where Mr. Olson has been in full communication and compliance with the Government.</u>

**Criminal History** – Mr. Olson has no prior charges or allegations of violence, drug trafficking, child exploitation, *et cetera*., and the Government therefore strains into ancient DUI convictions to cobble together a criminal history. While the Motion attempts to use Mr. Olson's misdemeanor charges to show a flight risk, it misperceives the 3142(g) language "record concerning appearance at court proceedings." The bald recitals of probation violations in Mr. Olson's fifteen (15) year-old misdemeanor convictions do not indicate a failure to appear in Court. On the contrary, he did appear and was sanctioned, apparently, for violating probation. This is not applicable to the 3142 language.

The Motion cites not a single case to support its reliance on prior *civil* litigation in Mr. Olson's past. Mr. Olson asks the Court to disregard this information in its entirely.

**Flight Risk -** In interpreting Section 3142(g)(3), the history and characteristics of the Defendant, Mr. Olson asks the Court to remember that only a "serious" risk of flight warrants detention. *See* 18 U.S.C. § 3142(f)(2)(A); *see also United States v. Nwokoro,* 651 F.3d 108, 110 (D.C. Cir. 2011) (stressing the risk of flight must be serious). Numerous cases have addressed what is sufficient to establish by a preponderance of the evidence that a case involves a "serious" risk of flight. "In cases where only a serious risk of flight is at issue under § 3142(f)(2), it is generally accepted that more than evidence of the commission of a serious crime and the fact of a potentially long sentence is required to support a finding of serious risk of flight." *United States v. Giordano,* 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (cited by *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988)).

Turning to the Government's passport arguments, merely possessing a foreign passport, particularly one expired for eight (8) years, should be no bar to pretrial release. See, for example:

> Even accepting that he has the motive and ability to flee as argued by the Government, I find that my conditions of release are sufficient but not greater than necessary to reasonably assure his appearance as required. The GPS monitor combined with the surrender of his passport and the prohibition on visiting commercial transportation establishments are a direct impediment to him fleeing.

United States v. Runsdorf, 22-8015-WM (S.D. Fla. Jan. 24, 2022) (unpublished).

> As previously discussed, there is not a serious risk of flight in this case because Mr. Djoko has strong ties to the Western Washington area, his family has offered him support, and Mr. Djoko has complied with the legal process in this case.

United States v. Djoko, 1:19-cr-0146 (W.D. Wash. Oct. 1, 2019) (ordering surrender of passport among other conditions assuring appearance) (unpublished).

The Motion makes no attempt to argue that Mr. Olson has evaded the Government over the previous four (4) years, or ever, aside from a highly tangential and now debunked argument about DUI probation violations over ten (10) years prior to the instant charges.

In detailing a previous prosecution of Mr. Olson, the Government does not allege a failure to appear or an attempt to thwart or evade the jurisdiction of that Court. Strikingly, the Motion fails to address potential means of securing Mr. Olson's appearance – because there has never been a problem reaching Mr. Olson or obtaining his cooperation. The Government's memorandum below makes a tortured argument to the effect that, because Mr. Olson speculated in a message that his wife might flee the jurisdiction in his litigation of his family law case, Mr. Olson therefore intends to flee federal criminal charges now. This Government logic is bizarre and should be rejected. Mr. Olson's concerns about another individual's flight risk should not be imputed to himself.

Mr. Olson's history of extensive and willing cooperation in the Government's discovery process should weigh in his favor on this factor.

**Ties to the Community –** Mr. Olson has resided in Albuquerque, New Mexico with his children during his periods of custody over the children for the previous ten (10) years. His father also lives in Albuquerque, New Mexico and is willing to provide a property bond for Mr. Olson.  Mr. Olson's father has extensive health needs and depends on Mr. Olson for support.

**Conclusion re History –** The Government has an impossible question to answer: if Mr. Olson's history is so deeply concerning, why has the Government been content to wait four (4) years to place him into custody, given that nearly all necessary evidence to the indictment was seized four (4) years ago? The answer is that Mr. Olson's history poses no danger rising to a level warranting detention. He therefore asks the Court to find in his favor on Subsection 3.

15

e. <u>Dangerousness</u>

In reviewing the fourth 3142(g) factor, the nature and seriousness of the danger to any person or the community that would be posed by the person's release, Mr. Olson asks the Court to bear in mind that the Bail Reform Act "authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community ***which no conditions of release can dispel***." *Salerno*, 481 U.S. at 755 (emphasis added). Regarding dangerousness, Congress reasoned:

> [T]here is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.

S. Rep. No. 225, 98th Cong. 1st Sess. 6-7 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3189.

The exhibits attached to the Government's memorandum below are poor evidence of Mr. Olson's purported threatening behavior. Furthermore, these scattered, cherry-picked records are poor evidence of anything other than perhaps Mr. Olson imprudently expressing opinions regarding the intent of the Department of Justice. In four (4) years, these messages represent the best evidence the Government was able to find in favor of detention. No threats are made, no evidence is suppressed or hidden – bear in mind the extensive filter review with which Mr. Olson complied – no hints of violence or inducement are present. It is frankly beyond the pale for the Government to suggest at this late stage after Mr. Olson's years of compliance that he is somehow a danger to the Government's financial documents case for which all evidence has already been seized.

Inversely, rather than Mr. Olson posing a tampering threat to any aspect of the Government's witnesses or case, Mr. Olson's detention would substantially tamper with Mr.

Olson's defense, as Mr. Olson would be unable to maintain employment to pay legal fees, to meet freely and review evidence with counsel rather than having to undergo the arduous process of meetings in detention, to communicate via phone, email, or text message, and would force counsel to travel extensively to effectively meet with Mr. Olson. The Government seems unconcerned with the impact that Mr. Olson's detention would have on his circumstances, all while drawing vague dangers out of a smattering of Mr. Olson's emails.

## IV.    CONCLUSION

Mr. Olson therefore asks this Court to weigh the Section 3142(g) factors in totality in his favor and revoke the Order below.

## **CERTIFICATE OF SERVICE**

    I, Charles Haskell, hereby certify that the foregoing pleading was served on all parties via the CM/ECF filing system on April 4, 2025.

                                                                /s/ Charles Haskell
                                                                CHARLES HASKELL
                                                                Attorney for Defendant Olson