**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 25-CR-69-1 (RCL)** |
| | : | |
| **ERLEND OLSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR REVOCATION OF MAGISTRATE ORDER OF DETENTION

The United States of America, by and through the undersigned attorneys, respectfully submits this opposition to the defendant's Emergency Motion for Revocation of Magistrate Order of Detention, ECF No. 26 (the "Motion"). The defendant orchestrated a scheme to defraud approximately 200 investors and lenders of more than $250 million, subjecting him to a potential life sentence under the government's preliminary estimate of the applicable sentencing guidelines. He has spent more than a decade going to great lengths to conceal his income and assets to avoid paying his taxes, including directly lying to government officials. He has significant foreign ties and is a dual citizen of St. Kitts and Nevis—a country that offers visa-free travel to many countries without extradition treaties. And he actively attempted to tamper with witnesses during the pendency of this investigation. These facts and others led the Magistrate in the District of New Mexico to correctly find by a preponderance of the evidence that there are no conditions or combination of conditions that can reasonably assure the appearance of the defendant and order him detained pending trial. Exhibit 1. Now, more than two weeks later and while the defendant is in the process of being transported to the District of Columbia, the defense files what it styles as

1

an "emergency motion" to secure the defendant's release. *See* Def. Mot. In doing so, the defendant offers no new argument to negate his risk of flight. The same facts and circumstances which supported the New Mexico court's decision counsel in favor of the same finding here. The defendant's motion, therefore, should be denied.

## I. <u>Procedural History</u>

The defendant is charged by indictment in the District of Columbia with one count of Conspiracy to Commit Wire and Mail Fraud, in violation of 18 U.S.C. § 1349, five counts of Wire Fraud, in violation of 18 U.S.C. § 1343, one count of Mail Fraud, in violation of 18 U.S.C. § 1341, and four counts of Tax Evasion, in violation of 26 U.S.C. § 7201. *See United States v. Olson et al.*, Case No. 25-CR-69-RCL. The defendant was arrested in the District of New Mexico and made his initial appearance there on March 17, 2025. At that time, the government informed the Court that it was requesting detention based on the defendant's risk of flight and obstruction of justice. A detention hearing was set for March 20, 2025. The government filed a Memorandum in Support of Detention, and the defense filed a response. After a lengthy hearing, the judge found that "the government [had] shown by a preponderance of the evidence that Mr. Olson is a flight risk" and that each of the factors under 18 U.S.C. § 3142(g) favored detention. Exhibit 1. The defendant was ordered detained pending trial and to be transported to the District of Columbia. Exhibit 1.

## II. <u>Legal Authority and Argument</u>

Under 18 U.S.C. § 3145(b), a defendant may challenge a magistrate judge's order of detention before the assigned district judge. The court's review is *de novo* and governed by the standards set forth in 18 U.S.C. § 3142. *See United States v. Cole*, 459 F.Supp.3d 116, 120 (D.D.C. 2020). Under that statute, the Court "shall order the detention of the [defendant] before trial," 18

2

U.S.C. § 3142(e)(1), if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration of "the available information concerning" enumerated factors, *id*. § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id*. § 3142(e)(1).

The Court must consider the following factors in determining whether an individual is a flight risk: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence." *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

The Court should conclude after considering these factors that there is no condition or combination of conditions that would assure appearance of the defendant in court. *See* 18 U.S.C. § 3142(e)(1).

## A.    <u>Nature and Circumstances of the Offense Charged</u>

For investors, the defendant was the face of Theia Group Incorporated ("Theia")—an aerospace company he founded that purportedly was going to launch satellites and revolutionize the world by providing continuous remote sensing data for the entire globe simultaneously. Theia

3

never launched any satellites nor received any income. But the defendant and his co-conspirators raised more than $250 million from approximately 200 investors/lenders through a series of misrepresentations about Theia's financial position, contracts with third parties, and technical capabilities. Of that $250 million, the defendant took approximately $9 million for himself, which he hid from the U.S. Government, on top of more than $1.2 million in back taxes he already owed.

The indictment, which is incorporated by reference, ECF No. 1, provides a fulsome explanation of the investment fraud scheme and the defendant's tax evasion.

As indicated in the indictment, the defendant went to extreme lengths to deceive investors and to conceal the truth about Theia's business. For example, to substantiate the claim that Theia had $6 billion in escrow from sovereign nations who wanted access to data that would be generated from Theia's satellites, the defendant created a fake bank statement showing a balance of more than $6 billion. However, in doing so, the defendant took Theia's actual operating account ending in -8023 and simply added $6 billion to the balance.



Theia's True Account Statement                    The Fake Escrow Statement

Similarly, when pushed for audited or certified financial statements from an investment

group interested in making a nearly $25 million in Theia, the defendant and his co-conspirators concealed the actual audit report performed by a renowned accounting firm. That audit showed that Theia had no revenue and no money in escrow. It also expressed "substantial doubt" that Theia would continue as a going concern one year from the date the audited financial statements were issued. In an email, the defendant called the audit an "absolute disaster," and he and one of his co-defendants set out to find an alternative to provide to the investment group. The defendant and a co-defendant sent an accountant in Cypress false financial statements showing revenue and $6 billion in escrow and paid her $25,000 to "certify" the bogus statements. Those certified financials were then sent to the investment group, while the audit was concealed.

The defendant also curated his lies based on his audience. For example, on March 21, 2020, the defendant sent individual investors a question-and-answer document claiming: (1) Theia had $6 billion in escrow; (2) Theia had a contract with the U.S. government generating $3.8 million per month; and (3) Theia had $153 million in cash-on-hand. However, just six days later, on March 27, 2020, Olson sent a large institutional investor with the means to do more thorough due diligence a nearly identical question-and-answer document excluding any mention of billions of dollars in escrow or any current revenue.



| Sent to Individual Investors 3/21/2020 | Sent to Institutional Investors 3/26/2020 |

In reality, Theia had no money in escrow, no revenue, no contract with the U.S. government, and just over $2 million in cash.

The tax charges in the indictment show that the defendant's penchant for lies and deceit

extended not just to investors, but also the government. Knowing that he owed more than $1 million to the IRS, the defendant ensured that most of his compensation from Theia was received through a holding company called Meridian Vector Corporation ("MVC"). The defendant ensured that neither Theia nor MVC reported the defendant's income to the IRS.

| Message | |
| --- | --- |
| From: | Erlend Olson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8D518969227E445A9866003D3D450557-EOLSON] |
| Sent: | 2/3/2020 1:17:41 PM |
| To: | |
| Subject: | Fw: Your tax form is ready |

I do not receive a 1099 from THEIA. Please make sure that a 1099 is NOT sent to the IRS with respect to me.

Call me to discuss if needed.

Perhaps most brazenly, on April 2, 2018, the defendant purchased a personal Range Rover through MVC for more than $130,000. *See* Exhibit 2. One day later, on April 3, 2018, the defendant emailed an Assistant United States Attorney in the Central District of California stating he did not have the means to pay an approximate $90,000 penalty for failing to file a Report of Foreign Bank and Financial Accounts (FBAR) and needed to negotiate a payment plan. *See* Exhibit 3.

The defendant's conduct in this case is egregious. And his pattern of lies and deceit in this case alone should give the Court no confidence that he could comply with any combination of conditions of release. Such serious misconduct exposes the defendant to severe consequences. If convicted of every charge in the indictment, the defendant faces a maximum sentence of 160 years' incarceration, and the government computes his advisory guideline sentence as life in prison, given the size of the loss, the nature of the scheme, and the defendant's role in the crimes. The possibility of such a substantial sentence incentivizes desperate measures, such as flight and witness

6

tampering.

The defendant's only argument with respect to this factor is to say that the "crime at issue is not one of violence, terrorism, controlled substances, firearms or one of explosives or destructive devices." Def. Mot. At 10. However, this completely misses the point. In a case where the government seeks detention under 3142(f)(2)(A), the Court evaluates the nature and circumstances of the crime not as to whether they suggest the defendant is dangerous, but rather whether the circumstances of the case suggest that the defendant could follow the conditions set by the Court and would appear as required. Here, the facts of the defendant's rampant dishonesty suggest that the defendant cannot be trusted—not with investors, not in his dealings with the IRS, and certainly not to follow a court's release order when he faces such a significant sentence. The nature and circumstances of the crime thus weigh heavily in favor of detention.

## B.     <u>Weight of the Evidence Against the Defendant</u>

The second factor to be considered, the weight of the evidence, also demonstrates the necessity for detention. The evidence against the defendant is very strong. Contrary to the defendant's claim to the contrary, Def. Mot. at 11, the government has spoken to dozens of investors, who all describe the defendant as the primary purveyor of the false information material to their investments. Put more simply, the witnesses state that it was the lies told primarily by the defendant that caused them to invest. Moreover, the government need not only rely on witness testimony. The defendant is on a number of recorded calls and videos stating Theia had $6 billion in escrow, millions of dollars in monthly revenue, revenue producing government contracts, and more than $100 million in cash-on-hand. None of which was true.

Numerous Theia employees and principals have also been interviewed in this investigation.

7

Their testimony, along with thousands of documents, paint a clear picture: nothing happened at Theia without the defendant's knowledge. He cannot claim he was unaware that the information he peddled to investors was false. Such claim is not supported by the record.

For example, with respect to the fake escrow statement, the defendant used the same playbook in a scheme in his personal life. In July 2020, the defendant and his wife were looking to purchase luxury homes in Las Vegas, Nevada. Because of the high price range, the agent that they were working with requested "proof of funds or financials to submit to the sellers" to book showings of potential homes. In response, the defendant repurposed and further altered the fake escrow statement he derived from Theia's actual bank statement. This time, instead of adding $6 billion to Theia's bank statement, the defendant only added $10 million. However, he made a mistake, leaving the word "escrow" on the statement. *See* Exhibit 4.



Theia's True Account Statement                    The Fake Escrow Statement





<u>Sent to Las Vegas Real Estate Agent</u>

The defendant was the founder, owner, primary manager, and primary fundraiser for Theia. The evidence clearly shows he told scores of lies to investors, which he knew were false.

Given the strength of the government's case, the defendant understandably tries to minimize the importance of this factor, alluding to a "long-standing *precedential* admonition that underlying case related facts are the weakest of the 18 U.S.C. 3142 factors." Def. Mot. at 4 (emphasis added). Oddly, the defendant only cites a 9th Circuit case and an unpublished opinion from the District of Kansas in support of this proposition. In this district, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then-Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are— in accordance with the specific facts of this case—to determine whether pretrial detention is

9

appropriate." *Id*. at *10.   In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's

decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).

The Second Circuit reached the same decision after a thorough and careful analysis of the issue.

*See United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow

*Blackson* and *Zhang*; this factor should be given no less weight than any other factor. Here, the

weight of the evidence is strong. And such formidable evidence in concert with huge sentencing

exposure creates a strong incentive to flee. This factor weighs heavily in favor of detention.

### C.    **The Defendant's History and Characteristics**

The defendant has a criminal history, business history, and personal characteristics all

suggesting that no combination of conditions would assure his appearance in Court.

*The Defendant's Criminal History*

 The defendant has two prior convictions for driving under the influence of alcohol or

drugs. It is his performance under supervision on those cases, though, that suggests he could not

abide by conditions of release. On February 27, 2009, the defendant was found guilty in Orange

County Superior Court Case 08HM011947 of driving under the influence. On April 29, 2009, he

was sentenced to three years of probation. Within two months, on June 25, 2009, the defendant

had already violated his probation. Def. Mot. Ex. 2. On December 28, 2009—less than eight

months after being sentenced—the defendant violated probation again and had his probation

revoked. Def. Mot. Ex. 9 at 4. He was sentenced to 30 days jail, but the sentence was stayed

provided that the defendant completed an alcohol offender program.[1] Def. Mot. Ex. 9 at 4. Even

---

[1] At the time of the detention hearing in New Mexico, both the government and the court were under the impression
that the defendant was sentenced to and served 30 days in jail for this violation, as indicated on the Pretrial Services
Report. *See* Def. Mot. Ex. 2 at 6. The defendant has since produced documentation indicating that the imposed
sentence was suspended. Def. Mot. Ex. Ex. 9 at 13. Nevertheless, the fact remains that the defendant violated the

after that violation, the defendant violated his probation again in 2011 and had his probation revoked on June 13, 2011. Def. Mot. Ex. 9 at 6.

Less than a year after his first revocation of probation and while still on probation, the defendant was again arrested on December 17, 2010. He was charged with driving under the influence of drugs and alcohol and pleaded guilty on February 15, 2012. The defendant was sentenced to 45 days in jail followed by five years of probation. While the defendant brushes aside this history as "ancient," the defendant was in his 40s at the time of his noncompliance. The defendant repeatedly violated his conditions during his only periods of court-ordered supervision. Taken together with the history and characteristics outlined below, the Court should have no confidence that the defendant would comply with any conditions of release.

### The Defendant's Business History and History of Dishonesty with the Government

The indictment in this case details the defendant's history of lies dating back to 2017, but his history of deception spans nearly a decade earlier. Prior to Theia, the defendant was the founder and Chief Executive Officer of a company call Terralliance. *See* Exhibit 5. Terralliance sought to use remote sensing technology to map underground oil and gas reservoirs and other minerals. *Id*. That information purportedly could be used to assist petroleum engineers in deciding where to drill. *Id*. In 2008, the defendant was negotiating $1.1 billion in financing from the sovereign wealth fund of Singapore (the "Wealth Fund"). *Id*. Before closing the deal, an independent audit revealed that the defendant had spent more than $4 million on personal expenses to include family vacations, visits to gentlemen's clubs, and jewelry purchases. *See* Exhibits 6 & 7. Passport Management ("Passport"), a hedge fund, agreed to make a bridge loan to Terralliance while it

---

conditions of his supervision, and his probation was revoked.

attempted to close the deal with the Wealth Fund, but only if the defendant agreed to repay $4,438,989 to Terralliance. Exhibit 6 at 1-2. The defendant executed a promissory note for the amount but defaulted on the note. Exhibit 6 at 2. The defendant was terminated by Terralliance, which itself defaulted on the bridge loan from Passport Capital. Exhibit 6 at 2. The note was assigned to Passport, who eventually sued the defendant to collect on the note. *See Passport Management, LLC v. Olson*, 30-2010-346521 (Cal. Super. Ct.). After a trial, the court in that case ruled that Olson in fact owed the money to Passport. *See* Exhibit 6 & 8. As outlined in numerous news articles about the defendant's time at Terralliance, there are many similarities to the instant case, including misrepresentations to investors and lenders. *See* Exhibit 5. However, the judge's order in the Passport lawsuit and the defendant's embezzlement of millions of dollars of Terralliance funds is indicative of the defendant's pattern of dishonesty, which make release conditions untenable.

Additionally, as described in the indictment and above, the defendant's tax evasion scheme involved various lies and omissions to the government, including the lies to the Assistant United States Attorney in California described, *supra*. The investigation in this case also revealed that the defendant lied under penalty of perjury. For example, the defendant had a large outstanding California franchise tax liability. In February 2019, he filled out a financial statement with the California Franchise Tax Board to show that he had a financial hardship and seek a payment plan. Exhibit 9. On that form, which the defendant signed under penalty of perjury, the defendant vastly underreported his income and concealed the MVC bank account. *Id*. Most egregiously, the defendant claimed he was paying $10,200 in monthly estimated tax payments, when he was paying no taxes and actively evading payment. *Id*. This, like all the defendant's dishonest conduct,

demonstrates that the defendant could not be trusted to comply with release conditions, even if he swore to do so under oath.

The defendant responds to these facts by asking the Court to disregard it because it relates to prior civil litigation. Def. Mot. at 14. However, in considering a defendant's history and characteristics, the statute explicitly states that a court shall take into account available information concerning, among other things, a person's character, employment, and past conduct. 18 U.S.C. § 3142(g)(3)(A). The fact that, following a trial, a court found the defendant liable for more than $4 million he embezzled from his former company by a preponderance of evidence—the same standard at issue here—is no doubt relevant and properly considered in evaluating the defendant's character.

### *The Defendant's Personal Characteristics*

The defendant is a 61-year-old man with no ties to the District of Columbia. He has gone out of his way to keep no assets in his name. And in addition to his outstanding tax liability, he faces significant civil exposure in current and future litigation on notes in Theia he personally guaranteed. A bond is not a viable option and any type of home confinement with location monitoring in New Mexico is not feasible, as he would necessarily have to travel regularly to the District of Columbia to face prosecution in this case.

It is the defendant's foreign ties, though, that are most concerning. As outlined in the indictment and the materials provided on Terralliance, the defendant has cultivated a large network of contacts with means inside and outside the United States throughout the previous decades. He has also, at times, had access to private air travel.

In 2007, the defendant and his wife paid $250,000 to become a citizen of St. Kitts and

Nevis ("SKN") and obtained a passport. Exhibits 10 & 11. An SKN passport allows visa-free travel to more than 100 countries, including numerous countries with which the United States does not have extradition treaties. *Visa-Free Countries*, https://www.foreign.gov.kn/travel/.

Evidence in this case shows the defendant has previously considered using his SKN citizenship to circumvent rules. In June 2020, the defendant sought to travel to France for business, but Covid restrictions prevented travel from the United States to the European Union. The defendant suggested traveling to France from SKN as an SKN citizen. Exhibit 12. He even suggested falsely claiming to French authorities that he resided in Ireland with an associate. Exhibit 12.

While the defendant's known SKN passport is currently expired, the defendant's own words in evidence collected in this case demonstrate that an expired passport or even surrendering passports does little to mitigate his risk of flight. Exhibit 13. In 2015, the defendant's wife (J.O.) was involved in legal proceedings and eventually held in contempt. In an email, the defendant outlined why J.O. surrendering all her passports would do little to prevent her from fleeing. *Id*. Specifically, the defendant stated,

> I would add that [J.O.] producing her passports (even if she does, in fact, produce them all) does little to stop her from fleeing. Her most likely course of action is to go to SKN on a private yacht . . . It would only be a couple day trip, and [J.O.] probably has the cash on her to pay for it straight away . . . On arrival in SKN sans passport, she will say she lost her passport and obtain a new one, since she is a citizen of that country. As you may know, an SKN passport allows visa-free travel [to] more countries than just about any passport but maybe a UK passport.

*Id*.

Furthermore, it is worth noting that the defendant did not see the expired passport as any hindrance in his email communication regarding flying to France in 2020. Exhibit 12.

It is clear that the defendant has thought about how to flee. Through his SKN citizenship

and wealthy contacts, he has means to flee. And given his criminal exposure and evidence against him, he has a motivation to flee. He has previously failed under court-ordered supervision and has a history of lying to the government, even under penalty of perjury. This factor overwhelmingly favors detention.

**D.**     **Danger to the Community**

The fourth factor is the nature and seriousness of the danger to any person or the community posed by the defendant's release. Throughout the course of the investigation in this case, the defendant has attempted to tamper with witnesses or otherwise impede the government's investigation. In *United States v. Manafort*, Judge Jackson recognized that "danger" under the Bail Reform Act does not just apply to the "typical varieties of harm . . . such as dangerous substances being peddled on the street, or the unlawful possession of firearms." 17-CR-201 (ABJ), Dkt. 328 at 17. Both harm to the administration of justice and to the integrity of the courts are "entitled to the full protection of the Bail Reform Act." *Id; see also United States v. LaFontaine*, 210 F.3d 125, 134–35 (2d Cir. 2000) (holding that witness tampering in a white-collar case could support a finding of dangerousness under the 3142(g) factors).

The investors in this case have a deep desire to recoup the money they invested in Theia. Generally, investigators have heard from witnesses that the defendant suggested cooperation with the government's investigation and particularly, the prosecution of the defendant, would impede the ability of a buyer to purchase Theia's assets from receivership and make the investors whole. In an email to Associate 1 from the indictment—who provided updates to many investors—the defendant suggested that the potential buyer of Theia's assets would not want to work with those who cooperated with the investigation. Using coded and qualified language, the defendant stated

15

the buyer "will likely give opportunity to those who supported him closing," while not wanting to work with those who are making it "more difficult to keep [Theia's] core team intact." The defendant went on to say, "So, it would be suggested by some that those who get subpoenas from [the lead investigator] exercise their due process rights according to the best and proper way that preserves their potential future with all things that could become very positive." *See* Exhibit 14.

The defendant's most concerning incidence of witness tampering, though, involved messages with Witness-1 over Signal—an encrypted messaging application. Throughout the conversation, which is excerpted as Exhibit 15, the defendant: (1) assisted in drafting a statement to be provided to the lead investigator; (2) suggested several times that Witness-1 ask for immunity to "delay" the investigation; (3) suggested that the defendant would make sure Witness-1's legal fees were paid; and (4) told Witness-1 to withhold specific pertinent information.

The defendant took these actions prior to the case being charged. Now, that he has been indicted and is facing a potential life sentence, there is reason to think the defendant will take desperate measures to avoid a conviction.

In response to these arguments and others, the defendant argues that he has known about this investigation for years and has not fled. He also argues that the Court should consider how "cooperative" he has been during the pendency of the investigation. The defendant was not "cooperative" while he attempted to tamper with witnesses, and anyway the calculus changes considerably now that the defendant has actually been charged. The Court should reject these arguments, just as they were rejected by the judge in the District of New Mexico:

> Finally, Mr. Olson argues that during the past four years he has been cooperative with the government in its investigation in this case, and that this fact should weigh in favor of release. This argument does not account for what appears to be his attempts at influencing and discussing his case with potential victims and witnesses

16

as recently as the spring of 2024 *(see, e.g.,* Doc. 6, Exhibit 15). Specifically, Mr. Olson used an encrypted messaging application to discuss the investigation, explicitly referencing one of the case agents (Sublett) and ways that the witness could "delay" matters with the IRS. Mr. Olson also agreed to pay the witness's legal fees, and acknowledged that he signed a tolling agreement that should have eliminated a "rush" in the continued investigation. Now that Mr. Olson has been formally charged in this case, as the Government points out, he has every reason to flee using any means and his contacts abroad. This fact also weighs in favor of detention.

Exhibit 1.

### III. <u>Conclusion</u>

After examining the four factors, the Court should find by a preponderance of the evidence that there are no conditions or combination of conditions that will ensure the defendant's appearance at future court hearings, and that he should be detained. Therefore, the government respectfully requests that the Court issue an Order denying defendant's motion.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By: _____

Joshua A. Gold
TX Bar No. 24103101
Rebecca G. Ross
N.Y. Bar No. 5590666
Assistant United States Attorney
U.S. Attorney's Office
601 D St NW
Washington, D.C. 20530
Office: 202-815-8965
Joshua.Gold@usdoj.gov

KAREN E. KELLY
Acting Deputy Assistant Attorney General

By:     _/s/ Alexis S. Hughes_____
Alexis S. Hughes
D.C. Bar No. 90017487
Department of Justice Tax Division
150 M Street, N.E., Room 1.1405
Washington, DC 20002
alexis.hughes@usdoj.gov

18