# EXHIBIT 1

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT
### for the
District of New Mexico

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| Erlend Olson | ) | Case No. | 25-MJ-468 SCY |
| | ) | | |
| *Defendant* | ) | | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☐ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

☑ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted.  This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A.  Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which the maximum term of imprisonment of 10 years or more is prescribed; **or**

☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☐ **(e)** any felony that is not otherwise a crime of violence but involves: **(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; *and*

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; *and*

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; *and*

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

AO 472 (Rev. 11/16) Order of Detention Pending Trial

❏ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

❏ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

❏ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

❏ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

❏ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

❏ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

❏ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

❏ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

**OR**

❏ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

## Part III - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

❏ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☑ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

☑ Weight of evidence against the defendant is strong
☑ Subject to lengthy period of incarceration if convicted
☑ Prior criminal history
❏ Participation in criminal activity while on probation, parole, or supervision
❏ History of violence or use of weapons
☑ History of alcohol or substance abuse
❏ Lack of stable employment
❏ Lack of stable residence
❏ Lack of financially responsible sureties

AO 472 (Rev. 11/16) Order of Detention Pending Trial

- ❑ Lack of significant community or family ties to this district
- ☑ Significant family or other ties outside the United States
- ❑ Lack of legal status in the United States
- ❑ Subject to removal or deportation after serving any period of incarceration
- ❑ Prior failure to appear in court as ordered
- ❑ Prior attempt(s) to evade law enforcement
- ❑ Use of alias(es) or false documents
- ☑ Background information unknown or unverified
- ☑ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:

In reaching its decision, the Court considered the current indictment against Mr. Olson, filed March 13, 2025 in the District of Columbia; the Government's Memorandum in Support of Pretrial Detention and its exhibits (Doc. 6); Mr. Olson's Response and Memorandum in Opposition to Detention Motion and its exhibits (Doc. 9); and the pretrial services report and recommendations. The Court considered 18 U.S.C. Sec. 3142 and relevant case law. Finally, the Court also heard argument from the Government and Mr. Olson's attorney. In addition to the factors above, the government has shown by a preponderance of the evidence that Mr. Olson is a flight risk for the following additional and expounded reasons under 18 U.S.C. Sec. 3142(g):

Nature and circumstances of the offense: Mr. Olson is charged with eleven counts including conspiracy to commit wire and mail fraud (Count 1), aiding and abetting wire fraud (Counts 2-6), aiding and abetting mail fraud (Count 7), and tax evasion (Counts 8-11). The indictment also includes a forfeiture allegation. Mr. Olson is alleged to have created and engaged in a scheme that defrauded approximately 200 investors and lenders of over $250 million. If convicted of all counts, Mr. Olson faces a maximum prison sentence of 160 years, and a Sentencing Guideline range of life in prison. These facts all weigh in favor of detention.

Weight of the evidence: The government's recitation of the facts is compelling. The lion's share of evidence, as the defense concedes, is found in what is likely in excess of a million documents. The evidence also includes video and recorded phone calls. Mr. Olson's knowledge of the scheme appears to be significant as the example documents provided by the government suggest he not only forged company financial documents related to his business, but also used similar forged company documents in relation to his personal financial transactions. This factor also weighs in favor of detention.

History and characteristics: Mr. Olson retains dual citizenship with St. Kitts and Nevis. While his passport has expired, the Government has shown that he is keenly aware of how he could travel to St. Kitts and Nevis to obtain a new one. Notably, St. Kitts and Nevis offers visa-free travel to many countries without extradition treaties with the United States. Mr. Olson has also shown an inability to comply with court orders and his veracity is questionable. Over the course of two separate driving under the influence convictions in the state of California, admittedly 17 and 15 years ago respectively, Mr. Olson failed to comply with his probation requirements on at least four separate occasions. The Court notes that in both instances Mr. Olson did eventually complete his probationary period. Notably, however, one of the violations resulted in 30-days' imprisonment. Mr. Olson's attorney states that Mr. Olson has no recollection of what he did, or did not do, that resulted in a month-long incarceration. The Court finds this difficult to believe. The Court also notes Mr. Olson's misrepresentations to government officials and in financial statements—the first related to his alleged inability to pay a $90,000 penalty the day after purchasing a $130,000 vehicle and the second where he claimed he was (continued on page 4)

## Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____03/20/2025_____    _____
                                        United States Magistrate Judge

OTHER REASONS OR FURTHER EXPLANATION, CONT.

making $10,200 monthly estimated tax payments when in reality he was paying nothing. Mr. Olson's history and characteristics weigh heavily in favor of detention as he has shown an inability to comply with court orders and a willingness to be deceitful about matters of great importance.

Finally, Mr. Olson argues that during the past four years he has been cooperative with the government in its investigation in this case, and that this fact should weigh in favor of release. This argument does not account for what appears to be his attempts at influencing and discussing his case with potential victims and witnesses as recently as the spring of 2024 (*see, e.g.*, Doc. 6, Exhibit 15). Specifically, Mr. Olson used an encrypted messaging application to discuss the investigation, explicitly referencing one of the case agents (Sublett) and ways that the witness could "delay" matters with the IRS. Mr. Olson also agreed to pay the witness's legal fees, and acknowledged that he signed a tolling agreement that should have eliminated a "rush" in the continued investigation. Now that Mr. Olson has been formally charged in this case, as the Government points out, he has every reason to flee using any means and his contacts abroad.  This fact also weighs in favor of detention.

# EXHIBIT 2

STOCK NO JA381770
SOURCE

**JAGUAR** **LAND ROVER**

**Jaguar Land Rover**
**Albuquerque**
5010 Alameda Blvd NE
Albuquerque NM 87113
(505) 797-3600

**Land Rover Santa Fe**
2592 Camino Entrada
Santa Fe NM 87507
(505) 474-0888
Fax (505) 474-0142

DEAL # 738

CUSTOMER NAME ERLEND OLSON

SALESMAN
DATE 04/02/2018
BUS PHONE
RES PHONE (949) 630 5758

| NEW | USED | COLOR | 1AA/FUJI WHITE | TRIM | | APPROX DEL DATE 04/02/2018 | R O S NO |
|-----|------|-------|------|------|---|---|---|

| YEAR | CYL | MAKE LANDROVER | MODEL RANGE ROVER | I D NO SALGS5REXJA381770 | LICENSE NO | MOTOR VEHICLE |
|------|-----|------|------|------|------|------|
| 18 | 8 | ODOMETER READING 106 | TYPE MP | KEY NO | TAB NO | $ 123961.00 |

FILL OUT THIS SECTION IF USED CAR IS TO BE TRADED IN

YEAR N/A     MAKE N/A     MODEL N/A

ID NO N/A               LIC NO N/A

ODOMETER READING N/A           TAB NO

BALANCE OWED TO _____ N/A ___ BY _____

ADDRESS

| | ON CAR | ADD TO | | | |
|---|---|---|---|---|---|
| | | | | | N/A |
| | | | | | N/A |
| | | | | | N/A |
| | | | CALTEX | | 1134.00 |
| | | | | | N/A |
| | | | | | N/A |
| | | | LAND ROVER PPM | | 1350.00 |
| | | | | | N/A |

**WARRANTY INFORMATION**

(Buyer initials) **NEW VEHICLES AND DEMONSTRATORS** THIS VEHICLE IS SOLD WITH A MANUFACTURER'S LIMITED WARRANTY "THE MANUFACTURER'S LIMITED WARRANTY IS BUYER'S EXCLUSIVE REMEDY FOR ANY DEFECTS IN THE VEHICLE DEALER MAY PERFORM REPAIRS UNDER THE MANUFACTURER'S LIMITED WARRANTY, BUT DEALER IS NOT RESPONSIBLE FOR THE **MANUFACTURER'S LIMITED WARRANTY** OR FOR ANY IMPLIED WARRANTIES MADE BY THE MANUFACTURER DEALER MAKES NO WARRANTY ON THIS VEHICLE AND DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IF ANY WARRANTY IS DEEMED TO HAVE BEEN MADE BY DEALER, OR IF THIS VEHICLE IS SOLD WITH A SERVICE CONTRACT, THE TERMS OF ANY SUCH WARRANTY OR SERVICE CONTRACT ARE AS PROVIDED THEREIN, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED TO THE DURATION OF SUCH WARRANTY OR SERVICE CONTRACT, AND BUYER'S EXCLUSIVE REMEDY IS REPAIR OR REPLACEMENT OF DEFECTIVE PARTS BY DEALER

(Buyer initials) **USED VEHICLES** "NEW MEXICO LAW REQUIRES THAT THIS VEHICLE WILL BE FIT FOR THE ORDINARY PURPOSES FOR WHICH THE VEHICLE IS USED FOR FIFTEEN DAYS OR FIVE HUNDRED MILES AFTER DELIVERY, WHICHEVER IS EARLIER, EXCEPT WITH REGARD TO PARTICULAR DEFECTS DISCLOSED ON THE FIRST PAGE OF THIS AGREEMENT YOU (THE CONSUMER) WILL HAVE TO PAY UP TO TWENTY-FIVE DOLLARS ($25.00) FOR EACH OF THE FIRST TWO REPAIRS IF THE WARRANTY IS VIOLATED" THIS VEHICLE IS OTHERWISE SOLD **AS IS** (AFTER 15 DAYS OR 500 MILES), WITHOUT ANY FURTHER WARRANTY, EXPRESS OR IMPLIED, UNLESS A FURTHER WARRANTY IS GIVEN IN WRITING BY DEALER IF ANY FURTHER WARRANTY IS GIVEN IN WRITING BY DEALER, OR IF THIS VEHICLE IS SOLD WITH A SERVICE CONTRACT, THEN THE TERMS OF SUCH FURTHER WARRANTY OR SERVICE CONTRACT ARE AS PROVIDED THEREIN, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED TO THE DURATION OF SUCH WRITTEN WARRANTY OR SERVICE CONTRACT, AND BUYER'S EXCLUSIVE REMEDY IS REPAIR OR REPLACEMENT OF DEFECTIVE PARTS BY DEALER

| | | | TOTAL PRICE | $ 126445.00 |
|---|---|---|---|---|
| DOWN PAYMENT TRADE IN | (A) $ | N/A | | |
| LESS PAY OFF | (B) $ | N/A | | |
| TRADE IN (A LESS B) | (C) $ | N/A | | |
| REC # _____ CASH DOWN PAYMENT PREVIOUSLY PAID (D) | $ _____ | N/A | | |
| REC # _____ CASH DOWN PAYMENT HEREWITH (E) | $ | N/A | | |
| REC # _____ DEFERRED CASH DOWN PAYMENT | $ | N/A | | |
| CASH DOWN PAYMENT (D E & F) | (G) $ | N/A | | |

| | | | | |
|---|---|---|---|---|
| | | TOTAL DOWN PAYMENT (TOTAL OF C & G) | | $ N/A |
| | | UNPAID BALANCE | | $ 126445.00 |
| LICENSE FEE | $ 65.00 | SALES TAX | | $ 3923.81 |
| ADM FEE | $ 2.00 | ESTIMATED DMV FEES | | $ 67.00 |
| TOTAL DMV | $ 67.00 | DEALER TRANSFER SERVICE CHARGE | | $ 249.00 |
| | | TOTAL DUE TO SELLER | | $ 130684.81 |

**USED VEHICLES** ATTENTION CONSUMER Sign here only if the dealer has told you that this vehicle has the following problems and you agree to buy the vehicle on those terms

1. _____ N/A _____    2. _____ N/A _____    3. _____ N/A _____

Consumer Signature _____ N/A _____

**ALL VEHICLES** DEALER IS NOT LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS SALE OR THE USE OF THIS VEHICLE, INCLUDING BUT NOT LIMITED TO LOSS OF USE, LOSS OF TIME, INCONVENIENCE, TRANSPORTATION, RENTAL, LOSS OF EARNINGS OR PROFITS, OR ANY COMMERCIAL LOSS (This paragraph only applies after expiration of New Mexico's automatic 15-day/500-mile implied warranty in the case of used vehicles )

**USED VEHICLES AND DEMONSTRATORS.** THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THE CONTRACT INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE

**Dealer states** under oath that to the best of Dealer's knowledge there has been no alteration or **chassis repair** due to wreck damage on the vehicle being purchased, except as noted on this agreement

**Buyer states** under oath that to the best of Buyer's knowledge there has been no alteration or **chassis repair** due to wreck damage on the trade-in vehicle, except as noted on this agreement

**The full purchase price is due upon delivery.** This is a buyer's order agreement, not a credit agreement Dealer is not a lender Dealer may assist Buyer in obtaining third party financing, but Dealer is not responsible for obtaining financing Dealer does not guarantee credit approval Buyer grants Dealer a security interest in the vehicle being purchased under the Uniform Commercial Code to secure full payment Dealer has all rights and remedies of a secured party under the Uniform Commercial Code Buyer is not bound by credit terms until credit disclosures have been made Dealer may retain Buyer's deposit if Buyer fails to complete this purchase after the vehicle has been delivered or after this agreement becomes binding If this vehicle is delivered pending receipt of financing ("Spot Delivery"), Buyer must return the vehicle to Dealer immediately upon demand if financing fails for any reason

**SPOT DELIVERY: Buyer has the right to void this purchase if financing is not approved within 20 calendar days after delivery of the vehicle. Buyer has the right to the return of any trade-in and all money paid by buyer, if buyer voids this contract under this paragraph. To exercise this right, buyer must return the vehicle to the dealer in the same condition as received (normal wear and tear excepted), within 48 hours of receipt of notice that financing was not approved. Dealer shall not charge any fees as long as the vehicle is returned as provided in this paragraph.**

**Buyer agrees to buy and Dealer agrees to sell this vehicle on the terms on both sides of this agreement.** This agreement and any finance contract are an exclusive statement of the agreement between Buyer and Dealer, and cancel and supersede any oral or other agreement, promise or alleged representation concerning the vehicle and this purchase No modification of this agreement will be recognized unless made in writing and signed by Dealer **This agreement is not binding on Dealer until signed by Dealer's authorized representative.**

Buyer _____

Co-Buyer _____ N/A _____

Dealer _____

| Certified Copy |
|---|
| By _____ |

The Reynolds and Reynolds Company  RO602500 Q  (07/17)

# EXHIBIT 3

**From:** Erlend Olson <erlendolson@yahoo.com>
**To:** Makarewicz, Valerie (USACAC)
**Sent:** 4/3/2018 3:45:25 AM
**Subject:** Re: United States v. Olson

Valerie,

I will contact you shortly, this week. FYI, I have been trying to work with the IRS to enter into a payment plan for this and other back taxes owed, and my case has been assigned to a local IRS office, but last I checked with that office (about 10 days ago), my case has not yet been assigned to an actual agent. Apparently because of the amount owed I have to work with an agent directly. So for avoidance of doubt, I am not trying to avoid payment, but I have no means to pay such an amount straight away (I owe the state of CA around $1.3M, the IRS around the same with the FBARs penalties below - I presently have a hardship agreement with the FTB and am paying them $800 per month).

-Erlend

---

**From:** "Makarewicz, Valerie (USACAC)" <Valerie.Makarewicz@usdoj.gov>
**To:** "erlendolson@yahoo.com" <erlendolson@yahoo.com>
**Sent:** Monday, April 2, 2018 5:13 PM
**Subject:** United States v. Olson

Mr. Olson,
I am an Assistant United States attorney in Los Angeles, California, and have been assigned to prosecute a matter against you regarding certain foreign accounts and FBAR penalties asserted by the Internal Revenue Service.  On February 8, 2018, the United States of America filed a <u>COMPLAINT TO REDUCE FEDERAL PENALTY ASSESSMENTS TO JUDGMENT</u> against you in the Central District of California, which is attached, regarding these foreign accounts and the associated FBAR penalties.  I would like to discuss this matter with you as soon as possible. Please contact me to discuss this matter.

Valerie Makarewicz
Assistant United States Attorney



CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by replying to this e-mail message. Please destroy the original transmission and its attachments without reading or saving in any manner.

# EXHIBIT 4

**From:**        Erlend Olson <erlendolson@yahoo.com>
**To:**          ███████████████████████        █  █  █  ██████████
**CC:**
**Sent:**        7/31/2020 12:43:30 AM
**Subject:**     Re: POF: Ridges Homes and Condo
**Attachments:** JPM-Bank-Statement-0001_Redacted.pdf

Attached.

On Thursday, July 30, 2020, 5:05:13 PM MDT, ███  o ██ wrote:

I will defer to Erlend on the POF.
E, can you please reply?

Thank you,

J ██

Sent from my iPhone

On Jul 30, 2020, at 3:39 PM, ████████████████████ wrote:

Thanks J███! We just need proof of funds or financials to submit to the sellers to book the showings. What can I do to assist Ivan in procuring if any? We only have half a day left.



**CHASE** ⬡

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

March 31, 2020 through April 30, 2020
**Account Number:** 0000003323▉

---

### Customer Service Information

If you have any questions about your
statement, please contact your
Customer Service Professional.



ERLEND M OLSON dba SMARTCO ENTERPRISES
1455 PENNSYLVANIA AVE SUITE 820
WASHINGTON DC 20004-1008

## Commercial Checking

### Summary

|  | Number | Market Value/Amount | Shares |
|---|---|---|---|
| Opening Ledger Balance |  | $13,654,131.11 |  |
| Deposits and Credits | 1 | $873,085.77 |  |
| Withdrawals and Debits | 3 | $3,667,902.25 |  |
| Checks Paid | 0 | $0.00 |  |
| Ending Escrow Balance |  | $10,859,314.63 |  |

### Deposits and Credits

| Ledger Date | Description | Amount |
|---|---|---|
| ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ |

Please examine this statement of account at once. By continuing to use the account, you agree that: (1) the account is subject to
the Bank's deposit account agreement, and (2) the Bank has no responsibility for any error in or improper charge to the account
(including any unauthorized or altered check) unless you notify us in writing of this error or charge within sixty days of the mailing or
availability of the first statement on which the error or charge appears.

# EXHIBIT 5

CNN Money

Companies    Markets    Tech    Media                                    U.S. ▼

# How a big bet on oil went bust: Full version



Erlend Olson: "We figured that if we could make a treasure map of where the oil is, why not go dig the treasure ourselves?"

PHOTO ART STREIBER

By Adam Lashinsky, senior editor at large March 29, 2010: 9:59 AM ET

(Fortune) -- In the summer of 2008, Erlend Olson thought he had finally hit the jackpot.

A bit player in semiconductors for years, the former NASA engineer had made an improbable metamorphosis into a burgeoning oil-exploration kingpin. His company, Terralliance Technologies, a secretive startup in Newport Beach, Calif., had developed an algorithm for telling petroleum engineers where to drill.

| Facebook | Digg |
| Twitter | Buzz Up! |
| Email | Print |
| Comment on this story | |

Never mind that Olson was an electrical engineer with no background in oil. He had convinced some of the world's most sophisticated investors, including Goldman Sachs (GS, Fortune 500) and Kleiner Perkins, that his unconventional approach was legit. Kleiner would go on to bet a whopping $93 million on Terralliance, a sum that may be the storied firm's largest venture investment ever.

Terralliance hadn't found much oil, but its founder and CEO was so adept at locating cash reserves that he believed he was about to close a deal that would seal his company's future -- and his fortune.

He had come to New York that August to negotiate a financing with Temasek, the sovereign wealth fund of Singapore, which Olson had been romancing for months. The price of oil had recently soared to $145 a barrel, and Temasek planned to invest $1.1 billion, valuing Terralliance at more than $4 billion.

A hulking figure with a glassy-eyed intensity, Olson had assured his investors that an infusion of this magnitude could lead quickly to a public offering worth as much as $60 billion. That would make Olson, as he wistfully recalled later, a "three-comma guy."

Olson wasn't alone in counting commas. Kleiner Perkins thought it was on the threshold of its first mega-win since Google's (GOOG, Fortune 500) IPO in 2004. Goldman Sachs, which had been betting shrewdly on plummeting housing prices, envisioned another killing. Passport Capital, a young San Francisco hedge fund, anticipated burnishing its reputation for energy investments. John Fredriksen, a Norwegian supertanker mogul who had lent Terralliance $50 million only months earlier, stood to score a quick hit.

All told, the investors had sunk nearly half-a-billion dollars into Terralliance, an astounding sum given the audacity of the company's aspirations -- and the paucity of its accomplishments.

## Right Now

**7 things to know before the bell**

**SoftBank and Toyota want driverless cars**

**Aston Martin falls 5% in its London IPO**



## Hot List

**Frontline troops push for solar energy**
The U.S. Marines are testing renewable energy technologies like solar to reduce costs and casualties associated with fossil fuels.
Play



**25 Best Places to find rich singles**
Looking for Mr. or Ms. Moneybags? Hunt down the perfect mate in these wealthy cities, which are brimming with unattached individuals.
More



**Fun festivals: Twins to mustard to pirates!**
You'll see double in Twinsburg, Ohio, and Ketchup lovers should beware in Middleton, WI. Here's some of the best and strangest town festivals.
Play



## Original Shows

**Key to NBA's success? Embracing tech** NBA Commissioner David Stern says the basketball league is looking to expand its use of technology to improve gameplay and increase its audience.
Play



**Unique Homes**
**Selling Roy Rogers' former ranch** With 67 acres of land and room for 150 horses, the former ranch of the 'King of the Cowboys' sold at auction for $640,000.
Play



**Help Desk**
**Track testing tires to find the best** Find out how TireRack tests and reviews tires and why choosing the right ones for your car is so important.
Play



**All CNNMoney.com Original Shows**

## Markets

| Market Movers | | US Indices | |
|---|---|---|---|
| Company | Price | Change | % Change |
| Ford Motor Co | 8.29 | 0.05 | 0.61% |
| Advanced Micro Devic... | 54.59 | 0.70 | 1.30% |
| Cisco Systems Inc | 47.49 | -2.44 | -4.89% |
| General Electric Co | 13.00 | -0.16 | -1.22% |
| Kraft Heinz Co | 27.84 | -2.20 | -7.32% |

Data as of 2:44pm ET

| symbol |
| Go |

Sponsored by

Sponsors

Why experienced investors pumped so much capital into such a risky venture is just one mystery in the tale of Terralliance, a saga that has not been comprehensively told despite the high profiles of the players involved.

Kleiner Perkins, a firm that loudly promotes its most promising investments, for years didn't list Terralliance on its website and declined multiple requests to comment for this article. Despite interviews with many of the key people involved, it's also not clear what exactly Terralliance's technology purported to do, or how well its investors understood it.

What is certain is that Terralliance's gambit to become a force in oil exploration ended badly. Despite Olson's high expectations, the unraveling began during those August 2008 meetings in New York.

Before taking Temasek's cash, Kleiner and Goldman thought it was important to share concerns they had about Olson. Terralliance's globetrotting CEO may have been an oil industry neophyte, but he had spent like a Saudi prince. His shopping list ran the gamut from oil wells in Turkey and Mozambique to demilitarized Soviet fighter jets.

An auditor had raised red flags about Olson's dealings in the Congo and referred its findings to the U.S. Justice Department for potential anti-bribery-law violations. As troubling, Terralliance had yet to close its books on 2007. Two lead board members, Joe Lacob of Kleiner Perkins and Joe DiSabato of Goldman, informed Temasek's lead negotiator, Nagi Hamiyeh, that they intended to demote the charismatic but free-spending founder to chief scientist.

It was all too much for someone wielding a city-state's checkbook. Instead of signing on the dotted line, Hamiyeh returned to Singapore. In early 2009 the board fired Olson outright. By then the price of oil had cratered, Temasek's stock market holdings had collapsed, and Terralliance had all but crumbled into a heap of litigation, layoffs, and recriminations.

By the spring Kleiner Perkins was in damage-control mode on Terralliance, even as it was promoting a new thrust into the field of "green" energy. As for Olson, who was out of work and raising new funds to continue his global quest for oil, not adding a comma to his net worth was the least of his worries.

Olson didn't set out to look for oil. As the dotcom bubble was peaking in 2000, he found himself at a crossroads. Then 37, he had spent 14 years at NASA's Jet Propulsion Laboratory (JPL) in Pasadena, which runs the country's unmanned space probes.

After leaving JPL, Olson co-founded a semiconductor company in 1998 called Pivotal Technologies, where he was chief technology officer. Pivotal made chips for cable modems and Bluetooth devices, and its designs were in hot demand, enabling it to sell out to Broadcom after just two years for $605 million.

A government employee for most of his working life, Olson suddenly was wealthy. Not super-rich, mind you, but way beyond his space agency peers. "I went from making $65,000 a year to being worth millions," says Olson, who years later still affects the look of a gussied-up engineer: open-neck shirts, faded blue jeans, and black wingtips.

Olson was a rare twofer in the IT world: a technologist who could tell a story. "Erlend is a larger-than-life guy, and he always was," says an executive who worked with him at Pivotal. "He was the franchise. There was an engine under that hood." At Pivotal, however, Olson didn't have free rein, says this executive. "Erlend is like a nuclear reactor: If you use him properly, the guy can boil water. If you use him improperly, he can melt down the city."

Actually, finding water, not boiling it, happened to be Olson's goal. As he tells it, his parents, who had retired from positions at the top-secret Sandia National Labs in New Mexico, were missionaries in Africa and complained to him about the difficulty of drilling water wells.

NASA's projects search for signs of life on and beneath planetary surfaces, including the presence of water. Together with some other ex-JPL buddies, Olson began tinkering with publicly available satellite data of terrain near his home in Southern California. Olson also had familiarity with remote-sensing

technology deployed by NASA. He had designed low-power chips crucial to
running communications systems millions of miles from Earth.

The noodling by Olson and his JPL pals yielded an unexpected eureka
moment. "We kept running into oilfields, which was frustrating because we
were looking for water. I knew nothing about the oil business or the fossil-
fuels business," says Olson, who told Fortune his story in numerous
interviews over the past year at hotels and restaurants in Southern
California.

As he continued to investigate tracts that encompassed some of the oldest
and once most productive oilfields in the U.S., Olson made another startling
discovery: "We'd notice there was no pump jack, even though we knew
there was oil there."

The team spent the next couple of years modeling known oilfields and
developing an algorithm to test the model's predictive power. Olson likens
the experimentation to writing a program for forecasting stock market
fluctuations and then testing it on historical pricing data. The next step was
putting the technology to work. "We figured if we could make a treasure map
of where the oil is, why not go dig the treasure ourselves?"

Olson funded operations of the new company out of his own pocket. He
studied the oil and gas business and deemed it technologically timid. His
approach to finding hydrocarbons went beyond the two tools most favored
by the industry.

One is seismography, the bouncing of sound waves off structures beneath
the ground in the hunt for what geophysicists call anomalies -- abrupt
changes in the substructure that suggest that worthless dirt may have given
way to valuable minerals. The other is geology, or the analysis of rocks to
see whether their makeup suggests the presence of something worth drilling
for.

Olson's approach was to test for a series of indicators in the ground -- an
example is electrical activity that can be detected remotely -- that when
combined with massive computer files would yield accurate probability
studies on the chances of finding oil. The mapping technique was a first
step, to be followed by the industry's standard geophysical practices.

Whether it was real science or high-tech dowsing, Olson used his findings to
pitch investors. Kleiner's Lacob and Goldman's DiSabato invested a total of
$45 million in 2004 and 2005. (DiSabato had profitably invested in Pivotal.)

Kleiner and Goldman opened all kinds of doors. Olson was introduced to the
respected oil executive Joe Foster, founder and former CEO of Newfield
Exploration and a banking client of Goldman's in the 1990s. Terralliance
"had Kleiner Perkins and Goldman behind it," says Foster. "They told me
about this, and I said it sounds too good to be true."

Nevertheless, in the Continental Airlines lounge at the Houston airport,
Foster met with Olson. "Erlend sort of knocked my socks off. It didn't make
sense to me that you could acquire that kind of data with a satellite. But I left
the meeting saying, 'Shit, I'd better think about this.'" Foster joined
Terralliance's board in 2005.

Excitement about a sure-fire way to find oil -- and all sorts of other valuable
things -- isn't new, of course. "The real story, to boil it down, is as old as
mankind: a charismatic individual with a compelling story you just want to
believe," says Foster, who says he lost several hundred thousand dollars of
his own money in Terralliance. "My whole career I've been interested in
alternative exploration tools. By force of personality, [Olson] convinced a lot
of people. There's a real psychological story there. This was beyond
numbers and contours."

Investors wanted proof, so Terralliance began mapping small projects and
then drilling for oil and gas. Success was relative. The company's maps
accurately indicated oil was present in previously active oil basins -- albeit in
places previous drillers hadn't explored -- in locations including Oklahoma
and Alberta.

Though not a huge surprise, these finds helped Terralliance make the case
for bigger projects. The company raised an additional $248 million in mid-

2006, with new investors including Ithmar Capital, a private equity firm in
Dubai.

Olson was the fundraiser-in-chief as well as head negotiator for the drilling
leases he was signing around the world. At one point Terralliance claimed to
be drilling for oil or negotiating rights to explore for it on four continents,
including eight African countries. An oilfield in eastern Turkey produced
some oil, though it turned out not to be commercially viable when oil prices
dropped. An expensive well in Mozambique turned up all but dry. Many of
Terralliance's other proposed projects never broke ground.

Olson decided that Terralliance needed to make its own maps rather than
rely on purchased satellite data. So the company bought an airplane and a
helicopter, each fitted with custom-designed sensors. For Olson, this "low
and slow" approach was a half-measure. He craved the "high and fast"
capability of U-2 spy planes that NASA uses for research.

U-2s aren't available for commercial use, however, so Olson arranged to buy
two surplus Sukhoi SU-27 "Flanker" fighter jets, stars of the Cold War-era
Soviet air force, from the Ukrainian government. Terralliance paid $22 million
for the pair of jets, as well as more than $4 million for an option to purchase
two others.

Olson says the planes cost more than conventional, slower aircraft but are
more effective because they can cover more ground. "It was like a NASA
platform but better," he says. "I got the blue-collar version of the U2."

By 2007, Terralliance was running out of cash, despite having raised nearly
$300 million in less than three years. Olson is unapologetic about the
outlays. "We spent like NASA during the Apollo program, and we were on
our way to the moon as well," he says.

Stephen Buscher, an oil industry investment banker, relocated from Russia
at the end of the year to become Terralliance's chief financial officer. He
marveled at Olson's persuasive powers. "It's unbelievable how easy it was to
sell that story with Erlend manning the PowerPoint," says Buscher, who
signed on to take Terralliance public and has since left the company.

One PowerPoint obtained by Fortune sheds light on Olson's technique. In an
October 2007 presentation to Kleiner's partners, he proclaimed Terralliance
a "Revolution in Oil and Gas Exploration." He declared that the company
had 500 million acres in "oily places" under its control, more than Exxon
Mobil, a claim that seems to have encompassed everything from partnership
agreements to discussions with governments.

Olson had no doubt that if Terralliance could just raise more money, it had
"all the projects necessary to be as valuable" within five years as Occidental
Petroleum. Oxy, a decades-old oil company, was worth more than $60
billion.

There was never a shortage of potential investors willing to listen to Olson's
pitch. In early 2008, Temasek emerged as the most enthusiastic. The
Singaporean fund had begun a major thrust in oil acquisitions, forming a
special subsidiary, Orchard Energy, as its petroleum vehicle.

Temasek dispatched consultants to study Terralliance's technology, as well
as its petroleum assets. In the meantime Terralliance needed funding to
keep the drill bits turning. Through Goldman connections again, it met
Passport Capital, whose founder, John Burbank, had been a top-performing
U.S. hedge fund manager in 2007. Passport agreed to lend Terralliance
$150 million -- a bridge loan -- with the expectation that the loan would be
repaid in a matter of months.

To share the risk, Passport offered a third of its Terralliance loan to an
investment firm in London called Franklin Enterprises. Franklin is a private
investment arm of Norway's John Fredriksen, CEO of Frontline, a major oil
tanker operator.

Passport told Franklin about a company code-named Project Sunshine,
whose backers included the original investors in Google and which promised
to be the "Google of the oil and gas industry," according to a lawsuit Franklin
later filed against Passport. The pitch worked; Franklin invested in March.

How Terralliance was spending its capital became a central sticking point. The company hired a chief accounting officer named Howard Selzer, who had worked at Enron in its dark days.

Selzer hired PricewaterhouseCoopers, and together they became a thorn in the side of the CEO. Olson hadn't kept particularly good records in the early years of the company. Accounting for travel expenses was notably weak, and Selzer eventually identified $4.4 million of expenses Olson owed the company.

The auditors also had a devil of a time accounting for the business uses of all the company's property. A warehouse near Pasadena was supposed to contain aircraft parts but upon investigation was full of earthmoving equipment as well as a masterfully crafted baby crib. Olson had a side business in real estate development, and his wife had recently given birth to their first child. Olson -- who says the facility was Terralliance's original headquarters and that he had permission to store his belongings there -- personally sublet the warehouse from the company.

The auditors also accused him of making questionable payments to government officials in the Congo, where Terralliance had signed a drilling concession, and referred the matter to the U.S. Justice Department. (No one involved is aware of any actions taken in the case by Justice, which declined to comment. Olson also declined to comment on this.)

By then, board members -- in particular Kleiner's Lacob and Goldman's DiSabato -- had had enough of Olson. But there was a catch. He was the main point of contact with Temasek, and he also told Terralliance's story better than anyone else.

In an effort to remove his authority but keep him onboard, the board demoted Olson in September 2008 to chief scientist. The next month, when the auditors finally closed the books on 2007, they noted that Terralliance "renounced the concession interest" in the Congo, and that the "former officer" who negotiated it, Olson, "no longer had the authority to legally bind the company."

With so much turmoil, it's no wonder that Singapore's Temasek hit the pause button on its investment in August 2008. Fredriksen's Franklin Enterprises also caught wind of the controversy and asked Passport for its money back. Passport rejected the request, and in October, Franklin filed suit against Passport, charging the San Francisco firm with misleading it about the nature of Terralliance's management and finances. (In a court filing Passport denied the allegations.)

The Soviet fighter jets seemed a flamboyant purchase; some people involved with the company even doubted their existence. Whether or not they were a good idea, the planes were real. The same month that the auditors completed their work and Fredriksen sued Passport, the jets arrived unassembled at a commercial hangar in Rockford, Ill. The planes remain there and are for sale for $5 million apiece.

According to Pride Aircraft, which is marketing the planes, the twin fighter jets were "painted in the standard Russian air-superiority blue/gray camouflage scheme by the Ukrainian overhaul facility" that outfitted them for commercial use. The SU-27s never flew a mission for Terralliance.

In the year since Erlend Olson had told the Kleiner Perkins partners that his company could soon be worth $60 billion, the world had become a different place -- for Terralliance, for Wall Street, and for so many others. Terralliance's senior executives made a last-ditch effort to woo Temasek in November 2008. The deal team watched Barack Obama's acceptance speech from a Temasek conference room in Singapore. By this time, though, the price of oil had fallen to $60 a barrel, and Temasek formally walked away in December.

Kleiner Perkins moved swiftly in 2009 to try to salvage its investment. John Doerr, Kleiner's most prominent partner, hadn't previously been actively involved with Terralliance, but he began attending board meetings. He hired as executive chairman a longtime confidant, Mike Long. Doerr flew to London to meet with Franklin in the hope of resolving the litigation with Passport. He enlisted computing pioneer and Kleiner partner Bill Joy to evaluate Terralliance's technology.

In May, Terralliance announced new funding, which amounted to a restructuring of the company that severely diluted the stakes of existing investors. Kleiner, Goldman, Passport, and others invested an additional $54.2 million, $30.5 million of which ultimately went to Franklin. An additional $7 million was promised by the end of 2010 to Franklin, which dropped its suit against Passport.

With Olson gone -- he was fired as an employee in March and left the board in May -- Terralliance abandoned its wildcatting dreams. The investors still believe there's something to the mapping technology. So instead of buying drilling rights, today the company -- renamed TTI Exploration -- is charting plots on a project basis for clients.

Last July, Terralliance filed suit against Olson for misappropriation of trade secrets, alleging that he had failed to return documents belonging to the company and had started a new venture based on Terralliance's intellectual property.

There has been no activity in the suit since then because TTI doesn't know where Olson is and can't serve him with court papers, says TTI lawyer David Schindler of the Silicon Valley office of Latham & Watkins. Olson calls the company's claims baseless and says the lawyers shouldn't have any trouble serving him: "My wife doesn't seem to have any trouble finding me."

Of the many unanswered questions in the strange story of Terralliance, two stand out: Was there ever anything to the technology, and how could such seasoned financiers have invested so much money with so little control over it and in an industry with which they were so unfamiliar?

Given that Olson never patented the technology and otherwise wouldn't document it for his own investors, it's problematic for any outsider to judge it. He certainly believes that it works, and he says that consultants from Temasek's Orchard Energy blessed it.

That claim can't be verified because Temasek declined to comment for this article. Joe Foster, the former board member, says he still doesn't know whether the technology worked. "The way I came to look at this was as a very good reconnaissance tool," he says. "It would tell you where to do more work -- or to get the hell out."

Kleiner Perkins certainly believed. "They perceive themselves to be great venture capital investors and capable of taking substantive risks," says Foster. "I spent an afternoon with Kleiner. They were sold. They didn't necessarily have any technical background for this, but they had hired consultants. I had plenty of technical capability, and I got sucked right in too."

Kleiner Perkins declined to comment on Terralliance, citing the ongoing, if inactive, litigation against Olson. So did Goldman and Passport. Franklin Enterprises did not respond to requests for comment. Kleiner partner Joe Lacob, who exited the board last year, said in an e-mail: "Clearly, the economic upheaval of late 2008 and early 2009 dictated business-model changes for many, many companies. [Terralliance], through the efforts of many, has successfully navigated those waters and emerged, arguably, stronger than ever."

As for Erlend Olson, he has formed a new venture and has been spending his time in airplanes again, particularly between California and Africa. He still burns with the same intensity. But where once he searched for water, then for oil, now he's looking for validation.

--Reporter associate: Doris Burke ∎

Email    Print

First Published: March 29, 2010: 9:56 AM ET

## Sections

How falling barrel of oil went bust - Mar 26, 2010

**Toys 'R' Us brand may be brought back to life**
Bankrupt toy retailer tells bankruptcy court it is looking at possibly reviving the Toys 'R' Us and Babies 'R' Us brands. More

**JCPenney names Jill Soltau as its new CEO**
**S&P downgrades debt-riddled GE and GE Capital**

**Land O'Lakes CEO Beth Ford, from the cornfield to the C-suite**
Land O'Lakes CEO Beth Ford charts her career path, from her first job to becoming the first openly gay CEO at a Fortune 500 company in an interview with CNN's Boss Files. More

**Goldman Sachs slants research to help Democrats, top White House adviser says**
**China says it will never use its currency as a weapon in the trade war**

**Honda teams up with GM on self-driving cars**
Honda and General Motors are creating a new generation of fully autonomous vehicles. More

**The internet industry is suing California over its net neutrality law**
**Bumble to expand to India with the help of actress Priyanka Chopra**

**South Africa's first black female winemaker ready to go it alone**
In 1998, Ntsiki Biyela won a scholarship to study wine making. Now she's about to launch her own brand. More

**Want to clean up India? Turn trash into free Wi-Fi**
**Drones, robots, DIY toys shine at Toy Fair**

**How can I protect my investments from inflation?**
Whether you hedge inflation or look for a return that outpaces inflation, here's how to prepare. More

**How to catch up on retirement savings in your 50s**
**How do you know you're really ready to retire early?**



Contact Us

Closed Captioning

Site Map

    

Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: Â© 2018 Morningstar, Inc. All Rights Reserved. Factset: FactSet Research Systems Inc. 2018. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices Â© S&P Dow Jones Indices LLC 2018 and/or its affiliates.

© 2021 Cable News Network. A WarnerMedia Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy.

# EXHIBIT 6

### SUPERIOR COURT OF CALIFORNIA,
### COUNTY OF ORANGE
### CENTRAL JUSTICE CENTER

### MINUTE ORDER

DATE: 04/02/2012                    TIME: 01:46:00 PM        DEPT: C12

JUDICIAL OFFICER PRESIDING: Jamoa A. Moberly
CLERK: SUSIE GARCIA
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2010-00346521-CU-BC-CJC** CASE INIT.DATE: 02/22/2010
CASE TITLE: **Passport Management, LLC vs. Olson**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 71449162
**EVENT TYPE**: Chambers Work

APPEARANCES

The Court, having taken the trial in the above-entitled matter under submission on 3-7-2012, now makes the following ruling:

**Tentative Statement of Decision**

This matter was tried to the Court as between Plaintiff Passport Management, LLC and defendant Erlend Olsen, an individual. Trial concluded March 7, 2012.
The following is the Court's tentative statement of decision.

Facts

The basic facts are not in dispute as to the creation of the 2005 Notes. In 2005, defendant Erlend Olson who was then Chief Executive Officer of Terralliance made five promissory notes in favor of his then employer Terralliance. Ex. 4. He had been with the company since founding of it. The notes were created to show Olson's obligation to repay Terralliance for five advances totaling $613,430.80 that Terralliance made to Olson in order for Olson to acquire personal shares of Terralliance common stock from other Terralliance shareholders. This is not in dispute. The shares were later sold by Olson for a substantial profit. The notes were never repaid. Each of the 2005 notes matured on March 30, 2010. Each remains due and owing.

In the fall of 2007, an audit was commenced in conjunction with the attempt by Terralliance to obtain financing in the range of one billion dollars from a large investor, Temasek, a sovereign wealth fund from Singapore. An independent audit report was required for such financing. Olson was approached by the

DATE: 04/02/2012                    MINUTE ORDER                    Page 1
DEPT: C12                                                  Calendar No.

CASE TITLE: Passport Management, LLC vs. Olson        CASE NO: **30-2010-00346521-CU-BC-CJC**

then CFO of Terralliance, Howard Selzer, regarding the documentation and characterization of numerous charges and advances attributed to him and whether they were personal expenses. As a condition to Passport making the bridge loan to Terralliance in March 2008, Olson was required to represent that he would repay the unauthorized charges which at that time were still being determined. This led to creation of the 2008 promissory Note. It is undisputed that Olson executed the original Note and sent a copy of the Note to Terralliance senior executives, board members and legal advisors by e-mail on October 31, 2008. Ex. 11. The face amount of the note was $4,438,989 and outside maturity date December 31, 2009. The independent audit was completed soon after with reference therein to the executed note. In spite of demands on Olson, he did not deliver the original note. Shortly thereafter Passport made another loan to Terralliance of over seven million. In December 2008, the Temasek deal fell through. Olson never delivered the original 2008 signed Note but never said he would not deliver it nor did he ever disclose its whereabouts after his October 31, 2008 e-mail.

In May 2009, Terralliance entered into a workout and recapitalization agreement with Passport Management LLC following the multiple loans to Terralliance in 2008. As part of that agreement dated May 13, 2009 titled Strict Foreclosure Agreement ("SFA"), Terralliance agreed to Passport's foreclosure on the collateral that secured the prior loan which collateral included the 2005 and 2008 notes. Ex. 52. The collateral included all six notes issued by Olson to Terralliance and also any other notes issued by Olson for any advances made by the company to Olson prior to the date of the SFA.

The 2005 Notes

Olson has not denied his obligation to pay each of these notes. The original notes all bear Olson's signature. None of these notes have been paid. Under the SFA, Passport is entitled to enforce payment of these notes. Passport is the holder in fact and in due course of each of the 2005 Notes. It was clearly the intent of the parties that the allonges be attached to the notes and be enforceable by Passport. Olson has asserted no defense to his obligation to pay these notes which are all in default once it is established that Passport is entitled to payment.

The 2008 Note

Olson is estopped to claim that the original 2008 note was not signed by him and that the e-mail copy he sent was not enforceable. Olson sent it intending that it be relied upon as duly enforceable. This is clear from the face of the transmittal e-mail on October 31, 2008. There is no evidence that Olson did not so intend. That all sides were treating the e-mail copy as enforceable is shown by the omission of any reference to delivery of the original signed 2008 note in the list of other materials which Terralliance demanded from Olson in its letter of termination dated March 2, 2009. Ex. 102. There is no evidence that Olson was acting under any duress or coercion in signing and transmitting the 2008 Note. The Foreign Corrupt Practices Act investigation was ongoing in spring 2008 concerning activities in Africa and Olson was provided counsel and had conclude in October 2008. Independent counsel was retained by the Audit Committee to conduct the investigation. The advances encompassed by the 2008 Note were broad and not documented as authorized company expenses. The Price Waterhouse Coopers audit report dated November 28, 2008 noted the six promissory notes of Olson and amounts thereof as well as the status of the FCPA investigation. Ex. 30 at page 27. Completion and delivery of this audit was a condition precedent to the Temasek funding.

Defenses

Olson has asserted no defenses to enforcement of the 2005 Notes other than to assert that allonges had

CASE TITLE: Passport Management, LLC vs. Olson          CASE NO: **30-2010-00346521-CU-BC-CJC**

to be stapled to the notes at the time of transfer to Passport. There has been no evidence challenging the authenticity of the original notes. Ex. 4. There is no evidence of any coercion or duress surrounding Olson's execution of the 2005 Notes. The Notes are enforceable as against Olson by Passport under the terms of the SFA. As for the 2008 Note, the amount of the Note as reduced by the return of a truck vehicle by Olson is undisputed. Both the independent auditors and the counsel for Olson characterized the amount as due and owing by Olson. The FCPA investigation was not used to coerce Olson to sign the note. Rather Olson signed the 2008 note to facilitate the Temasek deal. Olson had already been demoted to Chief Scientist in September 2008.

Account Stated and/or Money Had and Received

Based on the evidence, in the event any of the notes are unenforceable then alternatively each of the face amounts and terms of the notes constitute accounts stated as against Olson by Terralliance, thus Passport as its successor in interest per the SFA. The sums reflected by each of the six notes less the amount of the returned vehicle reflect money of Terralliance received by Olson of his personal purposes and are still due and owing.

Damages

2005 Notes: The principal amounts total $613,430.80. The annual interest rate is 3.83%. The accrued interest as of 2-21-2012 is $152,301.99. Total principal and interest as of 2-21-2012 is $765,732.79. Daily interest shall accrue in 2012 on the principal at the 3.83% rate at $64.19 per day (366 days/year).

2008 Note: The principal is $4,363,639.26 (factoring in the payment for tender of the F-750 truck). The annual interest rate is 6%. The accrued interest as of the date of trial of 2-21-2012 is $872,173.54. The total principal and interest as of 2-21-2012 is $5,235,812.80. The daily rate of interest accrual on principal in 2012 at 6% is $715.35 (366 days/year).

This tentative decision shall constitute the statement of decision unless within 10 days either party specifies controverted issues or makes proposals not offered in the intended decision. Cal Rules of Court 3.1590.

Counsel for Passport is directed to prepare and submit a judgment consistent with this announcement.

Dated: April 2, 2012

_____
Jamoa A. Moberly
Judge of the Superior Court

# EXHIBIT 7



# Litigation Highlights 2012
## DELIVERING SUCCESS ACROSS INDUSTRIES



ATTORNEY ADVERTISING. Results depend on a number of factors unique
to each matter. Prior results do not guarantee a similar outcome.

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway | New York, NY 10036 | 877.323.4171

www.pillsburylaw.com
© 2013 Pillsbury Winthrop Shaw Pittman LLP. All rights reserved.

## Recovering Millions for a Hedge Fund Client

When our client Passport Capital made its investment in Terralliance Technologies, it thought it was buying into a fast-growing startup with a promising idea for optimizing oil field exploration. According to *Fortune* magazine, Terralliance had previously received large investments from Goldman Sachs and the venture capitalists at Kleiner Perkins.

Passport's investment in Terralliance was comparatively modest, but sizeable for the young San Francisco hedge fund. So when Terralliance collapsed amid allegations of mismanagement and misappropriation of funds by its founder, Passport turned to Pillsbury for help.

Passport had made significant bridge loans to Terralliance while the startup was waiting for a $1.1 billion financing from a Singaporean sovereign wealth fund. Investors were attracted by the compelling concept that Terralliance had developed an algorithm for successfully identifying underground oil fields based primarily on satellite data.

But the Singapore investors balked after finding out that Terralliance founder Erlend Olson, a charismatic former NASA engineer, had wired himself substantial amounts of company money without documenting any business justification. Olson had also reimbursed himself for family vacations, for visits to gentlemen's clubs, and for tens of thousands of dollars in jewelry purchases.

Terralliance defaulted on its loans and assigned to Passport various promissory notes from Olson. When Passport's lawsuit for nonpayment finally came to trial in 2012, Olson boldly argued he was the victim of a conspiracy on the part of Terralliance's investors.

After a nine-day trial, Pillsbury defeated all of Olson's defenses and secured an award in excess of $6 million, plus attorney's fees and costs.

| Client: | Passport Capital |
|---|---|
| Industry: | Financial Services |
| Area of Law: | Contracts |
| Venue: | California Superior Court, Orange County |
| Result: | After a nine-day bench trial, won an award of more than $6 million plus attorneys' fees and costs |



"The lesson on this case is that perseverance pays off."

—William Alberti, General Counsel and Chief Compliance Officer for Passport Capital

# EXHIBIT 8

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 05/11/2012                TIME: 10:30:00 AM          DEPT: C12

JUDICIAL OFFICER PRESIDING: Jamoa A. Moberly
CLERK: Gus Hernandez
REPORTER/ERM: Kimberly Rex-6638 CSR# 6638
BAILIFF/COURT ATTENDANT: Maria Concepcion

CASE NO: **30-2010-00346521-CU-BC-CJC**  CASE INIT.DATE: 02/22/2010
CASE TITLE: **Passport Management, LLC vs. Olson**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 71460047
**EVENT TYPE**: Review Hearing

**APPEARANCES**
Thomas V Lloran, from PILLSBURY WINTHROP SHAW PITTMAN LLP, present for Plaintiff(s).
Erlend Olson, self represented Defendant, present.

Hearing held. Court and counsel discuss the 6th Cause of Action of the 4th Amended Complaint. The 6th Cause of Action has previously been severed for trial.

The Court now sets a Trial Setting Conference as to the 6th Cause of Action for 06/11/2012 at 10:00 AM in Department C12.

Request for Dismissal as to Erlend Olson on the 6th Cause of Action is filed this date.

Court hears oral argument as to the Proposed Statement of Decision, Objections and Responses to Objections. The Court's tentative statement of decision now becomes the final statement of decision of the Court. Judgment signed and filed this date.

# EXHIBIT 9

**FTB**
STATE OF CALIFORNIA
**Franchise Tax Board**

# Financial Statement

Provide all of the following information. See instructions on pages 4 and 5 for assistance.

| **Taxpayer Name:** Erlend Olson | **Spouse/RDP Name:** |
|---|---|
| Social Security Number | Social Security Number: |
| Driver License Number: | Driver License Number: |
| Home Phone Number: | Home Phone Number: |
| Cell Phone Number: | Cell Phone Number: |
| Work Phone Number: | Work Phone Number: |
| Address: | Address: |
| ✔ Mark here if you would like us to update our records with the address listed above. | Mark here if you would like us to update our records with the address listed above. |

## List All Dependents and Nonrelatives Living With You

| Name: | Name: | Age: | Relationship: |
|---|---|---|---|
| Name: | Name: | Age: | Relationship: |

## Employment Information (If self-employed, see Section I.)

| **Taxpayer** | **Spouse/RDP** |
|---|---|
| Employer: SELF EMPLOYED | Employer: |
| Address: | Address: |
| City, State, ZIP Code: | City, State, ZIP Code: |
| Employer Phone Number: | Employer Phone Number: |
| Occupation: | Occupation: |
| How Long Employed: | How Long Employed: |

## Section A. Accounts – Include checking, online, mobile (e.g., PayPal) and savings accounts, prepaid debit cards, certificates of deposit, trusts, individual retirement accounts (IRAs), Keogh plans, simplified employee pensions, 401(k) plans, profit sharing plans, mutual funds, stocks, bonds, and other investments, including business accounts.

| Name of Financial Institution | Account Number | Type of Account | Current Value | Business |
|---|---|---|---|---|
| | | | | ✔ |
| | | | | |
| | | | | |
| | | | | |

## Section B. Credit Cards and Lines of Credit – VISA, MasterCard, American Express, department stores and lines of credit, etc.

| Type/Name of Financial Institution | Credit Limit | Account Number | Balance Owed |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |

## Section C. Real Estate – Include home, rental properties, vacation properties, timeshares, vacant land, and other real estate.

| Address | Primary Residence | Amount Owed | Equity |
|---|---|---|---|
| None | Yes    No | | |
| | Yes    No | | |
| | Yes    No | | |

## Section D. Other Assets – Include cars, boats, recreational vehicles, life insurance, artwork, jewelry, etc.

| Description | Monthly Payment | Year Purchased | Current Value | Balance Owed |
|---|---|---|---|---|
| None | | | | |
| | | | | |

See the instructions on pages 4 and 5 for assistance.

## Section E. Monthly Income

FTB Use Only

How often are you paid? (mark one) . . . . . . . . . . .  Weekly    Biweekly    Semi-Monthly    ✔ Monthly

How often is your spouse/RDP paid? (mark one) . .  Weekly    Biweekly    Semi-Monthly    Monthly

| | |
|---|---:|
| Net Pay (from wages and/or self-employed income) . . . . . . . . . . . . . . . . . . . . . . . . .$ | 60,000.00 |
| Spouse's/RDP's Net Pay (from wages and/or self-employed income). . . . . . . . . .$ | 0.00 |
| Net Rental Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Retirement (IRA, 401K, pension, etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Unemployment/Disability/Social Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Commissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |

Other Income    Dividends    Interest    Child Support

           Royalties    Alimony    Other (List _____). . .$     0.00

| | |
|---|---:|
| Amounts Contributed from Other People Living in Your Home . . . . . . . . . . . . . . .$ | 0.00 |
| **Total Monthly Income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | **60,000.00** |

## Monthly Necessary Expenses

### Section F. Local Standards

**Housing and Utilities**

| | |
|---|---:|
| Rent/Mortgage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 4,350.00 |
| Electric, Oil/Gas, Water/Garbage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Telephone/Cell/Cable/Internet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Real Estate Taxes and Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Maintenance and Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 125.00 |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . .$ | 4,475.00 |

**Transportation**

| | |
|---|---:|
| Transportation Ownership Costs    Mark box if IRS standard used . . . . . . . . . .$ | 1,470.00 |
| Transportation Operating Costs    Mark box if IRS standard used. . . . . . . . . . . .$ | 450.00 |
| Public Transportation    Mark box if IRS standard used. . . . . . . . . . . .$ | 220.00 |
| **Sub Total** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,140.00 |

### Section G. National Standards

| | |
|---|---:|
| Food. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,790.00 |
| Housekeeping Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 100.00 |
| Clothing and Clothing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 290.00 |
| Personal Care Products and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 40.00 |
| Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 340.00 |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,560.00 |
| Out of Pocket Health Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 140.00 |
| **Sub Total**    Mark box if IRS standard used. . . . . . . . . . . . . . . . . . . . . . . . . .$ | 3,700.00 |

### Section H. Other

| | |
|---|---:|
| Child/Dependent Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,100.00 |
| Federal Estimated Tax Payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| State Estimated Tax Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Term Life Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Retirement (IRA, 401K, Pension, etc.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Federal Installment Agreement (approved amount). . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Student Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 0.00 |
| Court Ordered Child Support/Alimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 22,650.00 |
| Health Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 2,250.00 |
| Other (specify)   PAYMENT TO US TREASURY DEPT   . . . . . . . . . . . . . . . .$ | 4,230.00 |
| Other (specify)   COURT ORDERED SCHOOL TUITION   . . . . . . . . . . . . . .$ | 4,500.00 |
| Other (specify)   LEGAL PAYMENTS/FEES   . . . . . . . . . . . . . .$ | 9,500.00 |
| Other (specify)   ESTIMATED TAXES   . . . . . . . . . . . . . . . .$ | 10,200.00 |
| **Sub Total**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 55,430.00 |

| | |
|---|---:|
| **Total Monthly Income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 60,000.00 |
| **Total Monthly Necessary Expenses**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 65,745.00 |
| **Net (difference between income and expenses)**. . . . . . . . . . . . . . . . . . . . . . . .$ | -5,745.00 |

See the instructions on pages 4 and 5 for assistance.

## Section I. Business Information

| Name of Business | FEIN | Type of Business |
|---|---|---|
| Consulting | none | Engineering |
|  |  |  |

List the amounts owed to you or your business:

| Name | Address | Amount Owed |
|---|---|---|
| none |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Total Amount Owed |  |  |
| Amount Available To Pay Immediately |  |  |

If your business accepts credit card payments provide the name of the individual or business on the account and type of credit card.

| Name on Account | Card Type | Issuing Bank Name and Address | Account Number |
|---|---|---|---|
| none |  |  |  |
|  |  |  |  |
|  |  |  |  |

Have you filed bankruptcy?        Yes    ✔ No    If yes, what chapter and file date?

**Notes** (use this space to provide an explanation of assets, income and expenses which require specification or additional space)

(1) I have an outstanding judgment against me of $13,239,000 which is being pursued vigorously by Passport Management LLC.

(2) I have an outstanding judgment against me of $3,650,000 owed to my ex-wife which is being pursued vigorously by her.

(3) I have an outstanding balance of approximately $3,250,000 owed to the IRS which I am attempting to settle. The payments to the US Treasury dept are not part of that, but rather are penalties from another adjudication with the Treasury Dept.

(4) My business expenses are intermixed with my personal expenses in my bank account since my credit is so bad I have been unable to open a separate business checking account (see summary attached).

(5) I also have substantial alimonary child support due every month and substantial legal expenses.

### Franchise Tax Board Privacy Notice

To learn about your privacy rights, how we may use your information, and consequences if you do not provide information we request, go to **ftb.ca.gov/Forms** and search for **1131**. To request this notice by mail, call 800.338.0505 and enter form code **948** when instructed.

### Rights as a Taxpayer

The California Taxpayers' Bill of Rights (R&TC Sections 21001-21028) requires that we adequately protect the rights, privacy, and property of all California taxpayers during the process of assessing and collecting taxes. Our goal is to make certain we protect your rights. We want you to have the highest confidence in the integrity, efficiency, and fairness of our state tax system. FTB 4058, *California Taxpayer's Bill of Rights*, includes information on state taxpayers' rights. Get FTB 4058 at **ftb.ca.gov** or call us at 800.338.0505 (select Personal Income Tax), or mail us at FRANCHISE TAX BOARD, PO BOX 942840, SACRAMENTO CA 94240-0040.

**I (we) declare under penalty of perjury under the laws of the State of California that this Financial Statement is true, correct, and complete.**

| Taxpayer's Signature | Spouse's/RDP's Signature | Date |
|---|---|---|
| X | X | 24 FEB 2019 |

EXHIBIT 10



Saint Christopher (St. Kitts) and Nevis

**PASSPORT**

| | | |
|---|---|---|
| TYPE | COUNTRY CODE | PASSPORT NO |
| P | KNA | R0018636 |

SURNAME
OLSON

GIVEN NAMES
ERLEND MICHAEL

NATIONALITY
ST. KITTS AND NEVIS

DATE OF BIRTH ██████████

SEX
M

DATE OF ISSUE
18 JUN 2007

PLACE OF BIRTH
UNITED STATES

DATE OF EXPIRY
17 JUN 2017

PLACE OF ISSUE
BASSETERRE, ST. KITTS

P<KNAOLSON<<ERLEND<MICHAEL<<<<<<<<<<<<<<<<<<
R0018636<5USA6304250M1706170C<8135<<<<<<<30

# EXHIBIT 11



## SK&N
St Kitts & Nevis
CITIZENSHIP BY INVESTMENT

### Citizenship by Investment Unit
1st Floor, Ministry of Finance Building, Golden Rock, P. O. Box 597, Basseterre, St. Kitts and Nevis

**Your Ref: WRGOV1/2025**                                    <u>**CONFIDENTIAL**</u>

16th January, 2025

Insp. Jerry Watt
Supervising Officer
White Collar Crime Unit
2nd Floor Ministry of Finance Bldg.,
GOLDEN ROCK

Dear Sir,

**Request for Information**

Your letter dated and received 15 January, 2025 refer.

Please be advised regarding the subjects of your inquiry:

### 1. ERLEND OLSON (D.O.B ▮▮▮▮▮▮▮

We confirm that **Erlend Olson** ▮▮▮▮▮▮▮▮▮▮ **(main applicant)** has been a citizen by investment since June, 2007. Subject's investment vehicle was through Sugar Diversification Foundation in the Value of Investment amount US$250,000.00.

There are no records of financial assets, bank accounts or other representations of financial holdings on record in support of the application process.

There are no other pending applications or requests being considered in relation to the subject of your request.

Please kindly note further that no information regarding the passport application process is held on record at the Citizenship by Investment Unit; such information may be accessed from the Ministry of National Security.

Should you require our further assistance, please do not hesitate to contact the undersigned.

Yours sincerely,

Damille James (Mr)
Board of Governors
Citizenship by Investment Unit

# EXHIBIT 12

Message

| | |
|---|---|
| **From:** | Erlend Olson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8D518969227E445A9866003D3D450557-EOLSON] |
| **Sent:** | 6/30/2020 2:32:50 PM |
| **To:** | Serge (FYDIBOHF23SPDLT)/cn=Recipients/cn=4be44c95b52f45d3b8186e42c29e0d1c-smontacq] |
| **CC:** | John Gallagher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=686c8e8ae44e4570ab5cfb26b710d531-jgallagher] |
| **Subject:** | Re: Current Situation |

Serge,

If all goes well, we will be able to turn Thales on with funds at end of July. Perhaps sooner. But, it will require that we make the changes to the contract that Joe and Johanne were working on, and that we are able to come to Cannes or Paris and meet with them.

Regarding meeting, I see that the US has been barred from EU for most purposes, but perhaps we can come on an essential worker pass? Can you look into the detail on your end please?

Also, I have the option of coming in from St. Kitts and Nevis as a St. Kitts and Nevis citizen. John could perhaps travel as an Irish citizen. We would need to know how carefully they investigate our actual home or residence on landing. John and I could certainly "reside" at Paul's house in Dublin Ireland too, if that works.

Re Oman, we will accelerate now. Can you tell us whom we might meet in or from Oman soon?

-E



CONFIDENTIAL AND FOIA EXEMPT

# EXHIBIT 13

**From:**       erlendolson@yahoo.com
**To:**
**Sent:**       9/19/2015 8:20:41 PM
**Subject:**    Re: Passport v. Olson - OC Superior Court, Case No. 346521 - Order and Judgment of
                Contempt



I would add that J█████producing her passports (even if she does, in fact, produce them all) does little to stop her from fleeing. Her most likely course of action is to go to SKN on a private yacht. Her former (current?) boyfriend, █████████, who is a fugitive in California, has worked extensively on charter yachts in Florida, which is where she met him. It would only be a couple day trip, and J████ probably has the cash on her to pay for it straight away, if she didn't get a ride in exchange for favors anyway. On arrival in SKN sans passport, she will say she lost her passport and obtain a new one, since she is a citizen of that country. As you may know, an SKN passport allows visa-free travel more countries than just about any passport but maybe a UK passport (since SKN was a British protectorate).



Erlend Olson

EXHIBIT 14

**From:**     Erlend Olson [erlendolson@yahoo.com]
**Sent:**     6/14/2022 2:12:18 PM
**To:**
**Subject:**  For avoidance of any doubt...



For avoidance of any doubt, our conversation was in NO WAY intended to suggest that anyone should do, or fail to do, anything they think they should or that they have been ordered to do or whatever. I am NOT interfering in any way with any investigation in any way, nor should anyone construe that I am attempting to.

I was simply giving you context that the IRS CI is paying a "scorched earth" game IN MY OPINION, and that game is because they have, shall we say, great difficulties in that the entire action they took was based on self-dealing liars (even if once removed) who were so blinded by their desire to "be heros" that they used the IRS for their own purposes. That is clear and proven now, even if the IRS is not fully aware of what we know.

I also know that the buyer has great plans and my understanding is he will likely give opportunity to those who supported him closing and getting everyone paid so the programs could proceed as envisaged. Conversely, those who contributed to making things more difficult to keep the core team intact to realize the future he is paying everyone fully for, would not be people he would want to work with in the future. I do not represent the buyer in any way, so that is not anything more than my opinion, though.

So, it would be suggested by some that those who get subpeonas from Sublett excercise their due process rights according to the best and proper way that preserves their potential future with all things that could become very positive. That's all.

But again, just my opinions. I have zero control or representation of anyone, so people should always do as their counsel or conscience or the law suggests, not what I suggest.

For avoidance of doubt.

-E

CONFIDENTIAL

EXHIBIT 15

I was thinking "in writing" was best as well to address the matter you know about, and nothing else whatsoever. Agree that you should stay out of the fray. Also I don't think its useful to talk about Gold this and Gold that, only that the "counterparty represented that he had the necessary fungible assets set aside and earmarked for the program to which he had committed with us and it was verified by our trusted staff in-country". That's it.

And then the team verified with you and you verified it then to me. THat's the chain that matters here.

I think its helpful what you said to me that "the only person who ever lied to you from the C suite was Buscher" but that's another matter...

9:28 AM

Part of MY strategy (doesn't have to be yours and isnt' yours of course) is that these crap-heads in DoJ don't even understand the key elements of what they don't know. As you say, the fact that they never ever asked you (or anyone else) as to the veracity of the MPP relationships is because they just took Buscher's representations hook-line-and-sinker. Be aware that the former AUSA (no longer on the case now) said to my lawyer that they thought the entire MPP program was "make believe" and there were not ANY contracts or anything at all. All made up. We can discuss the credit worthiness of counterparties, but they cannot question that it was real.

9:32 AM

OK. Good on the gold but as you know I have never seen the contract (by choice) so I was assuming that it was mentioned. If not? Then great. P

9:33 AM

Well you were copied on it back and forth, and you read it many times to tell me about certain terms and conditions that were a problem, not being met, whatever... not being gruff, just reminding you... anyway... but yes do also remember that there was discussion about Rex turning whatever he had (we didn't need to know what quality, where, etc) into cash, and that process was underway and verified by our team. That's what I cared most about myself at the time. Anyway, we can work together with my lawyer on the written version. As I said before I think by far its best, and you can lodge it with them. Now they may say they do NOT want your written statement, which will mean something too, but we cross that bridge when we get to it.

scam). He will add, "Although I fully intend to finish out my term in good health, should that not happen she will be ready to step into my shoes, and if -- as I expect -- I fill out my full term she will be one of the best prepared candidates to contest the 2028 election."

4:06 PM


Outgoing voice call · 9:07 PM

Call Again


Tue, Apr 2


One concern is that Sublett will not get back to you so he can control the timing and narrative as he sees fit... in other words not exactly ignoring you but not taking in your inputs as they come, only later when he wants them and has already "gone past" a place he is in now. I can't say a whole lot more, but it might be a good idea to email him your missive as-is with a note saying you will sign it formally "per our conversation as soon as you send me the proper validiction language you need above my signature but in the mean time you now have my statement on the matter". Something like that. That way he cannot avoid the truth any longer. Consider that if you would. I know some other things going on that I won't say, but he is under no obligation to help you hurt his narrative, and it wo... Read more

10:31 AM


I prefer to give him a few days, then explain that I am preparing for the state visit and want to get things off my plate, all of which is true. P

11:25 AM


Okay well they are concluding some matters this week in their process so would love for them to have your inputs before Thu. Thanks.

11:25 AM


Humm, OK Weds evening then. P

11:26 AM


Thanks. They are interviewing some "friends and family" today in DC, which is what they wanted to do with you too...

11:27 AM

Wed, Apr 3

Outgoing voice call · 2:02 PM

Incoming voice call · 2:03 PM

Call Back

docx

FBI Affadavit PS-EO Edit2.docx

22 KBSimple edit in black italics.  P

2:31 PM

Thanks. All fine as far as I am concerned. Obviously remove the italics and might be best if you did not leave the "EO" in the name of the file of course ha ha ha ha (I mean not ha ha ha of course).

2:35 PM

is my plan...

2:35 PM

Please do send and then copy me what you sent on email after the fact so I can make sure my lawyer has the exact thing you said as sent, even if you find typos left later, etc.... THANK YOU SO MUCH

2:35 PM

Hope it works out !  P

docx

10:29 AM


Got it. Thanks makes sense!

10:32 AM


FYI Sonny has already indicted his willingness to run USNC Tech based in Wash DC (a separate but wholly-owned company). USNC is planning a 7 person board with ▆▆▆▆▆ (we hope) as chairman, and Tiffanny on the board. I think I told you about Lyles (4 stars with a nuke engineering degree), and you know Tiffanny well enough. FYI she won the "Defense Industry CEO of the Year" award last year or the year before. She tripled the size of Novetta and Carlyle sold it for an obscene profit. P

10:39 AM


Tiff is absolute badass rock star. Without question she did magic. At the right time I want her on my board. You know the royal "me" so to speak. You mean ▆▆▆▆▆▆▆ ?

10:43 AM


Right, former MDA chair amongst other things. And the good news is that Jeff and Sonny are good friends of his. P

10:45 AM


By the way, if you want to "delay" things with the IRS, one way to do it is to have your lawyer state to them that you are "generally supportive" which does not mean anything other than to lay foundation for the next sentence which is "My client Peter Schafer has no interest in telling you details which you use to then implicate him in whatever crazy narrative you are cooking up, thus if you want to interview him, you must provide him immunity" which will then take weeks to sort out... just an idea, of course I am in no way offering you any advice nor suggesting in any way that you thwart any efforts by DoJ in any way whatsoever.


good re Lyles. Maybe we have two boards of similar composition at some point... ha ha ha

10:46 AM


I am sure Tiff would be pleased to consider your board. BTW when will your announcements begin to unwind the prosecution? I would love to have them lose interest. PS

5:43 PM

Sublet just turned down my request to reschedule. Jerks. P

6:11 PM

You really have to get a lawyer to call them and insist on immunity... it's the only way to delay. Clearly they are fucking with you.

6:15 PM

Well to be fair Sublet said he didn't have the authority I had to go to Ms Ross (?).

Just for my peace of mind and marriage tranquility do you think T2 will eventually cover my legal fees?

6:18 PM

Without question

Have the lawyer call Ross she will delay

6:26 PM

Ok thx

7:23 PM

I just signed a tolling agreement giving them another year. They should not be in such a rush now.

7:33 PM

Not sure I understand

7:40 PM