<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                    ) 25-0069-RCL
 4            Plaintiff,            )
          vs.                      )
 5                                  )
     ERLEND OLSON,                  )
 6                                  ) Washington, D.C.
              Defendant.            ) April 8, 2025
 7   _____) 12:12 p.m.

 8

 9                Transcript of Bond Review Hearing
               Before the Honorable Royce C. Lamberth
10                   United States District Judge

11

12   APPEARANCES:

13   For the Government:  Joshua A. Gold, Esquire
                          Alexis Hughes, Esquire
14                        U.S. Attorney's Office
                          601 D Street NW
15                        Washington, DC 20001

16

17   For the Defendant:  Nicholas Sitterly, Esquire (by Zoom)
                          Charles R. Haskell, Esquire
18                        Law Offices of Charles R. Haskell, P.A.
                          641 Indiana Ave. NW
19                        Washington, DC 20004

20

21   Reported by:        Christine T. Asif, RPR, FCRR
                          Official Court Reporter
22                        United States District Court
                          for the District of Columbia
23                        333 Constitution Avenue, NW
                          Washington, D.C., 20001
24                        (202) 354-3247

25   Proceedings recorded by machine shorthand; transcript produced
     by computer-aided transcription
</pre>

```
1                    P R O C E E D I N G S
2              THE CLERK:  Your Honor, this is criminal case
3    25-69-1, United States of America versus Erlend Olson.
4              Counsel, please come forward to identify yourselves
5    for the record, starting with the government.
6              MR. GOLD:  Good afternoon, Your Honor.  Josh Gold on
7    behalf of the United States, and I'm joined at counsel table
8    by Alexis Hughes from the tax division also on behalf of the
9    United States.
10             MR. HASKELL:  Hi, good afternoon, Your Honor.
11   Charles Haskell on behalf of Erlend Olson.  And I'm joined via
12   Zoom by my co-counsel and lead counsel, Nick Sitterly.
13             THE COURT:  Okay.
14             MR. SITTERLY:  Good morning, Your Honor.  Nick
15   Sitterly for Mr. Olson, who's present.
16             THE COURT:  Okay.
17             MR. SITTERLY:  He's identified as Raymond in the
18   video Zoom.
19             THE COURT:  Okay.  Mr. Sitterly, I'll be glad to
20   hear you pro hoc vice or motion today for this hearing.  And I
21   understand you're working on the paperwork for normal pro hoc
22   vice.
23             MR. SITTERLY:  That's correct, Your Honor.
24   Unfortunately, our Supreme Court is a little backlogged.
25             THE COURT:  Right.  No problem.
```

1          And then the defendant, Mr. Olson, is online.

2          Mr. Olson, can you hear me okay?

3          THE DEFENDANT:  Yes, I can, Your Honor.

4          THE COURT:  Okay.

5          All right.  We're here then on the defendant's

6     appeal from the magistrate's determination on bond.  So I'll

7     let the defendant go first.

8          MR. SITTERLY:  Thank you, Your Honor.  The first

9     thing I'd ask the Court to entertain, I have Mr. Olson's

10    father here.  I have informed him that you may not be willing

11    to hear from him today, but I would like the Court to consider

12    testimony from Mr. Olson about the circumstances for the

13    defendant and his ties to the community and also the general

14    background and flight risk.  I can get through some background

15    information with Mr. Olson briefly if the Court will allow me

16    to call Mr. Chris Olson.

17         THE COURT:  Any objection by the government?

18         MR. GOLD:  No, Your Honor.

19         THE COURT:  Okay.  Go ahead.

20         Let me have the clerk then administer the oath.

21         THE CLERK:  Please raise your right hand.

22                     CHRISTOPHER OLSON,

23    called as a witness, being first duly sworn, was examined and

24    testified as follows:

25         THE WITNESS:  I do.  I do so swear.

```
1              THE COURT:  You may --

2              MR. SITTERLY:  Is the Court able to hear him okay?

3              THE COURT:  Yes.

4              MR. SITTERLY:  Okay.  All right.  Thank you, Your

5    Honor.

6                        DIRECT EXAMINATION

7    BY MR. SITTERLY:

8    Q.  Mr. Olson, would you state and spell your name for the

9    record?

10   A.  Christopher Olson.  First name C-h-r-i-s-t-o-p-h-e-r, last

11   name Olson, spelled O-l-s-o-n.

12   Q.  What is your relationship to the defendant?

13   A.  I'm his father.

14   Q.  About your background, Mr. Olson, where are you currently

15   employed?

16   A.  I'm employed at New Covenant Church in Albuquerque as an

17   associate pastor.

18   Q.  Did you say New Covenant Church in Albuquerque as an

19   associate pastor?

20   A.  Yes.  I'm sorry, yes, sir.

21   Q.  That's okay.  Just speak a little more slowly.  Your

22   signal is a little garbled on my end.

23   A.  Okay.

24   Q.  How long have you held that position?

25   A.  Since 2011.
```

1    Q.   Where were you employed prior to that?

2    A.   I was retired from Sandia National Labs in 2001.  I was

3    engaged in engineering consulting for several years.  Then I

4    was employed from 2003 until 2014 with Wycliffe Bible

5    Translators.  So my employment at Wycliffe Bible Translators

6    overlapped with my work as a pastor at New Covenant Church.

7    Q.   Walk the Court through the recent background for Mr. Olson

8    the defendant, if you would.

9    A.   Well, he worked in California after he graduated from

10   New Mexico State with a degree in electrical engineering.  And

11   while in California, he earned a master's degree in electrical

12   engineering from the University of Southern California and was

13   employed at Jet Propulsion Laboratory, which is NASA's

14   principal scientific laboratory.  He worked there primarily on

15   signal communication and remote sensing.  He left Jet

16   Propulsion Laboratory and established his own company, Pivotal

17   Technologies.  He was a -- I would say a forefront -- in the

18   forefront of developing microelectronics technology,

19   especially hybrid technologies that join digital with analog,

20   which is the basis now of all of our smartphones.

21   Q.   Let me cut in just to save time for the Court here.

22   A.   Oh, sure.

23   Q.   Talking about now ties to the community, describe

24   Mr. Olson's connection to Albuquerque, New Mexico.

25   A.   Well, he grew up here from age 2 until he graduated from

1  high school.  And he actually spent an additional year working

2  here in Albuquerque before he went off college at New Mexico

3  State.  So he has those original ties.  His 17-year-old son is

4  now following in his father's footsteps going to Albuquerque

5  Academy here in Albuquerque.  And playing the same sports,

6  making the same grades, and wants to be an electrical engineer

7  like his dad.  So he's tied both by his background for his

8  whole life until he graduated from high school to New Mexico

9  State, and he's tied by his family ties to me, to his sister

10  and his brother.  His sister is the president of Hospital

11  Services Corporation.  His brother is the head of --

12  **Q.**  Let me stop you.  And his sister is in New Mexico as

13  well?

14  **A.**  Yes, his sister -- actually, I'm living in the same house

15  with his sister and his brother-in-law now.  And his son is

16  domiciled here while Mr. Olson is in custody.  His brother,

17  Garth, is the head of surgical services, the director of

18  surgical services for the University of New Mexico Medical

19  School, and is also a full professor on clinical faculty

20  there.  And so he has very close family relationships here.

21  His other brother lives in Dallas, about an hour away, but

22  visits here quite often because of all his brother's ties

23  here.  So all his family ties are here.

24  **Q.**  How involved is Mr. Olson with his son's upbringing?

25  **A.**  Well, he's very intimately involved.  In addition to

1   supporting his son's education, he attends his son's sports

2   events.  He always has at least one or two projects going on

3   with his son, teaching his son to weld, helping his son learn

4   how to use computers and other microelectronics.  So they're

5   together often.

6   **Q.**  Thank you.

7       And does Mr. Olson provide any support or assistance to

8   you personally?

9   **A.**  Well, he assists me a great deal, not so much financially.

10  But since his divorce, he's been at my house constantly and,

11  in fact, lived with me in my house while his ex-wife was

12  unavailable for several years starting in 2016.  So for the

13  last nine years, he's lived in Albuquerque and we've had a

14  close association.  Since his divorce in 2020 -- '2 or '3, we

15  were closer.

16  **Q.**  Let me direct -- Mr. Olson, I'm sorry to interrupt you,

17  but let me direct you specifically.  Does he provide you with

18  any physical assistance, health assistance?

19  **A.**  Well, quite a bit.  He does most of my food shopping for

20  me.  I'm handicapped and have difficulty walking.  I'm 83

21  years old.  And we're in virtually daily conversation and

22  discussion often at my house, sometimes on the phone.

23  Occasionally at his house.  So he helps me with maintenance

24  around my house.  He's helped me get to doctor's appointments

25  and that sort of thing.  So he's been a constant support

1    really for me, almost daily.

2    **Q.**  Let me turn now and talk about flight risk.  The

3    government has alleged that Mr. Olson might flee the country

4    or flee the Court's jurisdiction.  At any point in the

5    previous ten years, has Mr. Olson indicated that he intended

6    to move out of the United States?

7    **A.**  No.

8    **Q.**  Have you seen him making any plans to do so?

9    **A.**  No, actually, just the opposite.  When he began to suspect

10   that he might be indicted, he asked me to keep his passport

11   and some of his important papers so they would be available to

12   his family in case he was indicted and taken into custody.  So

13   I actually have his passport in my possession.

14   **Q.**  Okay.  And at any point are you aware of him buying

15   tickets for international travel or otherwise arranging for

16   international travel?

17   **A.**  No.  And, in fact, I checked his checking account this

18   morning, because I have access to his checking account, and he

19   had $2.01 in it.  So he's -- although he has the ability to

20   earn money as an engineering consultant, right now he doesn't

21   have money in it.  If he were to even try to buy a ticket, he

22   would have to come to me to buy it.  So no, there's never been

23   any discussion of that.  And of course, I would never assist

24   him in anything like that, nor would he ever ask me.

25   **Q.**  Based on your close association with him, what information

1    do you have, if any, that Mr. Olson has been hiding or

2    concealing his funds?

3    **A.**   Well, I don't have any information that he's done such a

4    thing.  But since he moved back in with me in 2016, I know

5    that even for a year or two before that and certainly since

6    then, he's only had money that he's borrowed or else that he's

7    earned a small amount in engineering consulting, because he's

8    not been drawing a salary from his company that he founded.

9    So he doesn't have a lot of money.  And he -- I'm not aware of

10   any money that he's hidden anywhere.  His ex-wife has hidden

11   money, but he has not.  And they are not on good terms.

12              MR. SITTERLY:  Your Honor, I'll pass the witness at

13   this time.

14              THE COURT:  All right.

15              MR. GOLD:  Your Honor, can we either have Mr. Olson

16   on the screen, or could I take the witness from the -- so that

17   I can at least see him?

18              THE COURT:  Well, I don't know.  Let me ask the

19   clerk.

20              MR. GOLD:  It's not showing up here.  I'm happy to

21   do it up here.  I just can't see Mr. Olson, so it's harder

22   to --

23              MR. HASKELL:  We can turn this monitor on.

24              MR. GOLD:  Well, it's coming on over there.  So it's

25   totally up to --

THE CLERK:  Your Honor, there seems to be an issue with the monitor at the lectern.  There is no signal.  But we can --

THE WITNESS:  Do you want me to restart Zoom?

MR. GOLD:  No, no, I just turn this.  Here we go. That's fine.

CROSS-EXAMINATION

BY MR. GOLD:

Q.  Good afternoon, Mr. Olson.  So you said that your son has lived with you since 2016?

A.  Well, he moved in with me in 2016 when his wife moved back to New Mexico, which would have been about 2018 or '19, maybe 2020.  No, it was before the pandemic.  Then he moved back out of my house into a home with his wife that they rented.

Q.  And so you don't live at 1437 Honeysuckle Drive?

A.  No, no, I don't.

Q.  And that's where Mr. Olson lives though, correct, or lived, prior to his arrest?

A.  That's where he's been living for the past several years, in a rented house, yes.  He doesn't own that house.  He's actually been evicted from that house now.

Q.  But he lived there at least at the time of his arrest; correct?

A.  He was living there at the time of his arrest, to my knowledge, yeah.

**Q.** And so you see him from time to time, but you don't spend all your time with him. Is that fair to say?

**A.** That's fair to say. Right.

**Q.** And you don't know how he's paying 6,000 -- or was paying $6,000 a month for rent to that house?

**A.** I do know that because it's posted on the door of the house in an eviction notice. He's three months behind in rent.

**Q.** So four months ago, do you know how he paid the 6,000?

**A.** Either with money he earned as an engineering consultant or with borrowed money.

**Q.** Okay. So it's fair to say that you don't know everything about your son's finances?

**A.** No, I don't. No.

**Q.** Now, you mentioned that ten years ago or so, since then, he's indicated no, you know, interest in living outside the country, as I think was the term you used, starting back in 2016 when he came to live with you; right?

**A.** That's correct. There was times prior to that when he and his wife explored -- when they were still together, explored living elsewhere.

**Q.** And, in fact --

**A.** As a part of --

**Q.** In fact, he's a citizen of St. Kitts and Nevis?

**A.** Not that I'm aware of, no.

1    **Q.**  So you're not aware that your son is a dual citizen of

2    St. Kitts and Nevis?

3    **A.**  No, I'm not.

4    **Q.**  And you're aware that he lived in Nigeria for a time?

5    **A.**  I know that he visited Nigeria several times, but I'm not

6    aware that he ever lived there, no.

7    **Q.**  But he's at least traveled extensively throughout the

8    world; is that correct?

9    **A.**  He has traveled to a number of places, yes.  Originally,

10   with --

11   **Q.**  And that includes --

12   **A.**  Originally, with his business, Terralliance, and now

13   with Theia.

14   **Q.**  So he has -- it's fair to say that through those trips and

15   through those businesses, he's made contacts in different

16   places around the world; is that right?

17   **A.**  I'm sure he has met people there.  Now, I don't know the

18   depth of his contacts there.  He certainly doesn't talk about

19   them.

20   **Q.**  But you admit that he's traveled extensively out of the

21   country.  Is that fair to say?

22   **A.**  That's fair the say.  I have also.

23   **Q.**  Okay.  And he has, since 2016, traveled extensively

24   outside the country; is that correct?

25   **A.**  I have to think about that a minute.  I don't think he's

1    traveled extensively outside the country since 2016, but he

2    probably has been outside the country.  But you have to ask

3    him.

4            MR. GOLD:  That's right, Your Honor.  We have to ask

5    him.  Okay.  No further questions, Your Honor.

6            THE COURT:  Anything further you want to ask?

7            MR. SITTERLY:  No, Your Honor.  Thank you.

8            THE COURT:  Okay.  Thank you, Mr. Olson, for your

9    testimony.

10           THE WITNESS:  Thank you.

11           THE COURT:  You may proceed, Mr. Sitterly.

12           MR. SITTERLY:  Thank you, Your Honor.  With respect

13   to the government's position, the defense generally sees this

14   case as that the government is starting off in a very deep

15   hole here.  They're starting off with a basic constitutional

16   framework.  *Solerno's* probably got the most poignant quote

17   regarding detention being used only in the most exceptional

18   circumstances, and that it is a carefully guarded exception to

19   allowing defendants to remain free.

20           The government has heavy burdens of proof here, as

21   detailed in the memorandum that I filed.  The government has

22   no rebuttable presumption in this case.  They have no showing

23   of violence.  They have no threats of violence.  They have no

24   weapons.  They have no terrorism.  They have no drugs, no

25   guns, no child trafficking, child pornography.  None of the

1    types of facts that are typical in a lot of detention

2    hearings.

3         I understand that that's not an exhaustive list, but

4    there's something key to those types of cases that's very

5    different from this case that the government is not

6    recognizing.  In a lot of those cases, the typical diet of

7    cases that courts see, one can almost calculate the Sentencing

8    Guidelines before the arraignment even occurs, because the

9    evidence is so strong and the evidence is of a character that

10   it just makes the criminal offense obvious.  But it also makes

11   the danger and the mental instability of the defendant in

12   those cases so obvious.

13        It's a very different picture from the one we have

14   here.  The other things the government is lacking:  Mr. Olson

15   doesn't really have the ability to whatever they're alleging

16   about his witness tampering.  The fact of this case is that

17   most of the evidence is documentary financial records.  That

18   was all collected within the first months of the investigation

19   and certainly within the first years of the investigation when

20   Mr. Olson, through myself, through counsel, participated in a

21   extensive filter review process.  All the defendants did.  And

22   they gave up, and I assume the government has achieved and

23   obtained, all of the financial accounting records that it

24   wishes to have.  So Mr. Olson just really doesn't have the

25   ability to interfere with that aspect of the government's

1    case.

2          The government has not presented any evidence.

3    They're presenting kind of hints and allegations that

4    Mr. Olson might be hiding funds.  They're not presenting any

5    evidence, and they haven't presented any evidence over the

6    last four years.  They've never asked me, during our long

7    correspondence, that he treat his funds differently or that he

8    act differently with his accounting or that he display -- you

9    know, I assume that they're seizing accounting records

10   whenever they wish through their ongoing subpoenas.  They've

11   never communicated any dissatisfaction there.

12         There's a number of things the government does not

13   explain.  They haven't explained it in their briefing here.

14   They didn't explain it in their briefing below.  Why are none

15   of the other defendants in this case detained, and why is the

16   government not -- why has that not occurred despite them all

17   universally having similar circumstances to Mr. Olson?  They

18   have similar flight risks.  Mr. Stephen Buscher, for example,

19   wrote an autobiography detailing his long years in Russia and

20   in the eastern Europe countries as well as in Switzerland, and

21   spending a vast amount of time, including owning property in

22   Switzerland and several countries.  You know, the ties that

23   the other defendants have to other countries are equal, if not

24   vastly superior to that that Mr. Olson has.

25         So the government's really not explaining that

differential.  They're not explaining, from a big picture

sense here, why, over the last four years, they've -- the

government has been content to leave Mr. Olson free.  Almost

immediately in June of 2021, the government had all the

evidence that they needed to make the same allegations they're

making here.  They had the evidence they needed to make tax

allegations, wire fraud allegations.  It's not different from

the evidence that they're offering at this point in this

motion and in the indictment.  The picture is not different

materially.  They have perhaps multiplied the volume of

records that they could have made the allegations sufficient

to detain Mr. Olson four years ago, so why leave him free only

now to raise an alarm.

        And it's our position that the reason they're doing

that is because they perceive Mr. Olson as the person who is

most susceptible to pressure.  He is susceptible to pressure

because his background is in engineering, in science, in

working for NASA.  He is the individual who was able to apply

for and obtain all of the patents and the FCC licensure

underlying the intellectual property in this case.  And also

the NOAA licensure, the National Oceanographic Atmospheric

Administration, he was able to apply for all of that.  These

are not easy feats to accomplish.  They're not easy technical

feats.

        Mr. Olson has spent a lot of his life trying to

1    start technology-based companies.  And he may not have had the

2    success that he wished he would have had in a lot of areas.

3    The government is making quite a few allegations about his

4    honesty.  But the gravamen of Mr. Olson's life is not in crime

5    and violence and the type of behavior that would require this

6    court to detain him.

7         And because of that, what the government has done in

8    its briefing here is cobble together the most prejudicial

9    arguments.  They focused on his personal spending habits,

10   which are really neither here nor there.  They focused on a

11   civil case that's ancient history.  They're not explaining why

12   the Court needs to take notice of a contested civil case.

13   There's nothing in that that would require this Court to take

14   notice of a contested civil case where civil litigants, over

15   money, are making various allegations.

16         They're looking at a 13-year-old DUI in California.

17   The government's casting that -- trying to cast that in the

18   worst possible light in saying -- cherry-picking out a couple

19   of instances of probation noncompliance, but they're really

20   glossing over the fact that that probation noncompliance was

21   due to the complex nature of DWI probation.  You have a number

22   of different classes, counseling, fees that need to be paid.

23   There's a large infrastructure of probation requirements in

24   most DWI cases at a state level.  And what is in the records

25   that I attached to the memorandum is that Mr. Olson may have

1    been sanctioned for failing to meet an attendance requirement

2    at a class, but, ultimately, that was remedied and he

3    completed probation.

4            And so what the government wants to cast there as

5    noncompliance with the Court, I would ask the Court to see

6    that Mr. Olson did attend all court hearings prior to a

7    conviction.  He did enter into a plea which resulted in

8    conviction.  And he did enter into probation, which he

9    ultimately completed successfully, which requires a long

10   series of compliant acts with the court, with a couple of

11   minor cherry-picked noncompliance, arguably.  So I would say

12   that, you know, the government's trying to steal a march

13   there, and really those facts tend more in the defendant's

14   favor.

15           So -- and then the style of the government's

16   pleadings, I think, is what stands out as most prejudicial.

17   They're trying to say the word "lie" and "lying" as many times

18   and humanly possible in their pleadings.  They really want to

19   get Mr. Olson detained, because they perceive him as the one

20   they can apply the most pressure to.

21           I want to talk for a moment about the government's

22   case.  The government is -- I would say, the defendant would

23   say, resting its greatest weight on the facts of this case,

24   and essentially trying to say, $250 million was lost,

25   Mr. Olson is likely to face life in prison, it's a foregone

conclusion, please look no further.

        The review of the indictment and a review of their
pleadings really paint quite a different picture.  Mr. Olson's
involvement in this conspiracy is a bit vague.  He's alleged
to have given information that was perhaps inaccurate, but
that's a disagreement that we have with the government.  Theia
was a company, to give a little background, that was launched
and was never represented to do anything but provide security
applications through a cloud of satellites that was launched
to collect remote data on border activity, climate activity,
agricultural activity.  A number of different applications.
And that was the mission of the company.  That's what was
represented to lenders.

        The government represents them as investors.  In
fact, they were all lenders who signed lending agreements with
the company and were issued notes in most cases.  And that was
the representation to these individuals, that they were
entering into a startup company that was attempting to launch
a somewhat novel technology to provide these -- these
applications to customers.

        The government is alleging here that misstatements
were made regarding what contracts and what funding that
company had.  Well, we disagree with their position.  We
disagree that the -- all of the contracts that the government
claimed were false, were false.  We believe we did have

1    substantial contracts.  We believe we did have substantial

2    investments.  That's a disagreement we have with the

3    government.  It's not a foregone conclusion.

4         With regard to whatever statements the government

5    believes Mr. Olson made which were false, what they're not

6    showing there is the connection between those false statements

7    and the money that the lenders lost.  The indictment has six

8    or seven friends or family investors, and those are featured

9    front and center because they're the most emotionally resonant

10   cases.  But the vast majority of the $250 million in this were

11   provided by institutional lenders.

12        That number of 250 million is also pretty

13   substantially inflated.  The number that the institutional

14   investors actually transferred to Theia was much less than

15   that, potentially even as much as half of that $250 million.

16        All of that is going to be discovered and argued

17   about in the accounting details of this case, which could

18   potentially take years from now.  So, that is the major reason

19   we're asking the Court to consider that, you know, Mr. Olson

20   based on his background, based on who he is, based on his

21   family ties and everything else, should not be made to wait

22   for years in detention, potentially, away from everyone while

23   this case proceeds.

24        Let me address, just in closing here, a couple of

25   minor points.  Witness tampering, the government, again, here

is casting some messages that Mr. Olson had with associates in
this case in the worst possible light.  I would ask the Court
to remember that nearly all of Mr. Olson's business associates
and friends and personal associates have been wrapped up in
the Theia project for the last ten years.  This has been the
major project of his life for ten years.  It's been the major
project of his friend's life and many other individuals' life
for the last ten years.  He necessarily has been in contact
with a number of people who could be considered witnesses.

        The worst the government has been able to find is
Mr. Olson suggested delaying this investigation through legal
means, through -- by going through counsel and introducing
some delays.  That's what the government alleges.  I will
acknowledge that communications of that kind shouldn't happen.
I don't think that the Court has any reason to believe that if
the Court orders Mr. Olson not to communicate with these
individuals or not to have those conversations, that he will
disobey that order.  He will obey that order.

        With regard to the St. Kitts argument, the
government has not presented evidence that Mr. Olson is a
citizen of St. Kitts.  My understanding on information and
belief is that St. Kitts issues passports to tourists and to
people who have minimal requirements and that you don't
necessarily need full citizenship in order to obtain that.  I
don't have a very clear understanding of that, but it's the

government's burden to provide a clear understanding of that.
And it's questionable that they would allege he's a citizen
without offering any real proof of that.  The only proof they
have offered is a passport that expired in 2017, long before
there was any hint or suspicion of a government investigation
into this case.

So with that, Your Honor, if the Court doesn't have
any questions about this, I will just ask that the Court
consider that Mr. Olson has a deeply embedded life here in
New Mexico with his son, with his father, with the church
community that his father is a pastor to.  And that he is not
a violent man.  He is going to obey this Court's orders.  This
Court's orders will be the most serious Court orders he has
received in his life.  He will obey them.  Please give him a
chance on release.  Thank you, Your Honor.

THE COURT:  Let me ask you a few questions before I
hear from the government.  The Pretrial Services report
indicate that he declined to discuss his employment history
except to represent he's been employed for the last four
years.  What else can you tell me then about his current
employment?  You said he -- well, how would you describe his
current employment since Pretrial Services couldn't tell me in
their report?

MR. SITTERLY:  I think the best way to probably
describe it is contractual engineering odd jobs for various

1   friends and associates.  He's been in this kind of engineering

2   world for most of his life.  So he knows people who need help

3   with patent applications or with technical applications,

4   which, frankly, I'm too dumb to understand, Your Honor.  But

5   he gets kind of odd jobs here and there.  I'm not sure that he

6   refused to talk about that with Pretrial Services, but, you

7   know, I can certainly meet with him as well and supplement to

8   provide his -- a better employment background.

9           THE COURT:  The next question I had, on the face of

10  what I saw here, was it -- in terms of the prior probation

11  violation that resulted in a month-long period of

12  incarceration, it said he has no recollection of what he did

13  or didn't do that resulted in a 30-day period of

14  incarceration.  The magistrate judge found that difficult to

15  believe.  My own experience is someone who's on probation that

16  then gets a month-long period of incarceration, it had to be a

17  somewhat extreme violation that gets you 30 days then in jail.

18  So what else -- what else can you tell me about that?  I mean,

19  it stands out if you're on probation in a DUI case and you

20  then get to serve 30 days.  There must have been something

21  that happened.  And the magistrate said she -- basically, she

22  didn't believe that he didn't remember what would have gotten

23  him tossed in jail for 30 days.  Can you tell me any more

24  about that?

25          MR. SITTERLY:  I can, Your Honor, and I understand

1    the concern.  It was concerning to me as well.  I retained a

2    private investigator to pull up the misdemeanor court records

3    to try and understand what had happened, and we learned that

4    there was no 30-day incarceration.  Pretrial Services and the

5    government and myself, leading up to the detention hearing

6    below, we had access only to the electronic document that is

7    available online.

8                  THE COURT:  Right.

9                  MR. SITTERLY:  But nobody had reviewed the actual

10   court records themselves.  So I've attached the full DUI court

11   record for the Court to review.  And I believe the government

12   has now withdrawn the position that he was incarcerated.

13                 THE COURT:  That he was?

14                 MR. SITTERLY:  Yeah, I think the government has

15   withdrawn that allegation.

16                 THE COURT:  Okay.  Okay.  And then she did say that

17   he attempted to influence potential victims and witnesses.

18   Tell me more about what that was.  Using an encrypted

19   messaging application, she said.

20                 MR. SITTERLY:  Well, and that's Signal.  Signal is

21   fairly commonly used these days.

22                 THE COURT:  Even today by cabinet members.

23                 MR. SITTERLY:  Yes, Your Honor.  I think it's a bit

24   of a convention.  And the allegation, as I understand it, is

25   that Mr. Olson had suggested -- or the messages show that

1    Mr. Olson had suggested some delay tactics through attorneys,

2    through counsel, that the investigation could be delayed in

3    some way.

4              THE COURT:  And apparently it has been.

5              MR. SITTERLY:  Yes.  I don't know to what extent any

6    activity of witnesses actually delayed it.  The government

7    hasn't really alleged that.

8              And I'll acknowledge -- I'll acknowledge for the

9    Court that those type of communications shouldn't happen.  I

10   would also just say, though, that the government was in

11   possession of these communications.  Has never asked me,

12   despite our communication, to ask Mr. Olson to behave

13   differently.  They've never indicated up until right now, when

14   it's apparently an emergency after four years, that Mr. Olson

15   should behave differently with this messaging.

16             So I think it cuts in both directions, but it's

17   clear that Mr. Olson should not be making communications of

18   that kind.  I will acknowledge that with the Court.

19             THE COURT:  How do I ensure that that is carried out

20   without having him confined?

21             MR. SITTERLY:  Well, I think a better test of that

22   would have been if the government had asked him to stop and he

23   didn't.  What I would say is now that it's been raised as an

24   issue and it can be specifically addressed, please just give

25   him a chance.  Tell him not to do it and he won't do it.  He's

1    been compliant with my instructions, to a large extent.  The

2    government has not asked him not to do this stuff.  So please

3    just give him a chance to not do it.

4          THE COURT:  Now, the last question before I hear

5    from the government, if I was to revoke the order of

6    detention, what are the conditions of release that you're

7    proposing that would reasonably ensure he doesn't take off for

8    St. Kitts or parts unknown?

9          MR. SITTERLY:  Well, I would say that like the other

10    defendants in this case, like any citizen, he does have the

11    ability to flee the jurisdiction.  Of course, it's not

12    perfect.  But, you know, what the government's missing here is

13    he's been traveling internationally over his life with his

14    American passport and just has all the defendants in this case

15    have been traveling with their American passports.  He's

16    willing to surrender that.  He's certainly willing to

17    surrender anything the Court asks him to surrender.  He's

18    willing to undergo GPS monitoring.  He's willing to, you know,

19    allow the government to track him in any way they wish to

20    track him.  But I would ask the Court to not accept the

21    government's argument that simply because he has traveled or

22    has made plans at some point in the past, that means he

23    necessarily will do so in the future.  He's got pretty deep

24    ties to New Mexico, as you heard.

25          THE COURT:  All right.  Mr. Gold.

1              Thank you, Mr. Sitterly.

2              MR. GOLD:  Your Honor, just briefly, before I begin,

3      Exhibit 11 to the government's response is a declaration from

4      a government official from St. Kitts and Nevis certifying that

5      he -- Mr. Olson is a citizen, that he purchased citizenship

6      back in 2007 for $250,000, and that he remains a citizen of

7      St. Kitts.  So just wanted to bring that point up because the

8      defense raised that there wasn't any evidence that he was

9      actually a citizen.

10              But, Your Honor, the defense's argument here was

11     almost entirely premised on the idea that this is a case where

12     we're seeking a hold based on dangerousness.  They were

13     talking about, well, this isn't a case that involves firearms,

14     this isn't a case that involves terrorism, child pornography,

15     this isn't the type of case where there's firearms involved.

16     Your Honor --

17              (Indiscernible crosstalk.)

18              THE COURT:  -- up every day --

19              MR. GOLD:  Yeah.  Your Honor, this is a case where

20     we're seeking detention under 3142(f)(2), based on the

21     defendant's risk of flight.  And so the question for Your

22     Honor and the question for the magistrate judge in the

23     district of New Mexico was, is he a significant risk of

24     flight.  The answer to that is clearly yes.  He's got every

25     reason to flee because he's facing such substantial charges.

1    Under the Sentencing Guidelines, he's facing a potential life

2    sentence.  The weight of the evidence is so strong that that

3    provides a motive, that that sentence is more likely, making

4    it more likely he's going to flee.  He has had the means to

5    flee through his connections to various wealthy individuals,

6    both in this investment scheme and in his prior life with

7    Terralliance, which is described in the government's filing.

8    And he has means to flee by being a citizen of a foreign

9    country.

10           And, Your Honor, I just would point you, and I'm

11   sure you read it, the email -- the best reason for Your Honor

12   to see that just simply surrendering a passport or the fact

13   that his St. Kitts and Nevis passport is expired is not

14   enough.  Take it from the defendant's own words.  When

15   describing during a dispute with him and his ex-wife, who they

16   also paid for the $250,000 to become a citizen of St. Kitts

17   and Nevis, where she -- it was suggested that she could just

18   surrender her passport, the defendant said, "I would add that

19   my wife producing her passports, even if she does, in fact,

20   produce them at all, does little to stop her from fleeing.

21   Her most likely course of action is to go to St. Kitts and

22   Nevis on a private yacht.  It would only be a couple-day trip,

23   and she probably has the cash on her to pay for it straight

24   away.  On arrival in St. Kitts and Nevis sans passport, she

25   will say she lost her passport and attain a new one since she

is a citizen of that country.  As you may know, a St. Kitts
and Nevis passport allows visa-free travel to more countries
than just about any passport than maybe a UK passport."

Now, Your Honor, that was news to me, but that is,
in fact, true.  St. Kitts and Nevis offers visa-free travel to
more than a hundred countries, including numerous countries
that don't have extradition treaties with the United States.
So if Mr. Olson is a big risk of flight, which he is a
significant risk of flight, the question becomes, can Your
Honor trust him.  If he raises his right hand, and you're
trying to swear him into release conditions, can you trust him
to follow those conditions.  And everything about Mr. Olson's
life says that you can't.

Starting with the history and -- the nature and
circumstances of this case, Your Honor, this is a case about
lies.  Mr. Olson stands accused of being the primary person.
Now, the defense asked what sets Mr. Olson apart.  Well, this
is his company, Theia.  He is the lead defendant.  And part of
the allusion that the government makes in its -- in its filing
about why he would be sentenced to -- or subject to a life
sentence is because we think he fits the definition, under the
Sentencing Guidelines, of a leader and organizer.  And the
reason that is, is because we've talked to the investors.
We've talked to the investors, the institutional investors,
and to the friends and family investors.  And what did they

say?  This company was Erlend Olson.  The lies that they were
told that led them to invest, they were told by Mr. Olson.

        And we don't have to just rely on what those
investors said.  We have video recordings of him as well as
documentary evidence of him telling those lies.  And these
weren't your typical lies, Your Honor.  These were lies that
involved forging documents, falsifying records, concealing
audited financials, opening a secret bank account.  Most
egregiously, and as excerpted in the government's filing,
Mr. Olson repeated, again and again, a lie that Theia had
$6 billion in an escrow account that it had obtained from
$2 billion apiece from foreign countries.

        Now, what did Mr. Olson do to substantiate that lie?
He took Theia's bank account, which had about $800,000 in it,
and he doctored that bank account to just add a 6, comma, 00
in front of the exact amount that was in the bank account, to
make it look like Theia had $6 billion more than they actually
had.

        Now, how do we -- now, that just gives you a flavor
of the types of lies being told.  And that goes to the nature
and circumstances here.  Because the defense wants to talk
about the nature and circumstances as in, well, this isn't a
dangerous case.  This -- the crime itself isn't dangerous.
But the crime is the type of crime that makes you consider
whether he can be trusted to come to court.  And the lies that

1    he's told here, the government would submit, make it so you

2    cannot trust him to abide by conditions.

3            And the weight of the evidence the defense wants to

4    discount.  In fact, in its filing, it said that it's

5    precedent, that that is the least important factor under 3142,

6    but Chief Judge Howell in our district -- they cited 9th

7    Circuit and the district of Kansas unpublished case for that

8    assertion.  But then-Chief Judge Howell in our district went

9    through an analysis, a deep analysis of those cases, including

10   the 2nd Circuit which said the obvious, and Judge Howell said

11   that that's not true.  Weight of the evidence stands right

12   with the other four factors.

13           And it's particularly important, as I mentioned

14   earlier, because the stronger the evidence and the higher the

15   exposure, the more motivation there is to flee.  In other

16   words, if there's --

17           THE COURT:  I agree with her opinion in that.  I

18   agree.

19           MR. GOLD:  So moving on to what Your Honor, I think,

20   is the judge in New Mexico --

21           THE COURT:  I mean, I think it's difficult where it

22   took you four years to do it, though, and it's a problem about

23   all the other guys have gotten bail.

24           MR. GOLD:  Well, so --

25           THE COURT:  So explain that to me.  And it took four

1    years to do it, so that's -- why should he be the only one

2    that's not going to get bail.

3            MR. GOLD:  So, Your Honor, I think that's where the

4    history and characteristics set him apart.  For instance --

5    well, for one thing, his exposure is higher; right?  The

6    government believes he's the leader organizer of the scheme.

7    Additionally, he was instrumental into every bit of that

8    $250-million-plus loss amount.

9            So, for instance, I think the defense mentioned

10   Steve Buscher.  Steve Buscher only came on later in the scheme

11   as the CFO.  And the government did seek detention of

12   Mr. Buscher in Memphis.  He was the only other defendant that

13   the government sought detention for.  But the difference

14   between -- and he was released on a $500,000 bond.  Okay.  The

15   difference --

16           THE COURT:  Where was that?

17           MR. GOLD:  What was that?

18           THE COURT:  Where was that?

19           MR. GOLD:  In Memphis.

20           But the difference between Mr. Olson and Mr. Buscher

21   is, A, his role in the scheme; B, the evidence against

22   Mr. Olson is so far and away greater than all the other

23   defendants, and that's because what I mentioned, Your Honor,

24   all the investors say that Mr. Olson's the one who told them

25   the lies, and all the people who worked at Theia said nothing

1    happened at Theia without Mr. Olson knowing.

2            And then also, I think -- I talked about that

3    $6 billion escrow statement.  Well, the best defense for

4    Mr. Olson would be, well, I didn't know that was a lie.  Yeah,

5    it turned out not to be true, but someone gave me that escrow

6    statement and I just passed it along.

7            But as we noted in our filing, Mr. Olson used the

8    same playbook in his own personal life.  He was looking for a

9    condo in Las Vegas, a high-priced condo during COVID, and at

10   that time, because the agents didn't want just people coming

11   in and out due to COVID, they were requiring proof of funds in

12   advance of even showing an apartment.  And so Mr. Olson sent

13   as his proof of funds the exact same bank account that he'd

14   sent -- that had been used with investors that showed $6

15   billion.  But an agent probably would have been a little

16   confused if they got a $6 billion statement.  So instead of

17   changing it to $6 billion, he added 10 million instead of 6

18   billion to the balance.

19           And, in fact, he left off in one spot where he'd

20   changed it escrow.  So while the rest of the document says

21   it's a checking account, he left in one spot it's an escrow.

22   Which shows that Mr. Olson is the one who was doctoring these

23   documents.  He knew that that's what they had.  So the weight

24   of the evidence against Mr. Olson is so far and away.

25           But beyond that, what sets Mr. Olson apart is his

1    history and characteristics.  For one thing, he's lied

2    directly to the government on at least two occasions, which

3    the -- which the government notes in its filing.  One, he lied

4    to an AUSA in the Central District of Florida.  So Mr. Olson

5    had a fine that the -- a civil AUSA in California was trying

6    to collect for failing to report a foreign bank account.  And

7    the fine was around, I believe, $80,000 or so, $90,000.  And

8    Mr. Olson sent this AUSA asking for a payment plan, saying he

9    didn't have the money to pay when the day before, Mr. Olson

10   had purchased a $130,000 Range Rover car.

11        So he's shown a willingness to lie to government

12   officials, not just in an email but also under penalty of

13   perjury.  He was -- he has a substantial tax liability, not

14   only to the United States, which is part of this case, but to

15   California, the State of California, to their Franchise Tax

16   Board.  And on a form where he was trying to set up a payment

17   plan with the Central District of -- or with California, he

18   lied under penalty of perjury, saying that he was paying

19   $10,000 regularly on his federal income taxes when he was

20   paying nothing, severely undercounting what his income was at

21   the time which was in the millions, and not mentioning a bank

22   account for Meridian Vector Corporation, which was the holding

23   company he used to hold his salary from Theia.

24        So he's shown a willingness to lie to the

25   government, both to an AUSA and under penalty of perjury to

the State of California.  But also what sets him apart, Your

Honor, is this dual citizenship.  So he has this dual

citizenship to St. Kitts and Nevis.  And while his passport is

expired --

THE COURT:  What was the date that was taken out?

MR. GOLD:  The St. Kitts and Nevis?  Yes, that was

2007.  And I mentioned this in New Mexico, but you have to

wonder why someone who's an American citizen would be paying

$250,000 to become a citizen of St. Kitts and Nevis, which

does have this visa-free travel to more than a hundred

countries.

And, actually, what's interesting is even though

Mr. Olson's passport was -- is expired, at least the passport

that the government knows about, is currently expired, for one

thing, Mr. Olson, in that email that I read, suggested that

that wouldn't matter.  If he got to St. Kitts and Nevis, they

would just issue a new one because he's a citizen.  But, two,

that passport was also expired in 2020.  And there's emails

that the government attached to its filing that show in 2020,

he was trying to circumvent the rules, the COVID travel rules

where he couldn't travel on an American passport to Europe, by

traveling on a St. Kitts passport.  And obviously, he wasn't

concerned at that time that his passport may or may not have

been expired.  In fact, he suggested even lying and saying

that he was a resident of Ireland and leaving with the --

1    living with the -- saying he lived with the controller of

2    Theia group.  So all of this sets him apart.

3          Now, I want to touch briefly on the criminal history

4    portion.  Yes, these are older convictions.  But it's not like

5    a situation which I know Your Honor sees regularly, where you

6    have a 30-year-old who has a conviction from ten years ago and

7    says, you know, I was young, I've grown up, I've changed.

8    Mr. Olson was in his 40s at the time.  So we have data points

9    to consider when we're considering how Mr. Olson would do

10   under supervision.  In that case, regardless of whether he was

11   revoked to incarceration, he was revoked from probation

12   multiple times, had multiple violations, and, in fact, the

13   second DWI which he was sentenced to 45 days on occurred while

14   he was on probation from the first DWI.  Now, that wasn't a

15   case where his exposure was so much smaller.

16         Here, Your Honor, we have to consider that this

17   case -- Mr. Olson talks a lot about his ties to the community

18   in Albuquerque.  But as Your Honor knows, this case doesn't

19   take place in Albuquerque.  And that's a big, big problem

20   here.  Because let's say Your Honor were to put him on home

21   incarceration in Albuquerque.  Every substantive hearing in

22   this case, Mr. Olson is going to have to find a way to get to

23   D.C.  And when I spoke to the Pretrial Services officer about

24   that issue when I was in New Mexico, they said, well, they

25   give us their ticket and then once they get there, you know,

1    we coordinate with D.C., so that then D.C. takes over the

2    monitoring while he's here.

3            But what does that mean, Your Honor?  That means

4    that Mr. Olson necessarily is going to have to go to an

5    airport every time we're having a hearing in this case that

6    requires his appearance.  But more concerning than that, is

7    he's going to have to go to an airport after that hearing.  So

8    if we have a substantive hearing in this case that doesn't go

9    Mr. Olson's way, Your Honor has to put the trust in Mr. Olson

10   that he's going to go back to Albuquerque, back to where he

11   is, and follow his conditions.

12           There's too many gaps in GPS.  And Mr. Olson is

13   someone who has had basically unlimited access to money these

14   years.  He keeps no assets because he owes such a substantial

15   amount to the IRS.  But that has never stopped him from

16   getting access to private planes, getting access to money, to

17   living in a $6,000-a-month house, that is valued, or at least

18   on Redfin or Zillow, shows that it's worth more than -- you

19   know, it's worth sven figures, Your Honor, more than a million

20   dollars.

21           Now, he has the means to flee.  He has the ability

22   to flee, and he has a great motivation to flee.  So the first

23   three factors most certainly favor detention here.

24           Now, moving on to this last factor, the

25   dangerousness, now, Judge Jackson, Judge ABJ, Amy Berman

Jackson, she discussed in the *Manafort* case that when you're
considering the dangerousness factor, that you don't just
consider dangerousness in the way that you would traditionally
think of it, and the violent crimes that Mr. Sitterly was
mentioning, but also danger to the administration of justice.

Mr. -- the defense wants to say that Mr. Olson was
cooperative the entire time these four years. But that is
clearly not the case, Your Honor. For one thing, Mr. Olson --
having spoken to many of these investors, our investigators
have found that the investors want more than anything to get
their money back; right? So what Mr. Olson has done
throughout this process is suggested that any new buyer of
Theia's assets, which are now in -- were in receivership, they
wouldn't be able -- they would be worthless unless Mr. Olson
was involved. So any action they took that could potentially
put Mr. Olson in jail would be averse to them getting their
money back. And that's something we heard from multiple
investors, and that type of phrasing is excerpted in one of
the Government's Exhibits.

But most concerning, Your Honor, are the Signal
messages. And on these Signal messages, which, as Your Honor
noted, the judge in New Mexico found extremely concerning, the
defendant assisted in drafting a statement from this witness
that would be provided to the lead investigator. In fact,
before it was sent, he told -- and you'll see in the Signal

chats we excerpted, he told the witness, hey, make sure you take EO off the file path because they'll know that Erlend Olson had edited this statement.  And that statement was sent to the investigator.

Two, he suggested several times that the witness ask for immunity to delay the investigation.  And, in fact, did delay the investigation.

And he did this a few times, but on the very last page of government -- the government's last exhibit, when he -- the witness says, "Sublet turned down my request to reschedule the meeting," which Charles Sublet is the lead investigator in this case, Mr. Olson said, "You really have to get a lawyer to call them and insist on immunity.  It's the only way to delay."

Mr. Olson, so he suggested that defendant wouldn't -- and then he suggested that he would make sure that the defendant -- that he would get the witness's legal fees paid in connection with this case.

And, four, he told the witness to withhold specific pertinent information related to one of those contracts with an entity in a foreign country that Mr. Sitterly was alluding to.

So if he was that desperate to take those types of steps while the investigation was pending, Your Honor, now that he faces the charges, now he knows the charges, he knows

1    the potential exposure, he's starting to learn how strong the

2    government's evidence is, he -- this all gives him a huge

3    motivation to flee.  And given his dual citizenship, his

4    foreign ties, and his history of just saying whatever he needs

5    to say in the moment for his own interest, the government

6    submits that there's no conditions that will assure his

7    appearance in court and, frankly, that the Court cannot trust

8    him to follow any conditions.

9        THE COURT:  Tell me a little more about the length

10    of the investigation and then how you see this going in the

11    future.  Because if he's detained all this time, I'm going to

12    feel like I need to move this case along now if he's being

13    held without bail.  And the other defendants are going to say,

14    oh, we got to have a million tons of discovery.

15        MR. GOLD:  Right, Your Honor.  There --

16        THE COURT:  So I'm going to have competing pressures

17    on the Court.  Other defense counsel is going to want to stall

18    forever.  You know how these work.

19        MR. GOLD:  Yes, Your Honor, and I --

20        THE COURT:  So I'm going to have one counsel who

21    wants to move it quickly if he's detained and the other

22    counsel saying, oh, I need tons of discovery.  We couldn't try

23    this in a year.  The government had four years to get ready.

24    So you know what the competing concerns are going to be for

25    the Court.

1          MR. GOLD:  Well, so, Your Honor, I do want to say

2     something about that --

3          THE COURT:  Unless I'm wrong.

4          MR. GOLD:  Well, I want to say something -- I'll

5     respond to that, but one thing about this four years, Your

6     Honor, is that this case has evolved over those four years.

7     Yes, four years ago there was a search warrant done of

8     Mr. Olson's house, but at that point this was just a tax case.

9     We had some suspicions that there might be some fraud

10    involved.  But the idea that we've had this case tied up with

11    a bow for four years and that Mr. Olson has had the full idea

12    of what he might be facing for four years is inaccurate, Your

13    Honor.  And if you look where the tax charges feature in the

14    indictment now, you can see that while they're very serious,

15    and we're talking about millions of dollars, we're talking

16    about hundreds of millions of dollars in the investment fraud.

17    And that's what took time to develop.

18          But, Your Honor, there will be a significant amount

19    of discovery.  In fact, we've already turned over discovery to

20    three of the other defendants and are just waiting for a

21    protective order to be issued with -- to be fully negotiated

22    with respect to Mr. Olson and to get a drive to get the

23    discovery over to him.

24          But Mr. Sitterly and the defense wanted to talk

25    about how this is some supercomplicated case.  And it's true

1    that there's a lot of documents and it was a long

2    investigation.

3            THE COURT:  They always are.

4            MR. GOLD:  But the facts -- the fact is, this is a

5    case where investors are going to say why they invested.  And

6    in most cases, that's going to be because of things Mr. Olson

7    told them.  And we're going to prove that those were false.

8    And we're going to prove that Mr. Olson was getting paid for

9    all of this and hiding the money.

10           So while it's complex in the size of the discovery,

11   the allegations and, I think, reading the indictment, it's

12   pretty simple.  Investors were lied to, that caused them to

13   give money, and that's fraud.

14           So, Your Honor, the government is happy -- we will

15   go on the Court's schedule, for one thing.  But, two, we will

16   do whatever we need to do to work with Mr. Sitterly to sort

17   through that huge discovery to make sure he's seen all of --

18   you know, everything he needs to see to make sure he is

19   prepared for trial.

20           In a similar case that we have -- I have more than

21   two million documents in before Judge Kollar-Kotelly where

22   the -- a defendant is detained.  You know, we're working

23   through all these same issues to make sure that the defendant

24   has access to -- the necessary access to the discovery, that

25   we're not trying to hide the ball on, you know, the most

1    important evidence.  And we will make sure, to the extent the

2    government can, to make sure that Mr. Olson and all the

3    defendants can get prepared for trial in as timely a manner as

4    they wish to proceed.

5              THE COURT:  Okay.  Mr. Sitterly, you get the last

6    word.

7              MR. SITTERLY:  Thank you, Your Honor.  I have a list

8    of points here about what the government said.  Of course, I'm

9    happy to address anything of immediate concern to the Court.

10             I'll start with the St. Kitts argument.  Mr. Olson

11   will do whatever it takes to renounce his St. Kitts

12   citizenship tomorrow if the Court orders him to.  He will fill

13   out whatever paperwork needs to be done, whatever

14   communications need to be accomplished.  He will renounce that

15   immediately.

16             The suggestion that the government is trying to make

17   into his words about him leaving to St. Kitts was actually a

18   comment Mr. Olson made during a long and difficult divorce

19   process with his wife.  And it was in suggestion that she

20   would flee, that she might behave this way.  And the

21   government's trying to turn that around somehow into an

22   allegation that he would flee.

23             And what I would ask the Court is why does the

24   government need to do that?  Why does the government need to

25   engage in that kind of tortured logic?  And the reason is

1    because they just don't have any evidence that he's ever used

2    the St. Kitts situation in the way that they're suggesting he

3    might do.  I don't have access to the citizenship records that

4    the government is claiming.  And the government may be correct

5    that he did this in 2007.  He does not have a clear

6    understanding of what his citizenship status is there.  But I

7    will cut to the chase with that, he'll renounce it, he'll get

8    rid of it.  No problem.

9           The sleight of hand that I would suggest is going on

10   there with the government, I think populates quite a bit of

11   their argument.  Right.  They're saying that, well, he's got

12   this really high exposure now and so now he's got a very

13   strong inclination to flee.  And that at the beginning of this

14   case, it was only a tax case, that's -- I would just say is

15   simply untrue.  This case was always set up in the exact way

16   that it is currently structured in the indictment.

17          A good indication of that was that the government

18   invited me to Washington, D.C., where I flew in October of

19   2023, and they presented to me a reverse proffer with several

20   AUSAs present, with the chief IRS CID investigator, Charles

21   Sublet present.  At that time the lead attorney, Leslie Gometh

22   (phonetic), presented to me a PowerPoint presentation with

23   their argument.  All of the same prejudicial arguments that

24   are being made here today were there two years ago.  That the

25   money was being spent improperly, that lies were being made,

1    this alleged $6 billion document was there.  All of the fraud

2    claims were there.

3              The initial raid in this case involved three

4    different locations in the United States, two on the east

5    coast and one in Albuquerque, New Mexico, with approximately

6    30 agents involved.  This was not a tax case simply from the

7    beginning.  It was never that.

8              The government encouraged me to discuss the

9    potential charges with Mr. Olson and the seriousness of it and

10   the extreme length of incarceration for the simple reason that

11   they wished him to cooperate.  They were attempting to solicit

12   his cooperation in the case.  And so they absolutely impressed

13   upon me and upon him, by proxy, the severe potential

14   circumstances of this case.  So there's no mystery that has

15   now been revealed at the last minute here.

16             The government alleged that Mr. Olson was at the

17   center of the company, that it was his company, that nothing

18   happened that he didn't know about.  There might be some

19   grains of truth in that, but the CFO in this case, the chief

20   financial officer who was responsible for being familiar with

21   and approving all financial documents in this case, was most

22   recently Steve Buscher.  Before that, it was a gentleman named

23   Paul Carroll who now resides in Ireland.  And Paul Carroll was

24   preceded by other individuals.  There were professional counts

25   involved.  Deloitte Touche was an auditor that was involved.

There was a board.  There were several other officers, some of whom are now co-defendants.

This was a complex, multistate aerospace startup corporation.  Mr. Olson was not the only decision-maker by a long shot.  He was not the only person who represented facts about the company to lenders.  Again, lenders, not investors. The institutional lenders in this case, something the government is just dodging, the institutional lenders in this case had access to much greater financial tools, auditors, resources, sophistication, and saw fit to invest, to lend their money through secured notes to Theia on the basis of what was represented to them.

So there's a far more complex process going on here than what the government is superficially showing.  The government is saying you can't trust Mr. Olson to come to court.  Well, he did go to court in the DUI case.  And I have the records up in front of me right now on that.  I have the portion highlighted.  He was sentenced to, for a probation violation, 30 days.  The immediate next line in that, this is my Exhibit H, "Suspended.  Stayed pending completion of a three-month first offender alcohol program.  Defendant ordered reinstated in level 1 alcohol program."  That's my exhibit. He did not serve any time in this case, and I really don't understand why the government is now resisting admitting that.

So you can trust him to come to court.  He did come

1    to court in that case.  He went to court in the civil case the

2    government referenced.  And most recently, where he went to

3    court quite substantially and followed court orders was in his

4    family and custody case, which has been a deeply involved

5    process where the Court has issued a number of orders that

6    were difficult for the family, for Mr. Olson, for his ex-wife,

7    for his child, and yet he did comply with those orders.

8    There's no suggestion he didn't.

9            I would say that there's a bit of sleight of hand

10   going on here.  The government represents that Mr. Olson lied

11   to a U.S. Attorney in California.  Why does the government not

12   include in that allegation what the government response was to

13   that?  Okay.  He allegedly lied to an AUSA.  Was he

14   prosecuted?  Were there sanctions for that?  Was he brought in

15   for some type of probation violation or a proceeding on the

16   basis of that lie?  Why is such thin information being

17   presented by the government?

18           They're saying he severely undercounted a bank

19   account.  Okay.  What was the response or the action at that

20   time?  Did they seek to prosecute him based on that?  Was a

21   fact-finding done by anybody?  All of these money allegations,

22   that he's been hiding money, squirreling away money, all of

23   that hinting, where is the proof of it?  They're saying that

24   his house is worth seven figures while omitting that it's a

25   leased house that he's now been evicted from; right.

1              And so the government is presenting this case of

2      puffery, essentially, and saying the Court cannot possibly

3      trust him.  There are several Courts who have ordered

4      Mr. Olson to comply.  He has complied.  There's no reason now

5      that he's not going to comply with this Court based on what

6      you heard from his father, his ties to his son, his ties to

7      his father.  We will do whatever it takes.

8              Let me just address your question briefly about the

9      complexity of this case.  The government is standing here

10     saying they're going to work -- it's not as complicated as it

11     seems.  The government, as recently as last week, asked the

12     defendants to provide four-terabyte hard drives to it so that

13     it can transmit the discovery to us.  The government is just

14     wrong about that.  This is --

15             THE COURT:  I can hardly wait.

16             MR. SITTERLY:  Yeah, me too.  Thank you, Your Honor.

17     And the protective order addressing that discovery has not

18     even been completed yet, let alone the transmission of the

19     discovery.

20             So I would say, Your Honor, my final argument is,

21     you know, please consider Mr. Chris Olson's word and the ties

22     to the community.  Give Erlend Olson a chance.  Allow him to

23     obey your orders.  Please.  Thank you, Your Honor.

24             THE COURT:  All right.  You still have to give me

25     what is the conditions of release that would reasonably assure

1    he appears for trial.  What are the conditions you're asking

2    for?

3          MR. SITTERLY:  He'll surrender his St. Kitts

4    citizenship or take whatever steps the government thinks are

5    appropriate there.  I wish the government would provide a

6    narrowly tailored means.  I think they should.

7          THE COURT:  They're arguing for detention.  So what

8    are you arguing in the alternative?

9          MR. SITTERLY:  That that's not the most narrowly

10   tailored means, that he can surrender his citizenship.  And I

11   think that the government, in good faith, should assist us

12   with that if that is their concern.  If the concern is he's

13   going to use that citizenship improperly, we'll surrender it.

14   We'll do whatever it takes to alleviate that concern.  Sitting

15   here right now, I don't know exactly what that is.  But if the

16   Court wanted to say take all steps to revoke or surrender that

17   citizenship, we will do it.  GPS monitoring, whatever kind of

18   pretrial monitoring the Court is typically used to using or

19   thinks is appropriate.  If the Court wants him to attend

20   weekly sessions or testing or any kind of, you know,

21   intervention that the Court seeks, we'll comply with it.

22         THE COURT:  All right.  The Court will be in recess,

23   and I'll rule as prompt as I can.  Thank you very much,

24   Counsel.

25         MR. SITTERLY:  Thank you, Your Honor.

1              (The proceedings were concluded at 3:27 p.m.)

2

3              I, Christine Asif, RPR, FCRR, do hereby certify that
   the foregoing is a correct transcript from the stenographic
   record of proceedings in the above-entitled matter.

4
                          _____/s/_____
5                              Christine T. Asif
                            Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
25-69-1,
  2:3.
June of 2021,
  16:4.
October of
  2023,
  44:18.
$10 34:19.
$130 34:10.
$2 30:12.
$2.01 8:19.
$250 18:24,
  20:10, 20:15,
  27:6, 28:16,
  35:9.
$250-million-pl
  us 32:8.
$500 32:14.
$6 11:5, 30:11,
  30:17, 33:3,
  33:14, 33:16,
  33:17, 37:17,
  45:1.
$80 34:7.
$800 30:14.
$90 34:7.
.
.
< 0 >.
00 30:15.
000 11:4, 11:5,
  11:9, 27:6,
  28:16, 30:14,
  32:14, 34:7,
  34:10, 34:19,
  35:9.
000-a-month
  37:17.
.
.
< 1 >.
1 46:22.
10 33:17.
11 27:3.
12:12 p.m.
  1:13.
13-year-old
  17:16.
1437 10:15.

17-year-old
  6:3.
19 10:12.
.
.
< 2 >.
2 5:25, 7:14.
20001 1:29,
  1:46.
20004 1:37.
2001 5:2.
2003 5:4.
2007 27:6,
  35:7, 44:5.
2011 4:25.
2014 5:4.
2016 7:12, 9:4,
  10:10, 10:11,
  11:18, 12:23,
  13:1.
2017 22:4.
2018 10:12.
202 1:47.
2020 7:14,
  10:13, 35:18,
  35:19.
2025 1:12.
25-0069-RCL
  1:6.
250 20:12.
27 50:1.
2nd 31:10.
.
.
< 3 >.
3 7:14, 50:1.
30 23:17,
  23:20, 23:23,
  45:6,
  46:19.
30-day 23:13,
  24:4.
30-year-old
  36:6.
3142 31:5.
3142(f)(2
  27:20.
333 1:45.
354-3247
  1:47.

.
.
< 4 >.
40s 36:8.
45 36:13.
.
.
< 6 >.
6 11:4, 11:9,
  30:15,
  33:17.
601 1:28.
641 1:36.
.
.
< 8 >.
83 7:20.
.
.
< 9 >.
9th 31:6.
_____/s/___
  _____
  50:7.
.
< A >.
A. 1:25,
  1:35.
abide 31:2.
ability 8:19,
  14:15, 14:25,
  26:11,
  37:21.
ABJ 37:25.
able 4:2,
  16:18, 16:22,
  21:10,
  38:14.
above-entitled
  50:5.
absolutely
  45:12.
Academy 6:5.
accept 26:20.
access 8:18,
  24:6, 37:13,
  37:16, 42:24,
  44:3, 46:9.
accomplish

  16:23.
accomplished
  43:14.
account 8:17,
  8:18, 30:8,
  30:11, 30:14,
  30:15, 30:16,
  33:13, 33:21,
  34:6, 34:22,
  47:19.
accounting
  14:23, 15:8,
  15:9,
  20:17.
accused
  29:16.
achieved
  14:22.
acknowledge
  21:14, 25:8,
  25:18.
act 15:8.
ACTION 1:5,
  28:21, 38:15,
  47:19.
activity 19:10,
  19:11,
  25:6.
acts 18:10.
actual 24:9.
actually 6:1,
  6:14, 8:9,
  8:13, 10:21,
  20:14, 25:6,
  27:9, 30:17,
  35:12,
  43:17.
add 28:18,
  30:15.
added 33:17.
addition
  6:25.
additional
  6:1.
Additionally
  32:7.
address 20:24,
  43:9, 48:8.
addressed
  25:24.

addressing
  48:17.
administer
  3:20.
Administration
  16:22,
  38:5.
admit 12:20.
admitting
  46:24.
advance
  33:12.
aerospace
  46:3.
afternoon 2:6,
  2:10, 10:9.
age 5:25.
agent 33:15.
agents 33:10,
  45:6.
ago 11:9,
  11:15, 16:12,
  36:6, 41:7,
  44:24.
agree 31:17,
  31:18.
agreements
  19:15.
agricultural
  19:11.
ahead 3:19.
airport 37:5,
  37:7.
alarm 16:13.
Albuquerque
  4:16, 4:18,
  5:24, 6:2,
  6:4, 6:5,
  7:13, 36:18,
  36:19, 36:21,
  37:10,
  45:5.
alcohol 46:21,
  46:22.
Alexis 1:26,
  2:8.
allegation
  24:15, 24:24,
  43:22,
  47:12.

allegations
  15:3, 16:5,
  16:7, 16:11,
  17:3, 17:15,
  42:11,
  47:21.
allege 22:2.
alleged 8:3,
  19:4, 25:7,
  45:1,
  45:16.
allegedly
  47:13.
alleges
  21:13.
alleging 14:15,
  19:21.
alleviate
  49:14.
Allow 3:15,
  26:19,
  48:22.
allowing
  13:19.
allows 29:2.
alluding
  39:21.
allusion
  29:19.
Almost 8:1,
  14:7, 16:3,
  27:11.
alone 48:18.
already
  41:19.
alternative
  49:8.
although
  8:19.
America 1:5,
  2:3.
American 26:14,
  26:15, 35:8,
  35:21.
amount 9:7,
  15:21, 30:16,
  32:8, 37:15,
  41:18.
Amy 37:25.
analog 5:19.

analysis
  31:9.
ancient
  17:11.
answer 27:24.
anybody
  47:21.
apart 29:17,
  32:4, 33:25,
  35:1, 36:2.
apartment
  33:12.
apiece 30:12.
apparently
  25:4,
  25:14.
appeal 3:6.
appearance
  37:6, 40:7.
APPEARANCES
  1:23.
appears 49:1.
application
  24:19.
applications
  19:9, 19:11,
  19:20,
  23:3.
apply 16:18,
  16:22,
  18:20.
appointments
  7:24.
appropriate
  49:5,
  49:19.
approving
  45:21.
approximately
  45:5.
April 8 1:12.
areas 17:2.
arguably
  18:11.
argued 20:16.
arguing 49:7,
  49:8.
argument 21:19,
  26:21, 27:10,
  43:10, 44:11,

  44:23,
  48:20.
arguments 17:9,
  44:23.
around 7:24,
  12:16, 34:7,
  43:21.
arraignment
  14:8.
arranging
  8:15.
arrest 10:18,
  10:22,
  10:24.
arrival
  28:24.
Asif 1:41,
  50:3, 50:8.
asks 26:17.
aspect 14:25.
assertion
  31:8.
assets 37:14,
  38:13.
assist 8:23,
  49:11.
assistance 7:7,
  7:18.
assisted
  38:23.
assists 7:9.
associate 4:17,
  4:19.
associates
  21:1, 21:3,
  21:4, 23:1.
association
  7:14, 8:25.
assume 14:22,
  15:9.
assure 40:6,
  48:25.
Atmospheric
  16:21.
attached 17:25,
  24:10,
  35:19.
attain 28:25.
attempted
  24:17.

attempting
  19:18,
  45:11.
attend 18:6,
  49:19.
attendance
  18:1.
attends 7:1.
Attorney 1:27,
  44:21,
  47:11.
attorneys
  25:1.
audited 30:8.
auditor
  45:25.
auditors
  46:9.
AUSA 34:4,
  34:5, 34:8,
  34:25,
  47:13.
Ausas 44:20.
autobiography
  15:19.
available 8:11,
  24:7.
Ave. 1:36.
Avenue 1:45.
averse 38:16.
aware 8:14,
  9:9, 11:25,
  12:1, 12:4,
  12:6.
away 6:21,
  20:22, 28:24,
  32:22, 33:24,
  47:22.
.
.
< B >.
back 9:4,
  10:11, 10:13,
  11:17, 27:6,
  37:10, 38:11,
  38:17.
background
  3:14, 4:14,
  5:7, 6:7,
  16:17, 19:7,

20:20,
  23:8.
backlogged
  2:24.
bail 31:23,
  32:2,
  40:13.
balance
  33:18.
ball 42:25.
bank 30:8,
  30:14, 30:15,
  30:16, 33:13,
  34:6, 34:21,
  47:18.
Based 8:25,
  20:20, 27:12,
  27:20, 47:20,
  48:5.
basic 13:15.
basically
  23:21,
  37:13.
basis 5:20,
  46:11,
  47:16.
become 28:16,
  35:9.
becomes 29:9.
began 8:9.
begin 27:2.
beginning
  44:13,
  45:7.
behalf 2:7,
  2:8, 2:11.
behave 25:12,
  25:15,
  43:20.
behavior
  17:5.
behind 11:7.
belief 21:22.
believe 19:25,
  20:1, 21:15,
  23:15, 23:22,
  24:11,
  34:7.
believes 20:5,
  32:6.

below 15:14,
  24:6.
Berman 37:25.
best 22:24,
  28:11,
  33:3.
better 23:8,
  25:21.
beyond 33:25.
Bible 5:4,
  5:5.
big 16:1, 29:8,
  36:19.
billion 30:11,
  30:12, 30:17,
  33:3, 33:15,
  33:16, 33:17,
  33:18,
  45:1.
bit 7:19, 19:4,
  24:23, 32:7,
  44:10,
  47:9.
Board 34:16,
  46:1.
bond 3:6,
  32:14.
Bond Review
  Hearing
  1:17.
border 19:10.
borrowed 9:6,
  11:11.
bow 41:11.
briefing 15:13,
  15:14,
  17:8.
briefly 3:15,
  27:2, 36:3,
  48:8.
bring 27:7.
brother 6:10,
  6:11, 6:16,
  6:21, 6:22.
brother-in-law
  6:15.
brought
  47:14.
burden 22:1.
burdens

13:20.
Buscher 15:18,
  32:10, 32:12,
  32:20,
  45:22.
business 12:12,
  21:3.
businesses
  12:15.
buy 8:21,
  8:22.
buyer 38:12.
buying 8:14.
.
< C >.
C-h-r-i-s-t-o-p
  -h-e-r
  4:10.
C. 1:11, 1:46,
  36:23, 37:1,
  44:18.
cabinet
  24:22.
calculate
  14:7.
California 5:9,
  5:11, 5:12,
  17:16, 34:5,
  34:15, 34:17,
  35:1,
  47:11.
call 3:16,
  39:13.
called 3:23.
car 34:10.
carefully
  13:18.
carried
  25:19.
Carroll
  45:23.
cases 14:4,
  14:6, 14:7,
  14:12, 17:24,
  19:16, 20:10,
  31:9, 42:6.
cash 28:23.
cast 17:17,
  18:4.

casting 17:17,
    21:1.
caused 42:12.
center 20:9,
    45:17.
Central 34:4,
    34:17.
certainly 9:5,
    12:18, 14:19,
    23:7, 26:16,
    37:23.
certify 50:3.
certifying
    27:4.
CFO 32:11,
    45:19.
chance 22:15,
    25:25, 26:3,
    48:22.
changed 33:20,
    36:7.
changing
    33:17.
character
    14:9.
characteristics
    32:4, 34:1.
charges 27:25,
    39:25, 41:13,
    45:9.
Charles 1:34,
    1:35, 2:11,
    39:11,
    44:20.
chase 44:7.
chats 39:1.
checked 8:17.
checking 8:17,
    8:18,
    33:21.
cherry-picked
    18:11.
cherry-picking
    17:18.
Chief 31:6,
    44:20,
    45:19.
child 13:25,
    27:14,
    47:7.

Chris 3:16,
    48:21.
Christine 1:41,
    50:3, 50:8.
Christopher
    3:22, 4:10.
Church 4:16,
    4:18, 5:6,
    22:10.
CID 44:20.
Circuit 31:7,
    31:10.
circumstances
    3:12, 13:18,
    15:17, 29:15,
    30:21, 30:22,
    45:14.
circumvent
    35:20.
cited 31:6.
citizen 11:24,
    12:1, 21:21,
    22:2, 26:10,
    27:5, 27:6,
    27:9, 28:8,
    28:16, 29:1,
    35:8, 35:9,
    35:17.
citizenship
    21:24, 27:5,
    35:2, 35:3,
    40:3, 43:12,
    44:3, 44:6,
    49:4, 49:10,
    49:13,
    49:17.
civil 17:11,
    17:12, 17:14,
    34:5, 47:1.
claimed
    19:25.
claiming
    44:4.
claims 45:2.
class 18:2.
classes
    17:22.
clear 21:25,
    22:1, 25:17,
    44:5.

clearly 27:24,
    38:8.
CLERK 2:2,
    3:20, 9:19,
    10:1.
climate
    19:10.
clinical
    6:19.
close 6:20,
    7:14, 8:25.
closer 7:15.
closing
    20:24.
cloud 19:9.
co-counsel
    2:12.
co-defendants
    46:2.
coast 45:5.
cobble 17:8.
collect 19:10,
    34:6.
collected
    14:18.
college 6:2.
COLUMBIA 1:2.
Columbia
    1:44.
coming 9:24,
    33:10.
comma 30:15.
comment
    43:18.
commonly
    24:21.
communicate
    21:16.
communicated
    15:11.
communication
    5:15,
    25:12.
communications
    21:14, 25:9,
    25:11, 25:17,
    43:14.
community 3:13,
    5:23, 22:11,
    36:17,

48:22.
companies
    17:1.
company 5:16,
    9:8, 19:7,
    19:12, 19:16,
    19:18, 19:23,
    29:18, 30:1,
    34:23, 45:17,
    46:6.
competing
    40:16,
    40:24.
completed 18:3,
    18:9,
    48:18.
completion
    46:20.
complex 17:21,
    42:10, 46:3,
    46:13.
complexity
    48:9.
compliant
    18:10,
    26:1.
complicated
    48:10.
complied
    48:4.
comply 47:7,
    48:4, 48:5,
    49:21.
computer-aided
    1:50.
computers
    7:4.
concealing 9:2,
    30:7.
concern 24:1,
    43:9, 49:12,
    49:14.
concerned
    35:23.
concerning
    24:1, 37:6,
    38:20,
    38:22.
concerns
    40:24.

concluded
  50:1.
conclusion
  19:1, 20:3.
conditions
  26:6, 29:11,
  29:12, 31:2,
  37:11, 40:6,
  40:8, 48:25,
  49:1.
condo 33:9.
confined
  25:20.
confused
  33:16.
connection
  5:24, 20:6,
  39:18.
connections
  28:5.
consider 3:11,
  20:19, 22:9,
  30:24, 36:9,
  36:16, 38:3,
  48:21.
considered
  21:9.
considering
  36:9, 38:2.
conspiracy
  19:4.
constant
  7:25.
constantly
  7:10.
Constitution
  1:45.
constitutional
  13:15.
consultant
  8:20,
  11:10.
consulting 5:3,
  9:7.
contact 21:8.
contacts 12:15,
  12:18.
content 16:3.
contested
  17:12,

17:14.
contracts
  19:22, 19:24,
  20:1,
  39:20.
contractual
  22:25.
controller
  36:1.
convention
  24:24.
conversation
  7:21.
conversations
  21:17.
conviction
  18:7, 18:8,
  36:6.
convictions
  36:4.
cooperate
  45:11.
cooperation
  45:12.
cooperative
  38:7.
coordinate
  37:1.
Corporation
  6:11, 34:22,
  46:4.
correct 2:23,
  10:17, 10:23,
  11:19, 12:8,
  12:24, 44:4,
  50:4.
correspondence
  15:7.
Counsel 2:4,
  2:7, 2:12,
  14:20, 21:12,
  25:2, 40:17,
  40:20, 40:22,
  49:24.
counseling
  17:22.
countries
  15:20, 15:22,
  15:23, 29:2,
  29:6, 30:12,

35:11.
country 8:3,
  11:17, 12:21,
  12:24, 13:1,
  13:2, 28:9,
  29:1,
  39:21.
counts 45:24.
couple 17:18,
  18:10,
  20:24.
couple-day
  28:22.
course 8:23,
  26:11, 28:21,
  43:8.
Courts 14:7,
  48:3.
Covenant 4:16,
  4:18, 5:6.
COVID 33:9,
  33:11,
  35:20.
crime 17:4,
  30:23,
  30:24.
crimes 38:4.
CRIMINAL 1:5,
  2:2, 14:10,
  36:3.
CROSS-EXAMINATI
  ON 10:7.
crosstalk.
  27:17.
current 22:20,
  22:22.
currently 4:14,
  35:14,
  44:16.
custody 6:16,
  8:12, 47:4.
customers
  19:20.
cut 5:21,
  44:7.
cuts 25:16.
.
.
< D >.
dad 6:7.

daily 7:21,
  8:1.
Dallas 6:21.
danger 14:11,
  38:5.
dangerous
  30:23.
dangerousness
  27:12, 37:25,
  38:2, 38:3.
data 19:10,
  36:8.
date 35:5.
day 27:18,
  34:9.
days 23:17,
  23:20, 23:23,
  24:21, 36:13,
  46:19.
DC 1:29,
  1:37.
deal 7:9.
decision-maker
  46:4.
declaration
  27:3.
declined
  22:18.
deep 13:14,
  26:23,
  31:9.
deeply 22:9,
  47:4.
Defendant 1:12,
  1:33, 3:1,
  3:5, 3:7,
  3:13, 4:12,
  5:8, 14:11,
  18:13, 18:22,
  27:21, 28:14,
  28:18, 29:18,
  32:12, 38:23,
  39:15, 39:17,
  42:22, 42:23,
  46:21.
defendants
  13:19, 14:21,
  15:15, 15:23,
  26:10, 26:14,
  32:23, 40:13,

41:20, 43:3,
48:12.
defense 13:13,
27:8, 27:10,
29:17, 30:21,
31:3, 32:9,
33:3, 38:6,
40:17,
41:24.
definition
29:21.
degree 5:10,
5:11.
delay 25:1,
39:6, 39:7.
delay. 39:14.
delayed 25:2,
25:6.
delaying
21:11.
delays 21:13.
Deloitte
45:25.
depth 12:18.
describe 5:23,
22:21,
22:25.
described
28:7.
describing
28:15.
desperate
39:23.
despite 15:16,
25:12.
detailed
13:21.
detailing
15:19.
details
20:17.
detain 16:12,
17:6.
detained 15:15,
18:19, 40:11,
40:21,
42:22.
detention
13:17, 14:1,
20:22, 24:5,

26:6, 27:20,
32:11, 32:13,
37:23,
49:7.
determination
3:6.
develop
41:17.
developing
5:18.
diet 14:6.
difference
32:13, 32:15,
32:20.
different
12:15, 14:5,
14:13, 16:7,
16:9, 17:22,
19:3, 19:11,
45:4.
differential
16:1.
differently
15:7, 15:8,
25:13,
25:15.
difficult
23:14, 31:21,
43:18,
47:6.
difficulty
7:20.
digital 5:19.
DIRECT 4:6,
7:16, 7:17.
directions
25:16.
directly
34:2.
director
6:17.
disagree 19:23,
19:24.
disagreement
19:6, 20:2.
discount
31:4.
discovered
20:16.
discovery

40:14, 40:22,
41:19, 41:23,
42:10, 42:17,
42:24, 48:13,
48:17,
48:19.
discuss 22:18,
45:8.
discussed
38:1.
discussion
7:22, 8:23.
disobey
21:18.
display 15:8.
dispute
28:15.
dissatisfaction
15:11.
District 1:1,
1:2, 1:19,
1:43, 1:44,
27:23, 31:6,
31:7, 31:8,
34:4,
34:17.
division 2:8.
divorce 7:10,
7:14,
43:18.
doctor 7:24.
doctored
30:15.
doctoring
33:22.
document 24:6,
33:20,
45:1.
documentary
14:17,
30:5.
documents 30:7,
33:23, 42:1,
42:21,
45:21.
dodging 46:8.
doing 16:14.
dollars 37:20,
41:15,
41:16.

domiciled
6:16.
done 9:3, 17:7,
38:11, 41:7,
43:13,
47:21.
door 11:6.
down 39:10.
drafting
38:23.
drawing 9:8.
Drive 10:15,
41:22.
drives 48:12.
drugs 13:24.
dual 12:1,
35:2, 40:3.
due 17:21,
33:11.
DUI 17:16,
23:19, 24:10,
46:16.
duly 3:23.
dumb 23:4.
during 15:6,
28:15, 33:9,
43:18.
DWI 17:21,
17:24, 36:13,
36:14.
.
.
< E >.
earlier
31:14.
earn 8:20.
earned 5:11,
9:7, 11:10.
east 45:4.
eastern
15:20.
easy 16:23.
edited 39:3.
education
7:1.
egregiously
30:9.
Either 9:15,
11:10.
electrical

5:10, 5:11,
    6:6.
electronic
    24:6.
elsewhere
    11:21.
email 28:11,
    34:12,
    35:15.
emails 35:18.
embedded
    22:9.
emergency
    25:14.
emotionally
    20:9.
employed 4:15,
    4:16, 5:1,
    5:4, 5:13,
    22:19.
employment 5:5,
    22:18, 22:21,
    22:22,
    23:8.
encouraged
    45:8.
encrypted
    24:18.
end 4:22.
engage 43:25.
engaged 5:3.
engineer 6:6.
engineering
    5:3, 5:10,
    5:12, 8:20,
    9:7, 11:10,
    16:17, 22:25,
    23:1.
enough 28:14.
ensure 25:19,
    26:7.
enter 18:7,
    18:8.
entering
    19:18.
entertain
    3:9.
entire 38:7.
entirely
    27:11.

entity 39:21.
EO 39:2.
equal 15:23.
Erlend 2:3,
    2:11, 30:1,
    39:2,
    48:22.
ERLEND OLSON
    1:10.
escrow 30:11,
    33:3, 33:5,
    33:20,
    33:21.
especially
    5:19.
Esquire 1:25,
    1:26, 1:33,
    1:34.
essentially
    18:24,
    48:2.
established
    5:16.
Europe 15:20,
    35:21.
events 7:2.
everyone
    20:22.
everything
    11:12, 20:21,
    29:12,
    42:18.
evicted 10:21,
    47:25.
eviction
    11:7.
evidence 14:9,
    14:17, 15:2,
    15:5, 16:5,
    16:6, 16:8,
    21:20, 27:8,
    28:2, 30:5,
    31:3, 31:11,
    31:14, 32:21,
    33:24, 40:2,
    43:1, 44:1.
evolved 41:6.
ex-wife 7:11,
    9:10, 28:15,
    47:6.

exact 30:16,
    33:13,
    44:15.
exactly
    49:15.
EXAMINATION
    4:6.
examined
    3:23.
example
    15:18.
except 22:19.
exception
    13:18.
exceptional
    13:17.
excerpted 30:9,
    38:18,
    39:1.
exhaustive
    14:3.
Exhibit 27:3,
    39:9, 46:20,
    46:22.
Exhibits
    38:19.
experience
    23:15.
expired 22:4,
    28:13, 35:4,
    35:13, 35:14,
    35:18,
    35:24.
explain 15:13,
    15:14,
    31:25.
explained
    15:13.
explaining
    15:25, 16:1,
    17:11.
explored
    11:20.
exposure 31:15,
    32:5, 36:15,
    40:1,
    44:12.
extensive
    14:21.
extensively

12:7, 12:20,
    12:23,
    13:1.
extent 25:5,
    26:1, 43:1.
extradition
    29:7.
extreme 23:17,
    45:10.
extremely
    38:22.
.
.
< F >.
face 18:25,
    23:9.
faces 39:25.
facing 27:25,
    28:1,
    41:12.
fact 7:11,
    8:17, 11:22,
    11:24, 14:16,
    17:20, 19:15,
    28:12, 28:19,
    29:5, 31:4,
    33:19, 35:24,
    36:12, 38:24,
    39:6, 41:19,
    42:4.
fact-finding
    47:21.
factor 31:5,
    37:24,
    38:2.
factors 31:12,
    37:23.
facts 14:1,
    18:13, 18:23,
    42:4, 46:5.
faculty 6:19.
failing 18:1,
    34:6.
fair 11:2,
    11:3, 11:12,
    12:14, 12:21,
    12:22.
fairly 24:21.
faith 49:11.
false 19:25,

20:5, 20:6,
42:7.
falsifying
30:7.
familiar
45:20.
family 6:9,
6:20, 6:23,
8:12, 20:8,
20:21, 29:25,
47:4, 47:6.
far 32:22,
33:24,
46:13.
father 3:10,
4:13, 6:4,
22:10, 22:11,
48:6, 48:7.
favor 18:14,
37:23.
FCC 16:19.
FCRR 1:41,
50:3.
feats 16:23,
16:24.
feature
41:13.
featured
20:8.
federal
34:19.
feel 40:12.
fees 17:22,
39:17.
few 17:3,
22:16,
39:8.
figures 37:19,
47:24.
file 39:2.
filed 13:21.
filing 28:7,
29:19, 30:9,
31:4, 33:7,
34:3,
35:19.
fill 43:12.
filter 14:21.
final 48:20.
finances

11:13.
financial
14:17, 14:23,
45:20, 45:21,
46:9.
financially
7:9.
financials
30:8.
find 21:10,
36:22.
fine 10:6,
34:5, 34:7.
firearms 27:13,
27:15.
First 3:7, 3:8,
3:23, 4:10,
14:18, 14:19,
36:14, 37:22,
46:21.
fit 46:10.
fits 29:21.
flavor 30:19.
flee 8:3, 8:4,
26:11, 27:25,
28:4, 28:5,
28:8, 31:15,
37:21, 37:22,
40:3, 43:20,
43:22,
44:13.
fleeing
28:20.
flew 44:18.
flight 3:14,
8:2, 15:18,
27:21, 27:24,
29:8, 29:9.
Florida 34:4.
focused 17:9,
17:10.
follow 29:12,
37:11,
40:8.
followed
47:3.
following
6:4.
follows 3:24.
food 7:19.

footsteps
6:4.
forefront 5:17,
5:18.
foregoing
50:4.
foregone 18:25,
20:3.
foreign 28:8,
30:12, 34:6,
39:21,
40:4.
forever
40:18.
forging 30:7.
form 34:16.
forward 2:4.
found 23:14,
38:10,
38:22.
founded 9:8.
four 11:9,
15:6, 16:2,
16:12, 22:19,
25:14, 31:12,
31:22, 31:25,
38:7, 39:19,
40:23, 41:5,
41:6, 41:7,
41:11,
41:12.
four-terabyte
48:12.
framework
13:16.
Franchise
34:15.
frankly 23:4,
40:7.
fraud 16:7,
41:9, 41:16,
42:13,
45:1.
free 13:19,
16:3,
16:12.
friend 21:7.
friends 20:8,
21:4, 23:1,
29:25.

front 20:9,
30:16,
46:17.
full 6:19,
21:24, 24:10,
41:11.
fully 41:21.
funding
19:22.
funds 9:2,
15:4, 15:7,
33:11,
33:13.
future 26:23,
40:11.
.
.
< G >.
gaps 37:12.
garbled 4:22.
Garth 6:17.
gave 14:22,
33:5.
general 3:13.
generally
13:13.
gentleman
45:22.
gets 23:5,
23:16,
23:17.
getting 37:16,
38:16,
42:8.
Give 19:7,
22:14, 25:24,
26:3, 36:25,
42:13, 48:22,
48:24.
given 19:5,
40:3.
gives 30:19,
40:2.
glad 2:19.
glossing
17:20.
GOLD 1:25, 2:6,
9:15, 26:25,
40:15,
42:4.

Gometh 44:21.
gotten 23:22,
  31:23.
GPS 26:18,
  37:12,
  49:17.
grades 6:6.
graduated 5:9,
  5:25, 6:8.
grains 45:19.
gravamen
  17:4.
great 7:9,
  37:22.
greater 32:22,
  46:9.
greatest
  18:23.
grew 5:25.
group 36:2.
grown 36:7.
guarded
  13:18.
Guidelines
  14:8, 28:1,
  29:22.
guns 13:25.
guys 31:23.
.
.
< H >.
habits 17:9.
half 20:15.
hand 3:21,
  29:10, 44:9,
  47:9.
handicapped
  7:20.
happen 21:14,
  25:9.
happened 23:21,
  24:3, 33:1,
  45:18.
happy 9:20,
  42:14,
  43:9.
hard 48:12.
harder 9:21.
hardly 48:15.
Haskell 1:34,

1:35, 2:11.
He'll 44:7,
  49:3.
head 6:11,
  6:17.
health 7:18.
hear 2:20, 3:2,
  3:11, 4:2,
  22:17,
  26:4.
heard 26:24,
  38:17,
  48:6.
hearing 2:20,
  24:5, 36:21,
  37:5, 37:7,
  37:8.
hearings 14:2,
  18:6.
heavy 13:20.
held 4:24,
  40:13.
help 23:2.
helped 7:24.
helping 7:3.
helps 7:23.
hereby 50:3.
hidden 9:10.
hide 42:25.
hiding 9:1,
  15:4, 42:9,
  47:22.
high 6:1, 6:8,
  44:12.
high-priced
  33:9.
higher 31:14,
  32:5.
highlighted
  46:18.
hint 22:5.
hinting
  47:23.
hints 15:3.
history 17:11,
  22:18, 29:14,
  32:4, 34:1,
  36:3, 40:4.
hoc 2:20,
  2:21.

hold 27:12,
  34:23.
holding
  34:22.
hole 13:15.
home 10:14,
  36:20.
honesty 17:4.
Honeysuckle
  10:15.
Honorable
  1:18.
Hospital
  6:10.
hour 6:21.
house 6:14,
  7:10, 7:11,
  7:22, 7:23,
  7:24, 10:14,
  10:20, 10:21,
  11:5, 11:7,
  37:17, 41:8,
  47:24,
  47:25.
Howell 31:6,
  31:8,
  31:10.
huge 40:2,
  42:17.
Hughes 1:26,
  2:8.
humanly
  18:18.
hundred 29:6,
  35:10.
hundreds
  41:16.
hybrid 5:19.
.
.
< I >.
idea 27:11,
  41:10,
  41:11.
identified
  2:17.
identify 2:4.
immediate 43:9,
  46:19.
immediately

16:4,
  43:15.
immunity 39:6,
  39:13.
important 8:11,
  31:5, 31:13,
  43:1.
impressed
  45:12.
improperly
  44:25,
  49:13.
inaccurate
  19:5,
  41:12.
incarcerated
  24:12.
incarceration
  23:12, 23:14,
  23:16, 24:4,
  36:11, 36:21,
  45:10.
inclination
  44:13.
include
  47:12.
includes
  12:11.
including
  15:21, 29:6,
  31:9.
income 34:19,
  34:20.
Indiana 1:36.
indicate
  22:18.
indicated 8:5,
  11:16,
  25:13.
indication
  44:17.
indicted 8:10,
  8:12.
indictment
  16:9, 19:2,
  20:7, 41:14,
  42:11,
  44:16.
Indiscernible
  27:17.

individual
  16:18.
individuals
  19:17, 21:7,
  21:17, 28:5,
  45:24.
inflated
  20:13.
influence
  24:17.
information
  3:15, 8:25,
  9:3, 19:5,
  21:21, 39:20,
  47:16.
informed
  3:10.
infrastructure
  17:23.
initial 45:3.
insist 39:13.
instability
  14:11.
instance 32:4,
  32:9.
instances
  17:19.
instead 33:16,
  33:17.
institutional
  20:11, 20:13,
  29:24, 46:7,
  46:8.
instructions
  26:1.
instrumental
  32:7.
intellectual
  16:20.
intended 8:5.
interest 11:16,
  40:5.
interesting
  35:12.
interfere
  14:25.
international
  8:15, 8:16.
internationally
  26:13.

interrupt
  7:16.
intervention
  49:21.
intimately
  6:25.
introducing
  21:12.
invest 30:2,
  46:10.
invested
  42:5.
investigation
  14:18, 14:19,
  21:11, 22:5,
  25:2, 39:6,
  39:7, 39:24,
  40:10,
  42:2.
investigator
  24:2, 38:24,
  39:4, 39:12,
  44:20.
investigators
  38:9.
investment
  28:6,
  41:16.
investments
  20:2.
Investors
  19:14, 20:8,
  20:14, 29:23,
  29:24, 29:25,
  30:4, 32:24,
  33:14, 38:9,
  38:10, 38:18,
  42:5, 42:12,
  46:6.
invited
  44:18.
involved 6:24,
  6:25, 27:15,
  30:7, 38:15,
  41:10, 45:3,
  45:6, 45:25,
  47:4.
involvement
  19:4.
involves 27:13,

27:14.
Ireland 35:25,
  45:23.
IRS 37:15,
  44:20.
issue 10:1,
  25:24, 35:17,
  36:24.
issued 19:16,
  41:21,
  47:5.
issues 21:22,
  42:23.
itself 30:23.
.
.
< J >.
Jackson 37:25,
  38:1.
jail 23:17,
  23:23,
  38:16.
Jet 5:13,
  5:15.
jobs 22:25,
  23:5.
join 5:19.
joined 2:7,
  2:11.
Josh 2:6.
Joshua 1:25.
Judge 1:19,
  23:14, 27:22,
  31:6, 31:8,
  31:10, 31:20,
  37:25, 38:22,
  42:21.
jurisdiction
  8:4, 26:11.
justice 38:5.
.
.
< K >.
Kansas 31:7.
keep 8:10.
keeps 37:14.
key 14:4.
kind 15:3,
  21:14, 23:1,
  23:5, 25:18,

43:25, 49:17,
  49:20.
Kitts 11:24,
  12:2, 21:19,
  21:21, 21:22,
  26:8, 27:4,
  27:7, 28:13,
  28:16, 28:21,
  28:24, 29:1,
  29:5, 35:3,
  35:6, 35:9,
  35:16, 35:22,
  43:10, 43:11,
  43:17, 44:2,
  49:3.
knowing 33:1.
knowledge
  10:25.
knows 23:2,
  35:14, 36:18,
  39:25.
Kollar-kotelly
  42:21.
.
.
< L >.
Laboratory
  5:13, 5:14,
  5:16.
Labs 5:2.
lacking
  14:14.
large 17:23,
  26:1.
Las 33:9.
last 4:10,
  7:13, 15:6,
  16:2, 21:5,
  21:8, 22:19,
  26:4, 37:24,
  39:8, 39:9,
  43:5, 45:15,
  48:11.
later 32:10.
launch 19:18.
launched 19:7,
  19:9.
Law 1:35.
lawyer 39:13.
lead 2:12,

29:18, 38:24,
    39:11,
    44:21.
leader 29:22,
    32:6.
leading 24:5.
learn 7:3,
    40:1.
learned 24:3.
leased 47:25.
least 7:2,
    9:17, 10:22,
    12:7, 31:5,
    34:2, 35:13,
    37:17.
leave 16:3,
    16:12.
leaving 35:25,
    43:17.
lectern 10:2.
led 30:2.
left 5:15,
    33:19,
    33:21.
legal 21:11,
    39:17.
lend 46:10.
lenders 19:13,
    19:15, 20:7,
    20:11, 46:6,
    46:7, 46:8.
lending
    19:15.
length 40:9,
    45:10.
Leslie 44:21.
less 20:14.
level 17:24,
    46:22.
liability
    34:13.
licensure
    16:19,
    16:21.
lie 18:17,
    30:10, 30:13,
    33:4, 34:11,
    34:24,
    47:16.
lied 34:1,

34:3, 34:18,
    42:12, 47:10,
    47:13.
lies 29:16,
    30:1, 30:5,
    30:6, 30:20,
    30:25, 32:25,
    44:25.
life 6:8,
    16:25, 17:4,
    18:25, 21:6,
    21:7, 22:9,
    22:14, 23:2,
    26:13, 28:1,
    28:6, 29:13,
    29:20,
    33:8.
light 17:18,
    21:2.
likely 18:25,
    28:3, 28:4,
    28:21.
line 46:19.
list 14:3,
    43:7.
litigants
    17:14.
little 2:24,
    4:21, 4:22,
    19:7, 28:20,
    33:15,
    40:9.
live 10:15,
    11:18.
lived 7:11,
    7:13, 10:10,
    10:18, 10:22,
    12:4, 12:6,
    36:1.
lives 6:21,
    10:17.
living 6:14,
    10:19, 10:24,
    11:16, 11:21,
    36:1,
    37:17.
locations
    45:4.
logic 43:25.
long 4:24,

15:6, 15:19,
    18:9, 22:4,
    42:1, 43:18,
    46:5.
look 19:1,
    30:17,
    41:13.
looking 17:16,
    33:8.
loss 32:8.
lost 18:24,
    20:7,
    28:25.
lot 9:9, 14:1,
    14:6, 16:25,
    17:2, 36:17,
    42:1.
lying 18:17,
    35:24.
.
.
< M >.
machine 1:49.
magistrate 3:6,
    23:14, 23:21,
    27:22.
maintenance
    7:23.
major 20:18,
    21:6.
majority
    20:10.
man 22:12.
Manafort
    38:1.
manner 43:3.
march 18:12.
master 5:11.
materially
    16:10.
matter 35:16,
    50:5.
mean 23:18,
    31:21,
    37:3.
means 21:12,
    26:22, 28:4,
    28:8, 37:3,
    37:21, 49:6,
    49:10.

Medical 6:18.
meet 18:1,
    23:7.
meeting
    39:11.
members
    24:22.
memorandum
    13:21,
    17:25.
Memphis 32:12,
    32:19.
mental 14:11.
mentioned
    11:15, 31:13,
    32:9, 32:23,
    35:7.
mentioning
    34:21,
    38:5.
Meridian
    34:22.
messages 21:1,
    24:25,
    38:21.
messaging
    24:19,
    25:15.
met 12:17.
Mexico 5:10,
    5:24, 6:2,
    6:8, 6:12,
    6:18, 10:12,
    22:10, 26:24,
    27:23, 31:20,
    35:7, 36:24,
    38:22,
    45:5.
microelectronic
    s 5:18,
    7:4.
million 18:24,
    20:10, 20:12,
    20:15, 33:17,
    37:19, 40:14,
    42:21.
millions 34:21,
    41:15,
    41:16.
minimal

21:23.
minor 18:11,
   20:25.
minute 12:25,
   45:15.
misdemeanor
   24:2.
missing
   26:12.
mission
   19:12.
misstatements
   19:21.
moment 18:21,
   40:5.
money 8:20,
   8:21, 9:6,
   9:9, 9:10,
   9:11, 11:10,
   11:11, 17:15,
   20:7, 34:9,
   37:13, 37:16,
   38:11, 38:17,
   42:9, 42:13,
   44:25, 46:11,
   47:21,
   47:22.
monitor 9:23,
   10:2.
monitoring
   26:18, 37:2,
   49:17,
   49:18.
month 11:5.
month-long
   23:11,
   23:16.
months 11:7,
   11:9,
   14:18.
morning 2:14,
   8:18.
motion 2:20,
   16:9.
motivation
   31:15, 37:22,
   40:3.
motive 28:3.
move 8:6,
   40:12,

40:21.
moved 9:4,
   10:11,
   10:13.
moving 31:19,
   37:24.
MR. GOLD 2:6,
   3:18, 9:20,
   9:24, 10:5,
   10:8, 13:4,
   27:2, 27:19,
   31:19, 31:24,
   32:3, 32:17,
   32:19, 35:6,
   40:19, 41:1,
   41:4.
MR. HASKELL
   2:10, 9:23.
MR. SITTERLY
   2:14, 3:8,
   4:2, 4:4,
   4:7, 9:12,
   13:7, 13:12,
   22:24, 23:25,
   24:14, 24:20,
   24:23, 25:5,
   25:21, 26:9,
   43:7, 48:16,
   49:3, 49:9,
   49:25.
multiple 36:12,
   38:17.
multiplied
   16:10.
multistate
   46:3.
myself 14:20,
   24:5.
mystery
   45:14.
.
.
< N >.
name 4:8, 4:10,
   4:11.
named 45:22.
narrowly 49:6,
   49:9.
NASA 5:13,
   16:18.

National 5:2,
   16:21.
nature 17:21,
   29:14, 30:20,
   30:22.
nearly 21:3.
necessarily
   21:8, 21:24,
   26:23,
   37:4.
necessary
   42:24.
need 17:22,
   21:24, 23:2,
   40:12, 40:22,
   42:16, 43:14,
   43:24.
needed 16:5,
   16:6.
needs 17:12,
   40:4, 42:18,
   43:13.
negotiated
   41:21.
neither
   17:10.
Nevis 11:24,
   12:2, 27:4,
   28:13, 28:17,
   28:22, 28:24,
   29:2, 29:5,
   35:3, 35:6,
   35:9,
   35:16.
New 4:16, 4:18,
   5:6, 5:10,
   5:24, 6:2,
   6:8, 6:12,
   6:18, 10:12,
   22:10, 26:24,
   27:23, 28:25,
   31:20, 35:7,
   35:17, 36:24,
   38:12, 38:22,
   45:5.
news 29:4.
next 23:9,
   46:19.
Nicholas
   1:33.

Nick 2:12,
   2:14.
Nigeria 12:4,
   12:5.
nine 7:13.
No. 1:5,
   8:17.
NOAA 16:21.
nobody 24:9.
noncompliance
   17:19, 17:20,
   18:5,
   18:11.
None 13:25,
   15:14.
nor 8:24,
   17:10.
normal 2:21.
noted 33:7,
   38:22.
notes 19:16,
   34:3,
   46:11.
nothing 17:13,
   32:25, 34:20,
   45:17.
notice 11:7,
   17:12,
   17:14.
novel 19:19.
number 12:9,
   15:12, 17:21,
   19:11, 20:12,
   20:13, 21:9,
   47:5.
numerous
   29:6.
NW 1:28, 1:36,
   1:45.
.
.
< O >.
O-l-s-o-n
   4:11.
oath 3:20.
obey 21:18,
   22:12, 22:14,
   48:23.
objection
   3:17.

obtain 16:19,
  21:24.
obtained 14:23,
  30:11.
obvious 14:10,
  14:12,
  31:10.
obviously
  35:22.
Occasionally
  7:23.
occasions
  34:2.
occurred 15:16,
  36:13.
occurs 14:8.
Oceanographic
  16:21.
odd 22:25,
  23:5.
offender
  46:21.
offense
  14:10.
offered 22:4.
offering 16:8,
  22:3.
offers 29:5.
Office 1:27.
officer 36:23,
  45:20.
officers
  46:1.
Offices 1:35.
Official 1:42,
  27:4, 50:9.
officials
  34:12.
often 6:22,
  7:5, 7:22.
Okay 2:13,
  2:16, 2:19,
  3:2, 3:4,
  3:19, 4:2,
  4:4, 4:21,
  4:23, 8:14,
  11:12, 12:23,
  13:5, 13:8,
  24:16, 32:14,
  43:5, 47:13,

47:19.
old 7:21.
older 36:4.
omitting
  47:24.
once 36:25.
One 7:2, 14:7,
  14:13, 18:19,
  28:25, 32:1,
  32:5, 32:24,
  33:19, 33:21,
  33:22, 34:1,
  34:3, 35:14,
  35:17, 38:8,
  38:18, 39:20,
  40:20, 41:5,
  42:15,
  45:5.
ongoing
  15:10.
online 3:1,
  24:7.
opening 30:8.
opinion
  31:17.
opposite 8:9.
order 21:18,
  21:24, 26:5,
  41:21,
  48:17.
ordered 46:21,
  48:3.
orders 21:16,
  22:12, 22:13,
  43:12, 47:3,
  47:5, 47:7,
  48:23.
organizer
  29:22,
  32:6.
original 6:3.
Originally
  12:9,
  12:12.
otherwise
  8:15.
outside 11:16,
  12:24, 13:1,
  13:2.
overlapped

5:6.
owes 37:14.
own 5:16,
  10:20, 23:15,
  28:14, 33:8,
  40:5.
owning 15:21.
.
.
< P >.
p.m. 50:1.
page 39:9.
paid 11:9,
  17:22, 28:16,
  39:18,
  42:8.
paint 19:3.
pandemic
  10:13.
papers 8:11.
paperwork 2:21,
  43:13.
part 11:23,
  29:18,
  34:14.
participated
  14:20.
particularly
  31:13.
parts 26:8.
pass 9:12.
passed 33:6.
passport 8:10,
  8:13, 22:4,
  26:14, 28:12,
  28:13, 28:18,
  28:24, 28:25,
  29:2, 29:3,
  35:3, 35:13,
  35:18, 35:21,
  35:22,
  35:23.
passport.
  29:3.
passports
  21:22, 26:15,
  28:19.
past 10:19,
  26:22.
pastor 4:17,

4:19, 5:6,
  22:11.
patent 23:3.
patents
  16:19.
path 39:2.
Paul 45:23.
pay 28:23,
  34:9.
paying 11:4,
  34:18, 34:20,
  35:8.
payment 34:8,
  34:16.
penalty 34:12,
  34:18,
  34:25.
pending 39:24,
  46:20.
people 12:17,
  21:9, 21:23,
  23:2, 32:25,
  33:10.
perceive 16:15,
  18:19.
perfect
  26:12.
perhaps 16:10,
  19:5.
period 23:11,
  23:13,
  23:16.
perjury 34:13,
  34:18,
  34:25.
person 16:15,
  29:16,
  46:5.
personal 17:9,
  21:4, 33:8.
personally
  7:8.
pertinent
  39:20.
phone 7:22.
phonetic
  44:22.
phrasing
  38:18.
physical

7:18.
picture 14:13,
    16:1, 16:9,
    19:3.
Pivotal 5:16.
place 36:19.
places 12:9,
    12:16.
Plaintiff
    1:7.
plan 34:8,
    34:17.
planes 37:16.
plans 8:8,
    26:22.
playbook
    33:8.
playing 6:5.
plea 18:7.
pleadings
    18:16, 18:18,
    19:3.
Please 2:4,
    3:21, 19:1,
    22:14, 25:24,
    26:2, 48:21,
    48:23.
poignant
    13:16.
point 8:4,
    8:14, 16:8,
    26:22, 27:7,
    28:10,
    41:8.
points 20:25,
    36:8, 43:8.
populates
    44:10.
pornography
    13:25,
    27:14.
portion 36:4,
    46:18.
position 4:24,
    13:13, 16:14,
    19:23,
    24:12.
possession
    8:13,
    25:11.

possible 17:18,
    18:18,
    21:2.
possibly
    48:2.
posted 11:6.
potential
    24:17, 28:1,
    40:1, 45:9,
    45:13.
potentially
    20:15, 20:18,
    20:22,
    38:15.
Powerpoint
    44:22.
preceded
    45:24.
precedent
    31:5.
prejudicial
    17:8, 18:16,
    44:23.
premised
    27:11.
prepared 42:19,
    43:3.
present 2:15,
    44:20,
    44:21.
presentation
    44:22.
presented 15:2,
    15:5, 21:20,
    44:19, 44:22,
    47:17.
presenting
    15:3, 15:4,
    48:1.
president
    6:10.
pressure 16:16,
    18:20.
pressures
    40:16.
presumption
    13:22.
Pretrial 22:17,
    22:22, 23:6,
    24:4, 36:23,

49:18.
pretty 20:12,
    26:23,
    42:12.
previous 8:5.
primarily
    5:14.
primary
    29:16.
principal
    5:14.
prior 5:1,
    10:18, 11:19,
    18:6, 23:10,
    28:6.
prison 18:25.
private 24:2,
    28:22,
    37:16.
pro 2:20,
    2:21.
probably 13:2,
    13:16, 22:24,
    28:23,
    33:15.
probation
    17:19, 17:20,
    17:21, 17:23,
    18:3, 18:8,
    23:10, 23:15,
    23:19, 36:11,
    36:14, 46:18,
    47:15.
problem 2:25,
    31:22, 36:19,
    44:8.
proceed 13:11,
    43:4.
proceeding
    47:15.
Proceedings
    1:49, 50:1,
    50:5.
proceeds
    20:23.
process 14:21,
    38:12, 43:19,
    46:13,
    47:5.
produce

28:20.
produced
    1:49.
producing
    28:19.
professional
    45:24.
professor
    6:19.
proffer
    44:19.
program
    46:21.
program.
    46:22.
project 21:5,
    21:6, 21:7.
projects 7:2.
prompt 49:23.
proof 13:20,
    22:3, 33:11,
    33:13,
    47:23.
property 15:21,
    16:20.
proposing
    26:7.
Propulsion
    5:13, 5:16.
prosecute
    47:20.
prosecuted
    47:14.
protective
    41:21,
    48:17.
prove 42:7,
    42:8.
provide 7:7,
    7:17, 19:8,
    19:19, 22:1,
    23:8, 48:12,
    49:5.
provided 20:11,
    38:24.
provides
    28:3.
proxy 45:13.
puffery 48:2.
pull 24:2.

purchased 27:5,
  34:10.
put 36:20,
  37:9,
  38:16.
.
.
< Q >.
question 23:9,
  26:4, 27:21,
  27:22, 29:9,
  48:8.
questionable
  22:2.
questions 13:5,
  22:8,
  22:16.
quickly
  40:21.
quite 6:22,
  7:19, 17:3,
  19:3, 44:10,
  47:3.
quote 13:16.
.
.
< R >.
R. 1:34,
  1:35.
raid 45:3.
raise 3:21,
  16:13.
raised 25:23,
  27:8.
raises 29:10.
Range 34:10.
Raymond 2:17.
read 28:11,
  35:15.
reading
  42:11.
ready 40:23.
real 22:3.
really 8:1,
  14:15, 14:24,
  15:25, 17:10,
  17:19, 18:13,
  18:18, 19:3,
  25:7, 39:12,
  44:12,

46:23.
reason 16:14,
  20:18, 21:15,
  27:25, 28:11,
  29:23, 43:25,
  45:10,
  48:4.
reasonably
  26:7,
  48:25.
rebuttable
  13:22.
received
  22:14.
receivership
  38:13.
recent 5:7.
recently 45:22,
  47:2,
  48:11.
recess 49:22.
recognizing
  14:6.
recollection
  23:12.
record 2:5,
  4:9, 24:11,
  50:5.
recorded
  1:49.
recordings
  30:4.
records 14:17,
  14:23, 15:9,
  16:11, 17:24,
  24:2, 24:10,
  30:7, 44:3,
  46:17.
Redfin 37:18.
referenced
  47:2.
refused 23:6.
regard 20:4,
  21:19.
regarding
  13:17,
  19:22.
regardless
  36:10.
regularly

34:19,
  36:5.
reinstated
  46:22.
related
  39:20.
relationship
  4:12.
relationships
  6:20.
release 22:15,
  26:6, 29:11,
  48:25.
released
  32:14.
rely 30:3.
remain 13:19.
remains 27:6.
remedied
  18:2.
remember 21:3,
  23:22.
remote 5:15,
  19:10.
renounce 43:11,
  43:14,
  44:7.
rent 11:5,
  11:8.
rented 10:14,
  10:20.
repeated
  30:10.
report 22:17,
  22:23,
  34:6.
Reported
  1:41.
Reporter 1:42,
  50:9.
represent
  22:19.
representation
  19:17.
represented
  19:8, 19:13,
  46:5,
  46:12.
represents
  19:14,

47:10.
request
  39:10.
require 17:5,
  17:13.
requirement
  18:1.
requirements
  17:23,
  21:23.
requires 18:9,
  37:6.
requiring
  33:11.
reschedule
  39:11.
resident
  35:25.
resides
  45:23.
resisting
  46:24.
resonant
  20:9.
resources
  46:10.
respect 13:12,
  41:22.
respond 41:5.
response 27:3,
  47:12,
  47:19.
responsible
  45:20.
rest 33:20.
restart 10:4.
resting
  18:23.
resulted 18:7,
  23:11,
  23:13.
retained
  24:1.
retired 5:2.
revealed
  45:15.
reverse
  44:19.
review 14:21,
  19:2,

24:11.
reviewed
    24:9.
revoke 26:5,
    49:16.
revoked
    36:11.
rid 44:8.
risk 3:14, 8:2,
    27:21, 27:23,
    29:8, 29:9.
risks 15:18.
role 32:21.
Rover 34:10.
Royce C.
    Lamberth
    1:18.
RPR 1:41,
    50:3.
rule 49:23.
rules 35:20.
Russia 15:19.
.
.
< S >.
S. 1:27,
    47:11.
salary 9:8,
    34:23.
sanctioned
    18:1.
sanctions
    47:14.
Sandia 5:2.
sans 28:24.
satellites
    19:9.
save 5:21.
saw 23:10,
    46:10.
saying 17:18,
    34:8, 34:18,
    35:24, 36:1,
    40:4, 40:22,
    44:11, 46:15,
    47:18, 47:23,
    48:2,
    48:10.
says 29:13,
    33:20, 36:7,

39:10.
schedule
    42:15.
scheme 28:6,
    32:6, 32:10,
    32:21.
School 6:1,
    6:8, 6:19.
science
    16:17.
scientific
    5:14.
screen 9:16.
search 41:7.
second 36:13.
secret 30:8.
secured
    46:11.
security
    19:8.
seek 32:11,
    47:20.
seeking 27:12,
    27:20.
seeks 49:21.
seems 10:1,
    48:11.
seen 8:8,
    42:17.
sees 13:13,
    36:5.
seizing 15:9.
sense 16:2.
sensing 5:15.
sent 33:12,
    33:14, 34:8,
    38:25,
    39:3.
sentence 28:2,
    28:3,
    29:21.
sentenced
    29:20, 36:13,
    46:18.
Sentencing
    14:7, 28:1,
    29:22.
series 18:10.
serious 22:13,
    41:14.

seriousness
    45:9.
serve 23:20,
    46:23.
Services 6:11,
    6:17, 6:18,
    22:17, 22:22,
    23:6, 24:4,
    36:23.
sessions
    49:20.
set 32:4,
    34:16,
    44:15.
sets 29:17,
    33:25, 35:1,
    36:2.
seven 20:8,
    47:24.
several 5:3,
    7:12, 10:19,
    12:5, 15:22,
    39:5, 44:19,
    46:1, 48:3.
severe 45:13.
severely 34:20,
    47:18.
shopping
    7:19.
shorthand
    1:49.
shot 46:5.
shouldn't
    21:14,
    25:9.
show 24:25,
    35:19.
showed 33:14.
showing 9:20,
    13:22, 20:6,
    33:12,
    46:14.
shown 34:11,
    34:24.
shows 33:22,
    37:18.
Signal 4:22,
    5:15, 10:2,
    24:20, 38:20,
    38:21,

38:25.
signed 19:15.
significant
    27:23, 29:9,
    41:18.
similar 15:17,
    15:18,
    42:20.
simple 42:12,
    45:10.
simply 26:21,
    28:12, 44:15,
    45:6.
sir 4:20.
sister 6:9,
    6:10, 6:12,
    6:14, 6:15.
Sitterly 1:33,
    2:12, 2:15,
    2:17, 2:19,
    2:23, 13:11,
    24:9, 27:1,
    38:4, 39:21,
    41:24, 42:16,
    43:5.
Sitting
    49:14.
situation 36:5,
    44:2.
six 20:7.
size 42:10.
sleight 44:9,
    47:9.
slowly 4:21.
small 9:7.
smaller
    36:15.
smartphones
    5:20.
Solerno
    13:16.
solicit
    45:11.
somehow
    43:21.
someone 23:15,
    33:5, 35:8,
    37:13.
sometimes
    7:22.

somewhat 19:19, 23:17.
son 6:3, 6:15, 6:24, 7:1, 7:3, 10:9, 11:13, 12:1, 22:10, 48:6.
sophistication 46:10.
sorry 4:20, 7:16.
sort 7:25, 42:16.
sought 32:13.
Southern 5:12.
specific 39:19.
specifically 7:17, 25:24.
spell 4:8.
spelled 4:11.
spend 11:1.
spending 15:21, 17:9.
spent 6:1, 16:25, 44:25.
spoke 36:23.
spoken 38:9.
sports 6:5, 7:1.
spot 33:19, 33:21.
squirreling 47:22.
St. 11:24, 12:2, 21:19, 21:21, 21:22, 26:8, 27:4, 27:7, 28:13, 28:16, 28:21, 28:24, 29:1, 29:5, 35:3, 35:6, 35:9, 35:16, 35:22, 43:10, 43:11, 43:17, 44:2,

49:3.
stall 40:17.
standing 48:9.
stands 18:16, 23:19, 29:16, 31:11.
start 17:1, 43:10.
Starting 2:5, 7:12, 11:17, 13:14, 13:15, 29:14, 40:1.
startup 19:18, 46:3.
State 4:8, 5:10, 6:3, 6:9, 17:24, 34:15, 35:1.
statement 33:3, 33:6, 33:16, 38:23, 39:3.
statements 20:4, 20:6.
States 1:1, 1:5, 1:19, 1:43, 2:3, 2:7, 2:9, 8:6, 29:7, 34:14, 45:4.
status 44:6.
Stayed 46:20.
steal 18:12.
stenographic 50:4.
Stephen 15:18.
steps 39:24, 49:4, 49:16.
Steve 32:10, 45:22.
stop 6:12, 25:22, 28:20.
stopped

37:15.
straight 28:23.
Street 1:28.
strong 14:9, 28:2, 40:1, 44:13.
stronger 31:14.
structured 44:16.
stuff 26:2.
style 18:15.
subject 29:20.
Sublet 39:10, 39:11, 44:21.
submit 31:1.
submits 40:6.
subpoenas 15:10.
substantial 20:1, 27:25, 34:13, 37:14.
substantially 20:13, 47:3.
substantiate 30:13.
substantive 36:21, 37:8.
success 17:2.
successfully 18:9.
sufficient 16:11.
suggest 44:9.
suggested 21:11, 24:25, 25:1, 28:17, 35:15, 35:24, 38:12, 39:5, 39:15, 39:16.
suggesting 44:2.
suggestion

43:16, 43:19, 47:8.
supercomplicate d 41:25.
superficially 46:14.
superior 15:24.
supervision 36:10.
supplement 23:7.
support 7:7, 7:25.
supporting 7:1.
Supreme 2:24.
surgical 6:17, 6:18.
surrender 26:16, 26:17, 28:18, 49:3, 49:10, 49:13, 49:16.
surrendering 28:12.
susceptible 16:16.
suspect 8:9.
Suspended 46:20.
suspicion 22:5.
suspicions 41:9.
sven 37:19.
swear 3:25, 29:11.
Switzerland 15:20, 15:22.
sworn 3:23.
.
.
< T >.
T. 1:41, 50:8.
table 2:7.
tactics 25:1.
tailored 49:6,

49:10.
talked 29:23,
    29:24,
    33:2.
talks 36:17.
tampering
    14:16,
    20:25.
Tax 2:8, 16:6,
    34:13, 34:15,
    41:8, 41:13,
    44:14,
    45:6.
taxes 34:19.
teaching 7:3.
technical
    16:23,
    23:3.
Technologies
    5:17, 5:19.
technology
    5:18,
    19:19.
technology-base
    d 17:1.
ten 8:5, 11:15,
    21:5, 21:6,
    21:8, 36:6.
tend 18:13.
term 11:17.
terms 9:11,
    23:10.
Terralliance
    12:12,
    28:7.
terrorism
    13:24,
    27:14.
test 25:21.
testified
    3:24.
testimony 3:12,
    13:9.
testing
    49:20.
THE CLERK
    3:21.
THE DEFENDANT
    3:3.
THE WITNESS

10:4,
    13:10.
Theia 12:13,
    19:6, 20:14,
    21:5, 29:18,
    30:10, 30:14,
    30:17, 32:25,
    33:1, 34:23,
    36:2, 38:13,
    46:11.
themselves
    24:10.
then-chief
    31:8.
they'll 39:2.
They've 15:6,
    15:10, 16:2,
    25:13.
thin 47:16.
thinks 49:4,
    49:19.
though 10:17,
    25:10, 31:22,
    35:12.
threats
    13:23.
three 11:7,
    37:23, 41:20,
    45:3.
three-month
    46:21.
throughout
    12:7,
    38:12.
ticket 8:21,
    36:25.
tickets 8:15.
tied 6:7, 6:9,
    41:10.
ties 3:13,
    5:23, 6:3,
    6:9, 6:22,
    6:23, 15:22,
    20:21, 26:24,
    36:17, 40:4,
    48:6,
    48:21.
timely 43:3.
today 2:20,
    3:11, 24:22,

44:24.
together 7:5,
    11:20,
    17:8.
tomorrow
    43:12.
tons 40:14,
    40:22.
took 30:14,
    31:22, 31:25,
    38:15,
    41:17.
tools 46:9.
tortured
    43:25.
tossed 23:23.
totally 9:25.
touch 36:3.
Touche 45:25.
tourists
    21:22.
track 26:19,
    26:20.
traditionally
    38:3.
trafficking
    13:25.
Transcript
    1:17, 1:49,
    50:4.
transcription
    1:50.
transferred
    20:14.
Translators
    5:5.
transmission
    48:18.
transmit
    48:13.
travel 8:15,
    8:16, 29:2,
    29:5, 35:10,
    35:20,
    35:21.
traveled 12:7,
    12:9, 12:20,
    12:23, 13:1,
    26:21.
traveling

26:13, 26:15,
    35:22.
treat 15:7.
treaties
    29:7.
trial 42:19,
    43:3, 49:1.
trip 28:22.
trips 12:14.
true 29:5,
    31:11, 33:5,
    41:25.
trust 29:10,
    29:11, 31:2,
    37:9, 40:7,
    46:15, 46:25,
    48:3.
trusted
    30:25.
truth 45:19.
try 8:21, 24:3,
    40:22.
trying 16:25,
    17:17, 18:12,
    18:17, 18:24,
    29:11, 34:5,
    34:16, 35:20,
    42:25, 43:16,
    43:21.
turn 8:2, 9:23,
    10:5,
    43:21.
turned 33:5,
    39:10,
    41:19.
Two 7:2, 9:5,
    34:2, 35:17,
    39:5, 42:15,
    42:21, 44:24,
    45:4.
type 17:5,
    25:9, 27:15,
    30:24, 38:18,
    47:15.
types 14:1,
    14:4, 30:20,
    39:23.
typical 14:1,
    14:6, 30:6.
typically

49:18.
.
.
< U >.
UK 29:3.
ultimately
  18:2, 18:9.
unavailable
  7:12.
undercounted
  47:18.
undercounting
  34:20.
undergo
  26:18.
underlying
  16:20.
understand
  2:21, 14:3,
  23:4, 23:25,
  24:3, 24:24,
  46:24.
understanding
  21:21, 21:25,
  22:1, 44:6.
Unfortunately
  2:24.
United 1:1,
  1:5, 1:19,
  1:43, 2:3,
  2:7, 2:9,
  8:6, 29:7,
  34:14,
  45:4.
universally
  15:17.
University
  5:12, 6:18.
unknown 26:8.
Unless 38:14,
  41:3.
unlimited
  37:13.
unpublished
  31:7.
until 5:4,
  5:25, 6:8,
  25:13.
untrue 44:15.
upbringing

6:24.
Using 24:18,
  49:18.
.
.
< V >.
vague 19:4.
valued 37:17.
various 17:15,
  22:25,
  28:5.
vast 15:21,
  20:10.
vastly 15:24.
Vector 34:22.
Vegas 33:9.
versus 2:3.
via 2:11.
vice 2:20,
  2:22.
victims
  24:17.
video 2:18,
  30:4.
violation
  23:11, 23:17,
  46:19,
  47:15.
violations
  36:12.
violence 13:23,
  17:5.
violent 22:12,
  38:4.
virtually
  7:21.
visa-free 29:2,
  29:5,
  35:10.
visited 12:5.
visits 6:22.
volume 16:10.
vs 1:8.
.
.
< W >.
wait 20:21,
  48:15.
waiting
  41:20.

Walk 5:7.
walking 7:20.
wanted 27:7,
  41:24,
  49:16.
wants 6:6,
  18:4, 30:21,
  31:3, 38:6,
  40:21,
  49:19.
warrant 41:7.
Washington
  1:11, 1:29,
  1:37, 1:46,
  44:18.
wealthy 28:5.
weapons
  13:24.
week 48:11.
weekly 49:20.
Weight 18:23,
  28:2, 31:3,
  31:11,
  33:23.
weld 7:3.
whatever 14:15,
  20:4, 40:4,
  42:16, 43:11,
  43:13, 48:7,
  49:4, 49:14,
  49:17.
whenever
  15:10.
whether 30:25,
  36:10.
whole 6:8.
whom 46:2.
wife 10:11,
  10:14, 11:20,
  28:19,
  43:19.
will 3:15,
  21:13, 21:17,
  21:18, 22:8,
  22:13, 22:14,
  25:18, 26:23,
  28:25, 40:6,
  41:18, 42:14,
  42:15, 43:1,
  43:11, 43:12,

43:14, 44:7,
  48:7, 49:17,
  49:22.
willing 3:10,
  26:16,
  26:18.
willingness
  34:11,
  34:24.
wire 16:7.
wish 15:10,
  26:19, 43:4,
  49:5.
wished 17:2,
  45:11.
wishes 14:24.
withdrawn
  24:12,
  24:15.
withhold
  39:19.
within 14:18,
  14:19.
without 22:3,
  25:20, 33:1,
  40:13.
Witness 3:23,
  3:25, 9:12,
  9:16, 14:16,
  20:25, 38:23,
  39:1, 39:5,
  39:10, 39:17,
  39:19.
witnesses 21:9,
  24:17,
  25:6.
wonder 35:8.
word 18:17,
  43:6,
  48:21.
words 28:14,
  31:16,
  43:17.
work 5:6,
  40:18, 42:16,
  48:10.
worked 5:9,
  5:14,
  32:25.
working 2:21,

```
    6:1, 16:18,
    42:22.
world 12:8,
    12:16,
    23:2.
worst 17:18,
    21:2,
    21:10.
worth 37:18,
    37:19,
    47:24.
worthless
    38:14.
wrapped 21:4.
wrote 15:19.
Wycliffe 5:4,
    5:5.
.
.
< Y >.
yacht 28:22.
year 6:1, 9:5,
    40:23.
years 5:3,
    7:12, 7:13,
    7:21, 8:5,
    10:19, 11:15,
    14:19, 15:6,
    15:19, 16:2,
    16:12, 20:18,
    20:22, 21:5,
    21:6, 21:8,
    22:20, 25:14,
    31:22, 32:1,
    36:6, 37:14,
    38:7, 40:23,
    41:5, 41:6,
    41:7, 41:11,
    41:12,
    44:24.
young 36:7.
yourselves
    2:4.
.
.
< Z >.
Zillow 37:18.
Zoom 1:33,
    2:12, 2:18,
    10:4.
```