**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 25-CR-69 (RCL)** |
| | **:** | |
| **ERLEND OLSON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT OLSON'S MOTION TO
<u>RECONSIDER DETENTION ORDER</u>**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this opposition to Defendant Erlend Olson's motion

to reconsider this Court's April 9, 2025 detention order. Mot. to Reconsider Detention Order

(Def.'s Mot.), ECF No. 112, filed on April 18, 2026. The facts and circumstances underlying the

Court's detention order remain true today: Defendant orchestrated a scheme to defraud

approximately 200 investors and lenders of more than $250 million, subjecting him to a maximum

statutory sentence of 160 years' incarceration and a potential life sentence under the government's

preliminary estimate of the applicable sentencing guidelines. He has spent more than a decade

going to great lengths to conceal his income and assets to avoid paying his taxes, including directly

lying to government officials. He has significant foreign ties and is a dual citizen of St. Kitts and

Nevis—a country that offers visa-free travel to many countries without extradition treaties. And

he actively attempted to tamper with witnesses during the pendency of this investigation. In sum,

there is a serious risk that Defendant will flee prosecution and obstruct justice.

Moreover, the defense has provided no new information that has a material bearing on

whether there are conditions of release that will reasonably assure the appearance of Defendant

1

Olson as required. Indeed, the evidence against Defendant is stronger now: one of the charged defendants (Joseph Fargnoli) has pled guilty and agreed to cooperate against Defendant. Fargnoli was the first officer to join Olson at Theia Group Incorporated (Theia) and served as Theia's Chief Technology Officer for the entirety of the alleged conspiracy. As this Court found on April 9, 2025, after a hearing on Defendant's emergency motion to revoke the pre-trial detention order of a Magistrate Judge, ECF No. 26, and as memorialized in the Memorandum Opinion (Mem. Op.) issued the next day, ECF 30, and as remains true today, there are no conditions or combination of conditions that would reasonably assure Defendant's appearance. Accordingly, there is no reason to reopen the detention hearing or to modify Defendant's conditions of release.

## I. Procedural History

On March 13, 2025, Defendant was charged by indictment in the District of Columbia with one count of Conspiracy to Commit Wire and Mail Fraud, in violation of 18 U.S.C. § 1349; five counts of Wire Fraud, in violation of 18 U.S.C. § 1343; one count of Mail Fraud, in violation of 18 U.S.C. § 1341; and four counts of Tax Evasion, in violation of 26 U.S.C. § 7201. ECF 1. Defendant was arrested in the District of New Mexico and made his initial appearance before that Court on March 17, 2025. At that time, the government informed the Court that it was requesting detention based on Defendant's risk of flight and obstruction of justice. After a detention hearing held on March 20, 2025, U.S. Magistrate Judge Jennifer M. Rozzoni of the District of New Mexico ordered Defendant detained pending trial. ECF 33 (Rule 5(c)(3) Documents) at 8.

On April 7, 2025, Defendant filed an emergency motion for revocation of the magistrate's order of detention. ECF 26. The government filed its opposition the same day. ECF 28. This Court held a bond hearing on April 8, 2025, and issued the Memorandum Opinion on April 9, 2025,

2

denying Defendant's motion. ECF 30. The Court reasoned,

> Upon consideration of the evidence and arguments presented in connection with the pending motion, the factors set forth in 18 U.S.C. § 3142(g), and the possible release conditions set forth in § 3142(c), the Court finds that the government has established by a preponderance of the evidence that the defendant's pretrial release would pose a serious risk that he would flee. The scope of the defendant's alleged fraudulent activity in connection with the charged offenses, the substantial period of incarceration that he faces if convicted, his unstable situation in Albuquerque and his alleged overseas ties, and his attempt at witness tampering, when considered together, favor pretrial detention under 18 U.S.C. § 3142(f)(2).

Mem. Op. at 11. Defendant has been in custody since his arrest.

## II. Legal Authority and Argument

Defendant's initial detention hearing was held on March 20, 2025. A second hearing was held before this Court on April 8, 2025. Pursuant to the Bail Reform Act, a detention hearing may be reopened at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required." 18 U.S.C. § 3142(f). As discussed below, Defendant has not presented the Court with any such information: the detention hearing should not be reopened nor should the Court's detention order be disturbed.

### A.    Principles Governing Requests for Detention

In determining whether to reconsider its April 9, 2025 findings or detention order, the Court must consider the newly proffered information in light of (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *see United States v. Bikundi*,

47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013). As before, each of these factors weighs in favor of detention.

A serious risk of flight alone is sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986). Where the justification for detention is serious risk of flight, the decision must be supported by a preponderance of the evidence. *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

As Magistrate Judge Rozzoni and this Court have found, the government has shown by a preponderance of the evidence that Defendant presents a serious risk of flight if released. *See* ECF 33 at 8; Mem. Op. at 11. None of the purportedly new information cited in Defendant's Motion to Reconsider has a material bearing on this showing. Rather, as detailed below, it remains the case that (a) the Grand Jury has found probable cause that Defendant orchestrated a scheme to defraud approximately 200 investors and lenders of more than $250 million, (b) Defendant is facing serious charges with a potential severely long sentence, (c) Defendant has significant overseas ties, and (d) Defendant has attempted to engage in witness tampering.

**B.      There Continues to be No Condition or Combination of Conditions of Release That Would Reasonably Assure Defendant's Appearance as Required.**

**1.      Nature and Circumstances of the Offenses Charged**

The Court first must examine the nature and circumstances of the charged offenses. 18 U.S.C. § 3142(g)(1). This factor is materially unchanged and favors detention. For investors, Defendant was the face of Theia—a satellite company he founded that purportedly was going to revolutionize the world by providing continuous remote sensing data for the entire globe simultaneously. This data, to be collected from 112 satellites Theia planned to launch, supposedly

would transform human ability to detect and respond to events, such as earthquakes, wildfires, crime, and global warming, as well as identify certain natural resources under the earth's surface. Theia never launched any satellites nor received any income. But Defendant Olson and his co-conspirators raised more than $250 million from approximately 200 investors/lenders through a series of misrepresentations about Theia's financial position, its contracts with third parties, and its technical capabilities. Of that $250 million, Defendant took approximately $9 million for himself, which he hid from the U.S. government to which he already owed more than $1 million.

The indictment, which is incorporated by reference, provides a detailed explanation of the investment fraud scheme and Defendant's tax evasion. As shown in the indictment, Defendant went to extreme lengths to deceive investors and to conceal the truth about Theia's business. The tax charges in the indictment show that Defendant's penchant for lies and deceit extended not just to investors but also to the government. ECF 1. Additional details are included in the government's opposition to Defendant's emergency motion for revocation of the magistrate's order of detention, incorporated by reference. *See* ECF 28 at 3-7.

Defendant's egregious conduct and his pattern of lies and deceit in this case alone should give the Court no confidence that he could comply with any combination of conditions of release. Moreover, such serious misconduct exposes Defendant to severe consequences. If convicted of every charge in the indictment, Defendant faces a maximum sentence of 160 years' incarceration, and the government computes his advisory guideline sentence as life in prison, given the size of the loss, the nature of the scheme, and Defendant's role in the crime. The possibility of such a substantial sentence incentivizes desperate measures, such as flight and witness tampering. As this Court found in its April 9, 2025 Memorandum Opinion, "Considering the serious nature of the

offense and the severe punishment the defendant faces if convicted on all counts, this factor weighs in favor of detention." Mem. Op. at 5. None of the "new" information alleged in Defendant's Motion to Reconsider bears on the serious nature of the offense or the severe punishment faced by Defendant. *See* Def.'s Mot. at 1-2 (summarizing basis of motion).

### 2. The Weight of Evidence Against Defendant

In assessing any changed circumstances, the Court must also consider the weight of the evidence. 18 U.S.C. § 3142(g)(2). The weight of the evidence against Defendant—which, as detailed below, is even heavier since April 2025—is substantial. The government has spoken to dozens of investors, all of whom described Defendant as the primary purveyor of the false information material to their investments. Moreover, the government need not only rely on witness testimony in this case. Defendant is on numerous recorded calls and videos claiming that Theia had $6 billion in escrow, millions of dollars in monthly revenue, revenue-producing government contracts, and more than $100 million in cash-on-hand—none of which was true. Additional details are included in the government's opposition to Defendant's emergency motion for revocation of the magistrate's order of detention. *See* ECF 28 at 7-10.

Further, since April 2025, the government has developed additional evidence supporting the charges against Defendant. In particular, the government has obtained a guilty plea from Defendant Jospeh Fargnoli, who has agreed to cooperate and provide evidence against Defendant Olson. Fargnoli can provide insight into Defendant Olson's role within Theia, his unwavering focus on fundraising, and his penchant to exaggerate and mispresent Theia's progress and capabilities. Furthermore, Fargnoli was privy to Defendant Olson's materially altering documents and making false statements to deceive Theia's investors.

Defendant Olson was the founder, owner, primary manager, and primary fundraiser for Theia. The evidence clearly shows that he knowingly told scores of lies to investors. In sum, the weight of the evidence is strong. And such formidable evidence, in concert with huge sentencing exposure, creates a strong incentive to flee. As this Court found in its April 9, 2025 Memorandum Opinion, this factor weighs in favor of detention. Mem. Op. at 5. None of the "new" information alleged in Defendant's Motion to Reconsider has any material bearing on the strength of the case. *See* Def.'s Mot. at 9-10 ("we are unable to make anything approaching a definitive argument concerning the strength of the government's case"). And while the Defendant's motion lists six items that are purportedly inconsistent with the Government's proof of fraudulent intent, none of them rebuts the government's robust evidence of Olson's lies.

### 3.  The History and Characteristics of Defendant

The Court's review of Defendant's motion also must consider the history and characteristics of Defendant, including his character, physical and mental condition, and past conduct. 18 U.S.C. § 3142(g)(3). These factors are unchanged in all material aspects from information that was known to Defendant in April 2025.

Defendant is a 63-year-old man with no ties to the District of Columbia. He has gone out of his way to keep no assets in his name. And in addition to his outstanding tax liability, he faces significant civil exposure in current and future litigation on notes in Theia he personally guaranteed. As outlined in the indictment and elsewhere, Defendant has cultivated a large network of contacts with means inside and outside the United States throughout the previous decades. He has also, at times, had access to private air travel. Even more concerning are his foreign ties and ability to escape the Court's jurisdiction. Mem. Op. at 8-10. Further, Defendant has a prior history

of not complying with supervision and a lengthy history of dishonest conduct. The defense has not alleged any changes to his history and characteristics that have a material bearing on continued detention.

### Defendant's Foreign Ties

In 2007, the defendant and his wife paid $250,000 to become a citizen of St. Kitts and Nevis (SKN) and obtained a passport. An SKN passport allows visa-free travel to more than 100 countries, including numerous countries with which the United States does not have extradition treaties. *Visa-Free Countries*, https://www.foreign.gov.kn/travel/. ECF 28 at 13-14. As the Court noted in its Memorandum Opinion, Defendant Olson "retains dual citizenship in SKN." Mem. Op. at 8. As the Court further explained, "Although the defendant's SKN passport expired in 2017, the defendant has apparently not viewed this as an impediment, having since considered relying on his Kittitian citizenship to overcome travel restrictions." *Id*. at 8. The Court reasoned,

> [I]n the context of the defendant's past designs regarding his SKN citizenship, and the deceitful actions that form the bedrock of the pending charges, his knowledge of how to flee adds to this Court's finding that he poses a significant a flight risk—he has intimately thought about how to flee and has recently demonstrated a willingness to break rules and lie to travel authorities.

*Id*. at 9.

Last April, "defense counsel suggested that the defendant would renounce his St. Kitts citizenship if ordered to do so." *Id*. at 9. The Court expressed frustration that Defendant "cited no legal authority for the Court's ability to order a defendant to renounce their citizenship, nor did he provide any information about the mechanism or time frame for renouncing SKN citizenship," finding that "[t]his suggestion, without any legal backing, rings hollow." *Id*. at 9-10. Defendant now professes a willingness to renounce his SKN citizenship. Def.'s Mot. at 12. Defendant asserts,

however, that the process of renouncing his SKN citizenship would be "difficult if not impossible" while he remains detained and proposes renouncing his citizenship "as soon as he can complete the requisite documentation." *Id*. at 13. Given the lack of progress on any steps to renounce his citizenship in the past year, this proposal similarly rings hollow.

If Defendant were to flee to SKN, and then to one of these countries with which the United States does not have an extradition treaty, he could remain outside the reach of this Court indefinitely. *See United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee."); *Hong Vo*, 978 F. Supp. 2d at 45 (finding defendant's overseas assets and contacts in Vietnam, a country which maintained no extradition treaty with the United States, gave her the ability to evade capture); *United States v. Butina*, No. 18-218 (TSC) (D.D.C. July 24, 2018) ECF No. 15 at 6 ("A defendant's citizenship of a country with which the United States has no extradition treaty is a factor relevant to an assessment of the defendant's history and characteristics."); *United States v. Tajideen*, No. CR 17-46 (RBW), 2018 WL 1342475, at *7 (D.D.C. Mar. 15, 2018) (finding that a number of factors including the defendant's "several foreign citizenships, including citizenship in a country that does not have an extradition agreements with the United States" weigh in favor of detention), *aff'd*, 724 F. App'x 6 (D.C. Cir. 2018); *United States v. Myers et al.*, No. 9-00150 (D.D.C. June 10, 2009) ECF No. 16 at 16 ("The United States does not have an extradition treaty with Cuba; indeed the two countries do not have diplomatic relations."); *cf. United States v. Ho*, No. 3:16-CR-46, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016) (defendant's citizenship of a country with which the United States had no extradition treaty warrants the conclusion that "the United States cannot procure [the

9

defendant's] return[,] . . . suggest[ing] opportunities for flight") (citation omitted), *aff'd*, 2016 WL 10077327 (6th Cir. Dec. 9, 2016).

*Defendant's Character and Criminal History*

As detailed in the indictment, Defendant's history of lies dates back to 2017 and his history of deception spans nearly a decade earlier. *See* ECF 28 at 11-13. Additionally, as described in the indictment and above, Defendant's tax evasion scheme involved various lies and omissions to the government, including the lies to the Assistant United States Attorney in California and lies under penalty of perjury. *See id*. at 12. As with all of Defendant's dishonest conduct, this scheme demonstrates that Defendant could not be trusted to comply with release conditions, even if he swore to do so under oath.

As noted in the government's opposition to Defendant's emergency motion for revocation of the magistrate's order of detention, incorporated by reference, Defendant has two prior convictions for driving under the influence of alcohol or drugs for which he performed poorly on release. In particular, Defendant violated the terms of his release such that his probation was revoked at least twice and he had to serve 30 days in jail, followed by an additional period of probation during which he was again arrested and sentenced to 45 days in jail followed by five years of probation. *See id*. at 10-11. Defendant has yet to provide any documentary support for his claims that he may not have violated the terms of his release, Def.'s Mot. at 10-11; these violations were documented in exhibits Defendant filed with his emergency motion. ECF 26-2 & 26-9. The Court previously found that "[D]efendant's criminal history, instances of substance abuse in connection with these crimes, and numerous violations of his terms of supervision weigh in favor of detention." Mem. Op. at 6. This reasoning continues to be true today.

10

*Defendant's Physical and Mental Condition*

As explained below, contrary to Defendant's allegations (Def.'s Mot. at 4-5), his health conditions do not appear to have materially worsened and the facility where he is detained is able to meet his medical needs. As shown in medical records obtained from Northern Neck Regional Jail (NNRJ), where Defendant Olson is being held, Defendant has been seen by NNRJ medical staff on at least the following dates: May 13, 2025; May 23, 2025; May 30, 2025; July 31, 2025; April 20, 2026; April 21, 2026; April 22, 2026; April 23, 2026; April 25, 2026; April 26, 2026; and April 27, 2026. *See generally* Ex. A (filed under seal). Defendant's claim that he "repeatedly has sought treatment for [his medical conditions] from the jail where he is incarcerated, but has received virtually none," Def. Mot. at 4, is simply not true.

Moreover, Defendant's claim that NNRJ "requires Mr. Olson to fill out a form in order to request medical treatment," Def. Mot. at 4, is at best misleading. On April 20, 2026, he was "educated by [the] Nursing staff to let medical security know immediately if he feels like he is going into [atrial fibrillation]. [Defendant Olson] was reminded [that] medical is in the pod four times daily to see a nurse if any issues arise. [Defendant Olson] voiced understanding" and was returned to his cell without "issue or concern." Ex. A at 13. The medical records further do not support Defendant's claims that his symptoms of atrial fibrillation have worsened or that his complaints about other pains "have gone unanswered." Def. Mot. at 5.

Defendant has been seen by NNRJ medical staff on at least 11 occasions between May 2025 and April 2026. On April 20, 2026, Defendant Olson was added to a daily vitals check. Ex. A at 13. Defendant's medical condition does not support a reversal of the Court's detention order.

*Time Frame for Discovery, Pretrial Litigation, and Trial*

Defendant contends that his age, coupled with his counsel's projections as to the length of time needed for pretrial litigation and preparation for trial, constitute new information that has a material bearing on whether there are conditions of release that will reasonably assure his appearance as required and weigh in favor of pretrial release. *See* Def.'s Mot. at 5-9. This contention is wholly without merit.

Much of the information alleged in Defendant's motion was known to Defendant in April 2025. For example, the scope of the indictment, details of Theia's business operations, Theia's alleged "numerous contacts" with "a wide swath of entities" (Def.'s Mot. at 6), possible privilege issues relating to documents found during searches of Theia's DC offices and Olson's New Mexico residence in June 2021, and Theia's placement into receivership in October 2021 were all known to Defendant in April 2025.

Moreover, the government has moved expeditiously to provide discovery and to identify and resolve any issues concerning classified information.[1]  The vast bulk of the discovery produced to date was produced in June 2025, consisting of 1,093,437 documents/files [bates stamped USPROD-00000001 to USPROD-04072690]. *See* Exs. B & C. An additional 4,757 documents were produced in October 2025 [bates stamped USPROD-04072691 to USPROD-04081499], and 34 documents were produced in January 2026 [bates stamped USPROD-04081500 to USPROD-04081638]. *See* Exs. D & E. It is unclear why defense counsel is only "at the very beginning of the process in gathering and reviewing such documents." Def.'s Mot. at 6. It is true that the material

---

[1] Defendant claims, "Many of the documents relevant to this case are classified." Def.'s Mot. at 8. The government respectfully disagrees. Should the Court have questions about the scope of any classified evidence or discovery in this case, the government is prepared to address such questions *in camera* and *ex parte*.

that is the subject of the Government's Notice of Return of Digital Evidence (ECF 110) has yet to be processed, but none of this information will be used by the government in its case.

A bond is not a viable option and any type of home confinement with location monitoring in New Mexico is not feasible, as Defendant would necessarily have to travel regularly to the District of Columbia to meet with his attorneys and face prosecution in this case. Defendant argues that his lawyers "need frequent access to him to understand and effectively utilize the extraordinarily complex and technical materials being gathered" and that "[t]ravel to and from Northern Neck Regional Jail, including the time required to meet with Mr. Olson, typically occupies nearly a full day." Def.'s Mot. at 9. At the same time, Defendant offers no explanation how his proposal, whereby he would reside in New Mexico, *id*. at 14, would better accommodate his need to meet with his counsel. For all of the above reasons, Defendant's history and characteristics continue to militate in favor of detention.

### 4.    Danger to the Community

The Court's review of Defendant's motion also must consider Defendant's danger to the community, if any. 18 U.S.C. § 3142(g)(4). This factor also weighs in favor of detention and has not materially changed since April 2025. While this factor has "minimal relevance" in cases where the government is requesting detention solely based on risk of flight, *see Bikundi*, 47 F. Supp. 3d at 137, it is nevertheless significant that, throughout the investigation in this case, Defendant has attempted to tamper with witnesses or otherwise impede the government's investigation. As courts have recognized, such obstruction of justice constitutes a type of danger to the community. *See United States v. LaFontaine*, 210 F.3d 125, 134–35 (2d Cir. 2000) (holding that witness tampering in a white-collar case could support a finding of dangerousness under the § 3142(g) factors).

In his motion, Defendant attempts to explain away an example of witness tampering alleged by the government in its opposition to Defendant's emergency motion last year. Def.'s Mot. at 13-14. The Court examined these allegations prior to denying Defendant's emergency motion. Mem. Op. at 10-11. Defendant has presented no new information that has a material bearing on this factor.

Defendant took these actions before he was charged and arrested. Now, that he has been indicted and is facing a potential life sentence, Defendant will be even more likely to take desperate measures to avoid a conviction. This factor, too, weighs in favor of continued detention.

### III. Conclusion

This Court correctly found, by a preponderance of the evidence, that Defendant presents a serious risk of flight and that no condition or combination of conditions will reasonably ensure Defendant's appearance as required. The Court's order of detention should not be disturbed. The defense has presented no new information that has a material bearing on whether there are conditions of release that will reasonably assure the appearance of Defendant as required. Should the Court determine to reopen the detention hearing, the government would proffer the evidence described above in support of Defendant's guilt.

For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government respectfully requests that the Court deny Defendant's Motion to Reconsider Detention Order [ECF 112].

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ Jolie F. Zimmerman*
Jolie F. Zimmerman
D.C. Bar No. 465110
Rebecca G. Ross
Sarah W. Ranney
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
(202) 252-7220 (Zimmerman)
(202) 252-6937 (Ross)
(202) 252-7051 (Ranney)

KAREN E. KELLY
Acting Deputy Assistant Attorney General

By:     */s/ Alexis S. Hughes*
Alexis S. Hughes
D.C. Bar No. 90017487
Department of Justice
Criminal Division
950 Pennsylvania Ave., NW
Washington, DC 20530
alexis.hughes@usdoj.gov