**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-69-1 (RCL)** |
| | **REDACTED** |
| **ERLEND OLSON**, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION & ORDER</u>

Before the Court is Defendant Erlend Olson's motion to reconsider, ECF No. 112, this Court's detention order, ECF No. 30, along with the Government's opposition, ECF No. 123, and Olson's reply, ECF No. 136. The underlying circumstances that motivated this Court's detention order have not changed. Olson is alleged to have orchestrated a scheme to defraud about 200 investors and lenders of over $250 million, subjecting him to steep sentencing exposure that includes a potential life sentence, according to the government's preliminary estimate. Olson is further alleged to have concealed over $9 million of these funds and to have lied to government officials to avoid paying taxes for over a decade. Most importantly, he has significant foreign ties and has paid to become a dual citizen of a country that offers visa-free travel to many countries without extradition treaties. And he has attempted to tamper with a witness during the pendency of this case.

Although serious in light of the projected length of time to trial, the new information presented in Olson's motion for reconsideration regarding his health conditions do not overcome the Court's original reasons for keeping him detained. The motion for reconsideration and Olson's request for an evidentiary hearing will therefore be **DENIED**.

## I.    BACKGROUND

The Court presumes familiarity with the facts alleged in the Indictment.  ECF No. 1.  As relevant here, on March 13, 2025, Olson was charged by indictment in the District of Columbia with one count of Conspiracy to Commit Wire and Mail Fraud, in violation of 18 U.S.C. § 1349; five counts of Wire Fraud, in violation of 18 U.S.C. § 1343; one count of Mail Fraud, in violation of 18 U.S.C. § 1341; and four counts of Tax Evasion, in violation of 26 U.S.C. § 7201.  He was arrested in New Mexico and made his initial appearance at a federal court there on March 17, 2025.  Mem. of Law in Supp. of Emergency Mot. for Revocation at 3, ECF No. 26-1.

The government requested detention based on Olson's flight risk and obstruction of justice—specifically citing the hefty sentencing exposure Olson faced if convicted, allegations that he lied to federal officials to evade taxes, his significant foreign ties, and his attempts to tamper with witnesses.  Gov't's Opp'n to Def.'s Emergency Mot. for Revocation at 3–17, ECF No. 28.  After a detention hearing held on March 20, 2025, U.S. Magistrate Judge Jennifer M. Rozzoni of the District of New Mexico ordered Olson detained pending trial.  Order of Detention Pending Trial at 8, ECF No. 33.  On April 4, 2025, Olson filed an emergency motion for revocation of the magistrate's detention order, ECF No. 26, the government filed its opposition three days later, ECF No. 28, and this Court held a bond hearing the day after that.  In a Memorandum Opinion issued on April 9, 2025, this Court denied Olson's motion to reverse Judge Rozzoni's detention order, primarily on the basis that Olson was a flight risk.  Mem. Op. at 11, ECF No. 30.  Since then, Olson has spent most of his time at the Northern Neck Regional Jail in Warsaw, Virginia.

About two months ago, Olson filed the present motion asserting "that a number of changes in circumstances over the last year, in addition to additional facts that have been developed since that time, warrant reconsideration and revision of" this Court's order confirming his detention.

Def.'s Mot. for Recons., ECF No. 112. In this motion, Olson asks for an evidentiary hearing to assess these changed circumstances.

## II.    LEGAL STANDARDS

### A.  Reconsideration Standard

The Court may reopen a detention hearing "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B). "[I]n addition to 'bearing' on—having a logical relation to—detention, the sort of new information capable of reopening a detention hearing must also 'bear' materially—it must relate in some significant or essential way to the decision whether to detain." *United States v. Worrell*, No. 1:21-cr-292-RCL, 2021 WL 2366934, at *9 (D.D.C. June 9, 2021) (emphasis omitted).

### B.  Pretrial Detention Standard

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, sets forth limited circumstances in which a defendant may be detained before trial despite the Act's "presumption in favor of releasability," *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969). The Act requires that federal courts release a defendant before trial unless a court determines, after a hearing, that "no condition or combination of conditions will reasonably assure" the defendant's appearance in court or the "safety of any other person and the community." 18 U.S.C. § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

The government must demonstrate "by a preponderance of the evidence" that pretrial detention is appropriate based on the defendant's flight risk. *See United States v. Simpkins*, 826

F.2d 94, 96 (D.C. Cir. 1987) (internal quotation marks omitted).  "That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can 'reasonably' assure that the defendant will appear for trial."  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) (quoting 18 U.S.C. § 3142(c)).

### III.    DISCUSSION

To determine whether any conditions of release will reasonably assure Olson's appearance, the Court must "take into account the available information concerning" the following four factors set out in 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including— . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; . . . and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

The Court previously found that the government established by a preponderance of the evidence that Olson's pretrial release would pose a serious risk that he would flee.  Mem. Op. at 11, ECF No. 30.  Olson presents some new evidence in his motion for reconsideration—primarily concerning the present state of his physical health and the projected length of time until trial. Def.'s Mot. for Recons. at 12–13, ECF No. 112.  But, as explained in the Court's reexamination of the four § 3142(g) factors below, Olson has done little to mitigate the core facts that make him a flight risk.

### A.  Nature and Circumstances of the Charged Offenses

As the Court found in its prior order, the nature-and-circumstances factor weighs in favor of detention.  The alleged lies at the center of the charges against Olson do not inspire confidence

that he will comply with the proposed conditions of release. If proven, the fraud and tax evasion allegations in the indictment point to Olson's willingness to deceive not only investors but also the government.

What's more, Olson's sentencing exposure is a relevant consideration when considering whether he is a flight risk. If convicted of every charge in the indictment, Olson faces a maximum sentence of 160 years of incarceration, and the government computes his advisory guideline sentence as life in prison. Mem. Op. at 4, ECF No. 30. As this Court observed in its detention opinion, the considerable punishment that would likely accompany Olson's conviction is a factor that increases his flight risk. *Id.* (citing *United States v. Bikundi*, 47 F. Supp. 3d 131, 134 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 (D.D.C. 2013); *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011)).

That being said, Olson fairly points out that an important circumstance of the charges against him is the voluminous and complex discovery involved in this case, which will include, among other things, substantial privilege review as well as extensive litigation as to the use of classified materials under the Classified Information Procedures Act (CIPA). In fact, the Court has recently adopted the parties' CIPA filings schedule, which anticipates that litigation about classified discovery will continue into February 2027. Given the sheer breadth of discovery that Olson will need to work through with his counsel, his incarceration surely places burdens on his ability to prepare a defense in an expeditious manner.

But this reality is not an independent basis for reconsideration because Olson should have known at the time of his detention hearing that this case would involve sprawling discovery. To begin, Olson cannot now profess surprise about the business operations and contracts of the company that he founded and managed. Nor is the indictment's scope "new information" that was

unknown at the time of his detention hearing.  In fact, the Court discussed this facet of the litigation with the parties during the hearing and the government conceded that there would "be a significant amount of discovery" involved.  Detention Hr'g Tr. at 40:09–41:23, ECF No. 66.

What's also clear is that Olson knew that he was under investigation for years before his arrest in 2025.  This means that he should have known about the possible privilege issues relating to documents found when his New Mexico residence and Theia's D.C. offices were searched in June 2021.  And he should have known about the related complications that might arise from Theia's placement into receivership in October 2021.  Gov't's Opp'n at 12, ECF No. 123.

In sum, Olson knew at the time of his detention hearing that discovery in this case would greatly prolong pretrial proceedings, and the Court considered that issue.  While the finer points of this general fact might have come into greater focus as the litigation proceeded, Olson cannot now raise the projected length of time to trial as an independent basis for reconsideration.

## B.  Weight of the Evidence

The weight-of-the-evidence factor likewise remains largely unchanged and, in fact, perhaps more strongly weighs in favor of detention today.  In the detention order, the Court found that, while the case was still in a "preliminary stage," it appeared that "the government ha[d] assembled a comprehensive body of evidence directly implicating Olson."  Mem. Op. at 5, ECF No. 30.  The government now represents that it "has spoken to dozens of investors, all of whom described [Olson] as the primary purveyor of the false information material to their investments."  Gov't's Opp'n at 6, ECF No. 123.  On top of that, the government states that Olson "is on numerous recorded calls and videos claiming that Theia had $6 billion in escrow, millions of dollars in monthly revenue, revenue-producing government contracts, and more than $100 million in cash-on-hand—none of which was true."  *Id*.  But the most notable development on this front is the fact

6

that the government obtained a guilty plea from Defendant Jospeh Fargnoli, Theia's Chief Technology Officer, who agreed to cooperate and provide evidence against Olson. Fargnoli Plea Agreement, ECF No. 86; Statement of Offense ECF No. 87; Gov't's Opp'n at 6, ECF No. 123.

The hefty weight of this evidence, when considered alongside Olson's sentencing exposure, creates an incentive to flee. As explained in the detention order, and as reaffirmed below, Olson's own actions give ample reason to believe that he might do so.

## C.  The Defendant's History and Characteristics

The history-and-characteristics factor considers Olson's "physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

### 1.  Criminal History

In the detention decision, the Court noted that Olson has two prior convictions for driving under the influence of alcohol or drugs in Orange County, California, with several probation violations in connection with these convictions. Mem. Op. at 6, ECF No. 30. In particular, Olson violated the terms of his release such that his probation was revoked at least twice—resulting in him serving 30 days in jail, followed by an additional period of probation during which he was again arrested and sentenced to 45 days in jail followed by five years of probation. Pretrial Servs. Rep., ECF No. 26-2; Minutes, Superior Ct. of Cal., Orange Cnty., ECF No. 26-9]. These facts cut in favor of detention given that they tend to suggest that Olson will not comply with his release conditions.

In the motion for reconsideration, Olson's counsel acknowledges the convictions but, as to whether Olson violated parole, Olsen and counsel assert that they "are unsure if this is the case

7

and are making efforts to obtain the related Orange County records." Def.'s Mot. for Recons. at 10, ECF No. 112. "According to [Olson's counsel's] understanding, Mr. Olson was required to attend two classes, each for eighteen months, each held weekly, for a total of approximately 144 class sessions," and attendance reports or requests to be excused from class had to be sent "to a fax machine that sometimes was unable to receive faxes." *Id*. at 11. The motion states that "[a]pparently" Olson "ultimately was able to resolve the issues he had relating to the requirement to attend these classes." *Id.* at 11.

Olson has not provided any documentary support for his claims that he might not have violated the terms of his release, *id.*, whereas these parole violations are documented in exhibits he himself filed with his emergency motion to reverse the magistrate's detention decision over a year ago. *See* Pretrial Servs. Rep., ECF No. 26-2; Minutes, Superior Ct. of Cal., Orange Cnty., ECF No. 26-9. Given this, as well as Olson's counsel's seeming lack of certainty regarding the facts surrounding the alleged parole violations, the Court will not deem Olson's version of events as "new information capable of reopening a detention hearing." *Worrell*, 2021 WL 2366934, at *9.

### 2. Family/Community Ties & Financial Resources

The Court has previously determined that, although Olson has familial ties to Albuquerque, New Mexico, his lack of stability and other tenuous circumstances suggest that he poses a significant flight risk. Mem. Op. 6–8, ECF No. 30. For example, the Court focused on unexplained gaps in his family's knowledge of his financial position and his citizenship status, which raised doubts about whether his family ties will reasonably assure his continuing appearance in court. *Id.* at 7–8. The Court also observed that, before his arrest, Olson did not have stable employment and,

instead, sometimes worked "odd jobs," including ad hoc contractual arrangements for various engineering-related matters. *Id.* at 8 (quoting Detention Hr'g Tr. 21:4–21:13, ECF No. 66).

What's more, the government alleges that, in addition to his sentencing exposure and his outstanding tax liability, Olson faces significant civil exposure in current and future litigation related to notes that Theia owned that Olson personally guaranteed. Gov't's Opp'n at 7, ECF No. 123. This liability, coupled with the allegation that Olson took for himself and hid about $9 million of the funds invested in Theia, leans in favor of finding that he is a flight risk. Nothing in the motion for reconsideration convinces the Court otherwise.

### 3. Ties to Foreign Countries

Of greatest relevance to the Court's detention decision was Olson's ties to foreign countries and his demonstrated willingness to circumvent travel restrictions. Mem. Op. at 8–10, ECF No. 30. Perhaps the most concerning fact is that, in 2007, Olson paid $250,000 to become a dual citizen of St. Kitts and Nevis—a citizenship he still retains. *Id.* at 8; Citizenship Confirmation, Ex. 11, ECF No. 28-1; Detention Hr'g Tr. 27:02–27:09, ECF No. 66. A St. Kitts and Nevis passport (referred to as a "SKN" passport) allows visa-free travel to more than 100 countries, including numerous countries with which the United States has no extradition treaties. Mem. Op. at 8, ECF No. 30. While Olson's SKN passport expired in 2017, he has demonstrated that he knows how to flee using his citizenship. In 2015, while Olson's ex-wife was involved in legal proceedings, Olson wrote in an email that surrendering her passports would "do[] little to stop her from fleeing" because she could "go to SKN on a private yacht" and, from there, she could "say she lost her passport and obtain a new one, since she is a citizen of that country." *Id.* at 9 (quoting Email, Ex. 13, ECF No. 28-1). Olson's attempts to recontextualize this email does not detract from the fact that it evidences that he knows how to flee.

In fact, Olson has himself considered using his Kittitian citizenship to overcome travel restrictions. In June 2020, he sought to go to France for business, but Covid restrictions prevented travel from the United States to the European Union, so he suggested traveling to France from SKN as a SKN citizen. Email, Ex. 12, ECF No. 28-1 ("I have the option of coming in from St. Kitts and Nevis as a St. Kitts and Nevis citizen."). He further suggested falsely claiming to French authorities that he resided in Ireland with an associate. *Id*. ("We would need to know how carefully they investigate our actual home or residence on landing. John and I could certainly 'reside' at Paul's house in Dublin Ireland too, if that works.").

Rather than meaningfully fight these facts, Olson proposes renouncing his SKN citizenship upon release. Olson's counsel represents that he has sought to facilitate Olson's renunciation of his citizenship by contacting the Embassy of St. Kitts and Nevis, but he has received no acknowledgment in response. Def.'s Mot. for Recons. at 12–13, ECF No. 112. Nevertheless, Olson believes he can renounce his citizenship by completing a single page application form, a letter stating his need to renounce with an official supporting document, fees for the application and the certificate of renunciation, his certificate of citizenship, passport photos, and his St. Kitts/Nevis passport. *Id*. at 13 (citing Ex. 18, ECF No. 112-17). But he asserts that "assembling this documentation would be exceptionally difficult if not impossible while [he] is incarcerated." *Id.*

Although the Court does not doubt Olson's counsel's efforts, whether Olson should be released based on his promise to renounce his SKN citizenship comes down to a credibility determination. But his word alone simply does not carry much weight. Olson provides no time frame for how quickly he would be able to renounce is SKN citizenship and, given the evidence cutting against his trustworthiness, the Court cannot rely on any professed willingness to do so.

Ultimately, his SKN citizenship makes the possibility of fleeing a plausible reality—and this cuts squarely in favor of detention. *See, e.g.*, *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee"); *Hong Vo*, 978 F. Supp. 2d at 45 (finding that a defendant's overseas assets and contacts in Vietnam, a country which maintained no extradition treaty with the United States, gave her the ability to evade capture).

### 4. Defendant's Health

Pretrial release may be appropriate when a defendant explains "why his detention would prevent him from obtaining adequate treatment" for his medical conditions. *United States v. Hodge*, 820 F. Supp. 3d 24, 28 (D.D.C. 2026) (quoting *United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009)). This Court has not previously addressed this issue because Olson did not raise his health concerns as a basis for reversing the magistrate's decision to detain him. In his motion for reconsideration, Olson asserts that several unaddressed health issues have developed during, or have been exacerbated by, his time in custody. Namely, he states that he suffers from atrial fibrillation, an enlarged prostate, a hernia condition, bilateral knee osteoarthritis, and infections in his toes and teeth. Def.'s Mot. for Recons. at 4–5, ECF No. 112.

Beginning with the atrial fibrillation, Olson represents that he was diagnosed with this condition before his arrest, and that his symptoms—primarily the sensation of a repeatedly skipped and irregular heartbeat—have worsened and become more frequent while incarcerated. *Id*. at 5. He similarly states that he was diagnosed with an enlarged prostate before his incarceration began, and that this condition has worsened such that he is no longer able to urinate while standing up, is unable to void completely, and is in near-constant physical discomfort as a result. *Id*. His hernia apparently causes an obvious pointed protrusion of a portion of his stomach, visible upon physical

11

examination. *Id*. And he reports that his bilateral knee cartilage is turning into bone due to osteoarthritis, which affects his mobility and forces him to use a walker to get around. *Id*. As for infections, he reportedly has two infected toes and two infected teeth. Def.'s Reply at 3, ECF No. 136. To address these issues, Olson asserts that he "has filed well over a dozen reports regarding his need for medical care and attention," but he alleges that "[h]is complaints have gone unanswered." Def.'s Mot. for Recons. 5, ECF No. 112.

The government, on the other hand, counters by arguing that the Northern Neck Regional Jail, where Olson is detained, is able to meet his medical needs. ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████. And while Olson states that the prison requires him "to fill out a form in order to request medical treatment," Def.'s Mot. for Recons. at 4, ECF No. 112, ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████. The records of his visits with medical staff, which span from May 13, 2025, to April 27, 2026, do not indicate that his health conditions have worsened during his time in prison such that they present new challenges to activities of daily living.

In his reply, however, Olson casts doubt on the government's portrayal of his health needs. In particular, he states that after he filed the present motion, he received referrals to a podiatrist, urologist, orthopedist, dentist and cardiologist, "[n]ot one of [which] has occurred." Def.'s Reply at 3, ECF No. 136.

The Court takes seriously Olson's health concerns, but his medical records do not indicate that his physical condition has drastically changed since his arrest. They do, however, reveal that he has received some treatment and testing for his most serious issues. For example, as Olson himself acknowledges, a doctor in May 2025 proscribed Flomax for his prostate condition. In addition, labs were recently taken to monitor Olson's PSA and a prison physician gave him a referral to a urologist. *Id.* His records further indicate ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

The Court does not discount the possibility that the prison has at times been slow to provide care or that the care provided is less robust relative to the options available outside the prison context. And the Court is mindful that the projected length of time until trial is not only long but also nebulous. Nevertheless, the weight of the other considerations discussed in this opinion marshal in favor of detention.

### D. Danger to the Community

In the detention order, the Court recognized that while the danger-to-the-community factor has "minimal relevance" in cases where the government is requesting detention based on the risk of flight, *see Bikundi*, 47 F. Supp. 3d at 137, the fact that Olson has attempted to tamper with witnesses or otherwise impede the government's investigation further supports his detention. As

at least one court has recognized, obstruction of justice constitutes a type of danger to the community. *See United States v. LaFontaine*, 210 F.3d 125, 134–35 (2d Cir. 2000) (holding that witness tampering in a white-collar case could support a finding of dangerousness under the § 3142(g) factors).

The government has produced excerpts of a conversation between Olson and a potential witness over Signal, an encrypted messaging application, in which Olson engaged in witness tampering. Gov't's Opp'n, Ex. 15, ECF No. 28-1. For example, he assisted in drafting a statement to be provided to the government. *Id.* (suggesting that the witness should say "in writing" that the "counterparty represented that he had the necessary fungible assets set aside and earmarked for the program to which he had committed with us and it was verified by our trusted staff in-country"). He suggested several times that the witness ask for immunity to "delay" the investigation. *Id.* ("[I]f you want to 'delay' things with the IRS, one way to do it is to have your lawyers state to them that you are 'generally supportive' which does not mean anything other than . . . 'if you want to interview [my client], you must provide him immunity' . . . . You really have to get a lawyer to call them and insist on immunity… it's the only way to delay."). He even implied that he would "[w]ithout question" make sure that the witness's legal fees were paid. *Id.* Although Olson couched many of his statements by saying things like he was "in no way offering . . . any advice nor suggesting in any way that [the witness] thwart any efforts by DoJ in any way whatsoever," these communications read as if Olson was attempting to influence the witness. *Id.*

Relatedly, in an email to another potential witness, Olson suggested that a possible buyer of Theia's assets would not want to work with those who cooperated with the investigation. Def.'s Opp'n, Ex. 14, ECF No. 28-1. Using suggestive language, Olson stated the buyer "will likely give opportunity to those who supported him closing and getting everyone paid," while "[c]onversely"

14

those who make it "more difficult to keep [Theia's] core team intact . . . would not be people [the buyer] would want to work with in the future." *Id*. Though qualifying the message by emphasizing that its recipient should follow the advice of counsel, their conscience, and the law, Olson passively stated that "it would be suggested by some that those who get subpoenas from [the lead investigator] exercise their due process rights according to the best and proper way that preserves their potential future with all things that could become very positive." *Id*. The Court views this communication as an obvious attempt to manipulate the potential witness.

Olson offers no new information to explain away his attempts at witness tampering. While the Court does not consider this factor a wholly independent basis for its decision, these facts nonetheless weigh in favor of detention, as the Court previously held.

* * *

In sum, Olson has not presented new information warranting reopening his detention hearing. Meanwhile, the government has demonstrated by a preponderance of the evidence that pretrial detention continues to be appropriate based on the defendant's flight risk.

Accordingly, having reconsidered the evidence and arguments concerning Olson's detention, the Court affirms its prior holding: "The scope of [Olson's] alleged fraudulent activity in connection with the charged offenses, the substantial period of incarceration that he faces if convicted, his unstable situation in Albuquerque and his alleged overseas ties, and his attempt at witness tampering, when considered together, favor pretrial detention under 18 U.S.C. § 3142(f)(2)." Mem. Op. at 11, ECF No. 30. Indeed, it continues to be true that no condition or combination of conditions will reasonably assure the defendant's appearance in court. 18 U.S.C. § 3142(e)(1).

## IV.    CONCLUSION

For the foregoing reasons, Olson shall remain in custody pending trial and his motion for reconsideration will be **DENIED**. A separate Order consistent with this Memorandum Opinion shall issue.

**SO ORDERED.**

Date: _____ 6/15/26 _____

_____
Royce C. Lamberth
United States District Judge

16